UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

\* \* \*

| | |
|---|---|
| DWIGHT MANLEY,<br><br>                    Plaintiff,<br>     v.<br>MGM RESORTS INTERNATIONAL, *et al.*,<br><br>                    Defendants. | Case No. 2:22-cv-01906-MMD-DJA<br><br>ORDER |

**I.   SUMMARY**

Plaintiff Dwight Manley sued Defendants MGM Resorts International, MGM Growth Properties Operating Partnership, LP, and MGM Grand Hotel, LLC (collectively, "Defendants") after Manley was drugged while gaming at Defendants' casino and injured himself in that state, but Defendants failed to provide medical assistance or pause Manley's gaming play. (ECF No. 7 ("FAC").) Before the Court is Defendants' motion to dismiss Manley's negligence and consumer fraud claims.[1] (ECF No. 9 ("Motion").) As explained below, the Court will grant in part and deny in part the Motion.

**II.   BACKGROUND**

The following allegations are adapted from the FAC.

One afternoon in December 2021, Manley, visiting from California, went gambling at the MGM Grand Las Vegas hotel and casino resort ("MGM Grand")—a property owned and managed by Defendants. Manley had frequented Defendants' property as a VIP patron for many years. As a VIP patron, Manley received complementary lodging, courtesy of his assigned casino host, "so that [he] would play table games and enter a poker tournament to be held at MGM Grand." As with other VIP patrons, MGM Grand

---

[1]Plaintiff filed a response (ECF No. 20), and Defendants filed a reply (ECF No. 27).

staff allowed Manley to play on credit, wherein the MGM Grand extended credit to Manley during table play and later had him sign a credit instrument—a "marker"—in the amount of the credit advances, which evidenced his gaming debts. Manley alleges that "the process by which a patron increases his or her credit line is carefully decided by the casino and a patron's credit line is not routinely increased, certainly not in large increments." (ECF No. 7 at 2-4.)

Shortly after arriving and checking in at "The Mansion"—an exclusive luxury villa resort on the MGM Grand premises—Manley went with a friend to the high-limit gaming salon to "gamble[ ] alone at a blackjack table." After sitting down at the blackjack table, Manley ordered a cocktail from the gaming salon's bar and, after tasting the cocktail, remarked that it tasted abnormally bitter and "dirty." Shortly after drinking the cocktail, Manley felt disoriented and "out of it," and during game play he eventually "shattered an ashtray, cut his hand and was bleeding onto the blackjack table's felt." Manley does not recall cutting his hand, and at the time he "did not feel any pain[ ] and was unaware that he was bleeding." After cutting his hand, Manley began "dripping blood on the table," and Defendants, in turn, relocated him to a second blackjack table to continue playing. Defendants "did not seek medical attention" for Manley; instead, they gave Manley's friend bandages to put on Manley's hand in the bathroom before Manley would resume table play. (*Id.* at 4-5.)

Manley then continued playing at the second blackjack table, where he was presented with an application for a temporary increase in his credit limit maximum, known as a "this-trip-only" ("TTO") request. Around this time, Manley's assigned casino host relayed to Manley's friends that other staff had told her that Manley "was acting erratic." Despite the casino host's comment, Defendants "did nothing to stop [Manley] from further gaming play or to otherwise check on his well-being." After Manley lost the additional credit extended to him through the first TTO request, Defendants "again increased [Manley]'s credit limit with a second TTO." Due to his "disoriented" state, Manley also left

approximately $500,000 in gaming chips on the blackjack table, but he did not realize that he had done so. Manley does not recall these events. (*Id.* at 4-5.)

After about three hours of table play, Manley tried to get up from the blackjack table, but he "was so disoriented that he could not stand or walk without assistance." While Manley's friends took him back to his nearby villa, Manley fell multiple times, "sustained severe bruises," and told them that "he felt dizzy and slow" before "collaps[ing]" into bed and sleeping the entire night. Manley woke up the next morning "feeling nauseous and groggy, having almost no recollection of the events from the prior afternoon." Manley then texted his casino host, informing her that he believed he had been drugged the day before and that "something was wrong." Manley also requested that the casino host check the hotel's surveillance tapes "regarding how his first [cocktail] was made" because he suspected that the drink was "spiked." (*Id.* at 5-6.)

Upon his return to California, Manley sought medical assistance for his condition and sought a drug test to determine whether he had in fact been drugged. Subsequent test results "demonstrated the presence of [k]etamine in his system" during his stay on Defendants' premises. Up to this point, Manley had never knowingly consumed ketamine—a powerful, dissociative anesthetic. Thereafter, Manley informed Defendants that he had been drugged, filed a police report, and submitted a written complaint to the Nevada Gaming Control Board. Despite Manley's explanation that he had been drugged while gambling, Defendants nevertheless "deposited a [marker] for $2,000,000 and has continued to demand payment" of an additional $440,000. (*Id.* at 6-7.)

In the FAC, Manley asserts five claims, including negligence and consumer fraud in violation of the Nevada Deceptive Trade Practices Act ("NDTPA"). (ECF No. 1.)

**III.    DISCUSSION**

Relevant to this order, Defendants seek dismissal of the negligence and NDTPA claims. The Court addresses Defendants' Motion as to each challenged claim. The Court then addresses whether it will grant Manley leave to amend any deficient claims.

**A.     Negligence**

Defendants challenge Manley's negligence claim on two grounds. First, they argue the claim fails because Manley has not sufficiently pleaded the duty and causation elements of negligence. (ECF No. 9 at 5-6.) Second, they contend Manley's negligence claim is barred under Nevada's economic loss doctrine. (*Id.* at 6-8.) As explained below, the Court grants in part and denies in part Defendants' Motion as to the negligence claim.

**1.     Duty**

To prevail on a negligence claim under Nevada law, a plaintiff must establish "(1) the existence of a duty of care, (2) breach of that duty, (3) legal causation, and (4) damages." *Klasch v. Walgreen Co.*, 264 P.3d 1155, 1158 (Nev. 2011) (citation omitted). Whether a duty of care exists is a question of law for the Court to resolve. *Butler ex rel. Biller v. Bayer*, 168 P.3d 1055, 1063 (Nev. 2007). Generally, "a landowner owes a duty of reasonable care to entrants for risks that exist on the landowner's property." *Foster v. Wholesale Corp.*, 291 P.3d 150, 152, 156 (Nev. 2012). However, "it is well settled in Nevada that commercial liquor vendors, including hotel proprietors, cannot be held liable for damages related to any injuries caused by the intoxicated person, which are sustained by either the intoxicated patron or a third party." *Rodriguez v. Primadonna Co., LLC*, 216 P.3d 793, 798 (Nev. 2009) (citing *Hamm v. Carson City Nugget, Inc.*, 450 P.2d 358, 359 (Nev. 1969); *Snyder v. Viani*, 885 P.2d 610, 612-13 (Nev. 1994)). "In other words, Nevada subscribes to the rationale underlying the nonliability principle—that individuals, drunk or sober, are responsible for their torts." *Id.* (citing *Hinegardner v. Marcor Resorts*, 844 P.2d 800, 803 (Nev. 1992)).

In the FAC, Manley alleges that because he sustained his injuries while staying on Defendants' premises as an invited guest and patron, Defendants owed Manley a duty of care. (ECF No. 7 at 9.) Specifically, Manley argues Defendants "violated their duties to [Manley] by refusing to properly address [his] incapacitated state while concurrently extending credit and significantly increasing his credit limit, continuing to serve him alcohol, failing to properly respond to him cutting his hand and bleeding on a blackjack

table, and refusing to take any action after their own casino personnel observed him acting erratically." (*Id.*) Defendants counter in pertinent part that they owed no duty of care to Manley because, as a hotel proprietor, they are not liable under Nevada law for injuries caused by intoxicated patrons, including self-injuries. (ECF No. 9 at 6.)

The Court agrees with Defendants, but only to the extent they argue they had no duty to stop serving Manley alcohol once he had become visibly "erratic." (ECF No. 7 at 9.) *See also Rodriguez*, 216 P.3d at 798; *Hamm,* 450 P.2d at 359; *Snyder*, 885 P.2d at 612-13; *see also Mehta v. Victoria Partners*, Case No. 2:21-cv-01493-CDS-VCF, 2023 WL 205758, at *3 (D. Nev. Jan. 17, 2023) (finding the plaintiff's negligence claim "cannot proceed" in part because he failed to plead a duty owed to him by the defendant casino resort—a result of Nevada's commitment to the nonliability principle). To this extent, the Court grants Defendants' Motion on the negligence claim.

In all other respects, however, Manley has sufficiently pleaded the duty element of his negligence claim. The Court can reasonably infer from the FAC that Defendants owed Manley a duty of care in two ways: (1) Manley was an invited guest and patron on Defendants' premises when he sustained his injuries; or (2) the Nevada Gaming Regulations imposed a duty of care upon Defendants The Court can reasonably infer from the FAC that Manley—a VIP patron invited to gamble, eat, imbibe, and lodge at a casino resort owned and managed by Defendants—was an entrant to whom Defendants owed a "general duty of reasonable care . . . regardless of the open and obvious nature of dangerous conditions." *Foster*, 291 P.3d at 155-57.

**2. Causation**

Next, Defendants argue that the negligence claim fails because Manley has not sufficiently pleaded causation between Defendants' alleged misconduct and Manley's physical injuries. (ECF Nos. 9 at 5, 27 at 2-3.) Specifically, they contend Manley has not alleged any facts showing that "Defendants caused [Manley] to purportedly shatter an ashtray and cut his hand," or that one of Defendants' employees caused his drink to be "spiked." (ECF No. 9 at 5.)

Contrary to Defendants' assertion, Manley has sufficiently pleaded causation by alleging the following facts in the FAC. First, while staying at The Mansion at the MGM Grand, Manley ordered his first cocktail—the "spiked" cocktail leading to Manley's intoxication and consequent injuries and losses—"from the bar located in [Defendants'] high limit gaming salon."[2] (ECF No. 7 at 3-4.) Second, after Manley cut his hand on an ashtray and began "dripping blood" on the blackjack table, Defendants "did not seek medical attention" for him; instead, they simply gave Manley's friend band-aids to apply on Manley in the bathroom and then moved Manley to a second blackjack table to continue playing. (ECF Nos. 7 at 5, 20 at 11.) Third, despite Manley's apparent intoxication and "erratic" behavior, Defendants nevertheless issued Manley two credit-limit increases (via TTO requests) "in an amount significantly higher than it ever had extended [Manley] in more than 30 years of the casino/patron relationship." (ECF No. 7 at 6.) And lastly, Manley sustained severe bruises after falling numerous times while attempting to walk back to his villa. (*Id.* at 5-6.) Taken together as true facts, the Court can reasonably infer from the FAC that Manley's physical injuries and gambling losses—all sustained while on Defendants' premises—were reasonably foreseeable consequences of Defendants' actions, even if intentionally carried out by third parties. *See Taylor v. Silva*, 615 P.2d 970, 971 (Nev. 1980) ("A negligent defendant is responsible for all foreseeable consequences proximately caused by his or her negligent act.") (citation omitted); *see also El Dorado Hotel v. Brown*, 691 P.2d 436, 441 (Nev. 1984), *overruled on other grounds by Vinci v. Las Vegas Sands, Inc.*, 984 P.2d 750 (Nev. 1999) (recognizing that "where a third party's intervening intentional act is reasonably foreseeable, a negligent defendant is not relieved of liability," and that "the question of foreseeability is generally one for the jury") (citation omitted).

---

[2]For purposes of this Motion, the Court assumes that an employee working for Defendants prepared and potentially "spiked" the injurious cocktail at the bar.

### 3. Economic Loss Doctrine

Defendants next argue that Manley's negligence claim is barred by the economic loss doctrine. (ECF Nos. 9 at 6-8, 27 at 5-6.) Manley, they contend, seeks damages "that have nothing to do with his purported physical injuries"; he instead "seeks to recover his gambling losses" that "sound in contract." (ECF Nos. 9 at 8, 27 at 5.) Manley counters that he also alleges physical injuries (*i.e.*, cut hand, severe bruising) that accompany his alleged gambling losses. (ECF No. 20 at 15-16.)

"The economic loss doctrine marks the fundamental boundary between contract law, which is designed to enforce the expectancy interests of the parties, and tort law, which imposes a duty of reasonable care and thereby encourages citizens to avoid causing physical harm to others." *Calloway v. City of Reno*, 993 P.2d 1259, 1263 (Nev. 2000), *overruled on other grounds by Olson v. Richard*, 89 P.3d 31 (Nev. 2004) (citation and quotations omitted). "In Nevada, the doctrine bars unintentional tort claims when a plaintiff seeks 'purely economic losses.'" *Mehta*, 2023 WL 205758, at *3 (quoting *Calloway*, 993 P.2d at 1259). "Purely economic loss is a term of art that does not refer to all economic loss but only to economic loss not recoverable as damages in a normal contract suit." *Progressive Ins. Co. v. Sacramento Cnty. Coach Showcase*, Case No. 2:07-cv-01087-PMP-LRL, 2009 WL 1871947, at *4 (D. Nev. June 29, 2009) (citing *Giles v. Gen. Motors Acceptance Corp.*, 494 F.3d 865, 877-78 (9th Cir. 2007)). A plaintiff thus cannot recover economic losses "absent personal injury or damage to property other than the defective entity itself." *Calloway*, 993 P.2d at 1267 (citations omitted).

Here, the economic loss doctrine does not apply to, and thus does not bar, Manley's negligence claim. Manley does not merely seek economic losses (*i.e.*, gambling losses) that he could have recovered under contract law; he also alleges specific personal injuries—a cut hand, severe bruises, nausea, and grogginess—that resulted from Defendants' "fail[ure] to properly respond to him cutting his hand and bleeding on a blackjack table" during his ketamine-induced blackout. (ECF No. 7 at 5-6, 9.) Manley specifically attributes his physical injuries to Defendants' decisions to (1) simply give

Manley's friend bandages to apply on Manley in the bathroom and (2) relocate Manley to another blackjack table to resume play despite his injuries. (*Id.* at 5-6.) Accordingly, accepting Manley's allegations as true and drawing inferences in his favor, the Court finds that the economic loss doctrine does not bar his negligence claim.

In sum, the Court first finds that Manley's negligence claim fails only to the extent that Manley alleges Defendants had an affirmative duty to stop serving him alcohol once he became visibly intoxicated. However, the Court will otherwise allow the negligence claim to proceed against Defendants. Accordingly, the Court grants in part and denies in part the Motion on Manley's negligence claim.

### B. Consumer Fraud in Violation of the NDTPA

Relevant to this order, Defendants urge the Court to dismiss Manley's NDTPA claim for two reasons. First, the NDTPA is inapplicable here because the law does not encompass gambling-related credit instruments as "consumer goods or services" that form the basis of Defendants' alleged "deceptive trade practice." (ECF No. 9 at 8-9.) Second, even if the NDTPA applies here, Manley fails to sufficiently plead this claim with particularity, as required under Federal Rule of Civil Procedure 9(b). (ECF Nos. 9 at 12-13, 27 at 8 n.3.) Although the NDTPA likely applies, the Court agrees that Manley nevertheless fails to plead consumer fraud with particularity.

Under the NDTPA, a person engages in a "deceptive trade practice" if, as Manley alleges here, he or she "[k]nowingly takes advantage of another person's inability reasonably to protect his or her own rights or interests in a consumer transaction when such an inability is due to illiteracy, or to a mental or physical infirmity or another similar condition which manifests itself as an incapability to understand the language or terms of any agreement." NRS § 598.092(14). Such a deceptive trade practice can form the basis of a private right of action for "any person who is a victim of consumer fraud." NRS §§ 41.600(1), (2)(e); *see also Sears v. Russell Road Food & Bev., LLC*, 460 F. Supp. 3d 1065, 1070 (D. Nev. 2020); *Nev. Power Co. v. Eighth Jud. Dist. Ct.*, 102 P.3d 578, 583 n.7 (Nev. 2004) (per curiam). To state a claim under the NDTPA, a plaintiff must allege

"that (1) an act of consumer fraud by the defendant (2) caused (3) damage to the plaintiff." *Picus v. Wal-Mart Stores, Inc.*, 256 F.R.D. 651, 658 (D. Nev. 2009).

### 1. The NDTPA's Applicability to Gambling-Related Credit Instruments

Defendants seek dismissal of Manley's NDTPA claim because the statute itself does not govern Defendants' alleged actions. First, they argue that the NDTPA is inapplicable because gambling-related credit instruments—here, Defendants' extensions of credit to Manley, evidenced by TTO requests and markers—are not "consumer goods or services" underlying "deceptive trade practices." (ECF No. 9 at 8-9.) This argument is unpersuasive. While casino markers are contractually enforceable as credit instruments under Nevada law, *see Zoggolis v. Wynn Las Vegas, LLC*, 768 F.3d 919, 923-24 (9th Cir. 2014); *Morales v. Aria Resort & Casino, LLC*, 995 F. Supp. 2d 1176, 1180-81 (D. Nev. 2014), Defendants cite no authorities addressing whether the NDPTA encompasses extensions of credit for gambling purposes as consumer goods or services.[3] Without such authorities, and in viewing the facts and drawing inferences in Manley's favor, the Court assumes at this stage that markers and other gambling-related credit instruments are consumer goods or services to which the NDTPA applies.

Next, Defendants appear to argue that two statutes bar Manley from raising a NDTPA claim. First, under NRS § 598.0955(a), the NDTPA explicitly does not apply to "[c]onduct in compliance with the orders or rules of, or a statute administered by federal, state or local government agency." (ECF No. 27 at 7-8 & n.2.) Defendants contend that Nevada law expressly permits casinos to execute credit instruments. Thus, allowing Manley's NDTPA claim to proceed "would conflict with Nevada's longstanding gaming regulatory scheme." (ECF Nos. 9 at 9, 27 at 7-8.) Second, they argue that Manley must

---

[3]Defendants misconstrue a holding in *Gibilterra v. Aurora Loan Servs., LLC*, Case No. 2:12-cv-685 JCM (VCF), 2013 WL 4040820 (D. Nev. Aug. 6, 2013), wherein a court in this district dismissed a plaintiff's NDTPA claim because subsequent assignments of a deed of trust were real estate transactions that "d[id] not relate to a consumer transaction." *Id.* at *3. *Gibilterra* is inapposite here because this case involves gambling-related credit instruments, not real estate loans or other transactions involving real property.

1 first assert and exhaust his "claims recovering gambling losses" before the Nevada
2 Gaming Control Board because it has "exclusive jurisdiction" under NRS § 463.361. (ECF
3 No. 27 at 6.) On one hand, the Nevada Supreme Court does not appear to have squarely
4 addressed the issue of whether NRS § 598.0955(a) bars a patron's NDTPA claim
5 involving a casino's use of markers and other credit instruments to evidence gaming
6 debts. Even so, Ninth Circuit precedent clearly states that a patron's claims involving
7 gaming debts evidenced by a marker—a credit instrument under Nevada law—"do not
8 trigger the Gaming Control Board's exclusive jurisdiction over 'a gaming debt that is not
9 evidenced by a credit instrument.'" *Zoggolis*, 768 F.3d at 925 (quoting NRS § 463.361(2)).
10 As such, Manley may assert and resolve his NDTPA claim—stemming in part from the
11 execution of credit instruments evidencing a gaming debt—"in the same manner as any
12 other dispute involving the enforceability of a negotiable instrument." (ECF No. 20 at 18.)
13 *See also id.* (citation omitted).

### 2.   Rule 9(b)'s Heightened Pleading Standard

Defendants alternatively argue that even if the NDTPA applies to the TTO requests and executed markers, Manley's claim fails because it is not pleaded with particularity, as required under Federal Rule of Civil Procedure 9(b). (ECF No. 9 at 12-13.) Specifically, they argue, Manley "does not allege who with MGM was (1) aware of his purported condition and/or (2) presented him with the TTO Requests and credit instruments." (*Id.* at 12.) Defendants also point out that Manley "fails to allege the precise amounts of the TTO requests and credit instruments executed by [Manley]." (*Id.* at 13.) Manley does not appear to dispute that Rule 9(b) governs his NDTPA claim; he instead asserts that the FAC satisfies Rule 9(b)'s heightened pleading requirements. (ECF No. 20 at 9, 18.)

Rule 9(b) "applies where a plaintiff alleges fraud," *Destfino v. Reiswig*, 630 F.3d 952, 958 (9th Cir. 2011), and requires a plaintiff to "state with particularity the circumstances constituting fraud," Fed. R. Civ. P. 9(b). Rule 9(b) serves to (1) provide defendants with adequate notice, (2) deter plaintiffs from using the complaint as a fishing expedition, (3) protect those whose reputations would be harmed by being subject to

fraud charges, and (4) prevent plaintiffs from "'unilaterally imposing upon the court, the parties and society enormous social and economic costs absent some factual basis.'" *In re Stac Elecs. Sec. Litig.*, 89 F.3d 1399, 1405 (9th Cir. 1996) (quoting *Semegen v. Weidner*, 780 F.2d 727, 731 (9th Cir. 1985)). Under Rule 9(b), a plaintiff must provide the "who, what, when, where, and how" of the alleged fraudulent misconduct. *Vess v. Ciba-Geigy Corp. USA*, 317 F.3d 1097, 1106 (9th Cir. 2003). This requires "*more* than the neutral facts necessary to identify the transaction. The plaintiff must set forth what is false or misleading about a statement, and why it is false." *Id.* (citation and quotations omitted). "The standard can be relaxed when the facts of fraud are in the defendant's exclusive control, but the plaintiff must still state the 'factual basis for the belief.'" *Motogolf.com, LLC v. Top Shelf Golf, LLC*, 528 F. Supp. 3d 1168, 1174 (D. Nev. 2021) (quoting *Neubronner v. Milken*, 6 F.3d 666, 672 (9th Cir. 1993)).

The Court agrees that, in addition to Rule 8's pleading requirements, Manley's NDTPA claim is subject to Rule 9(b)'s heightened pleading standard because it sounds in fraud. *See id.* (applying Rule 9(b) to plaintiff's NDTPA claim); *see also Martinez v. MXI Corp*, Case No. 3:15-cv-00243-MMD-VPC, 2016 WL 951430, at *5 (D. Nev. Mar. 9, 2016) (determining that "Rule 9(b) governs a consumer fraud claim").

The Court further agrees that Manley fails to plead his NDTPA claim with particularity. The fraud underlying this claim is Defendants' act of "knowingly taking advantage of Plaintiff's [ketamine-induced] condition and entering into transactions with him for significant amounts of money while their own agents considered him to be acting erratically." (ECF No. 7 at 10.) The Nevada legislature has deemed such knowingly manipulative conduct inherently fraudulent under NRS § 598.092(14). To be sure, the identities of the specific MGM employees who provided the various TTO requests and credit instruments to Manley are likely facts currently under Defendants' exclusive control. (ECF No. 9 at 12.) *See also Motogolf.com, LLC*, 528 F. Supp. 3d at 1174.

However, Manley has neither consistently nor adequately alleged the facts involving the quantity and the amounts of the TTO requests and credit instruments that

11

are the crux of his consumer fraud claim. True enough, Manley sufficiently identifies two TTO requests (*i.e.*, "application[s] for a temporary increase in [a patron's] credit limit maximum") that Defendants presented to Manley after he had become visibly intoxicated and had cut his hand. (ECF No. 7 at 5.) That said, Manley does not allege any specific money amounts for each TTO request. Manley instead alleges that Defendants "deposited a credit instrument for $2,000,000" and demands payment of an additional $440,000. (*Id.* at 7.) It is unclear whether Manley's alleged TTO requests amounted to the "additional sum" of $440,000. (*Id.*) Moreover, it is unclear how many credit instruments were executed during Manley's ketamine-induced episode. On one hand, Manley's consumer fraud claim alleges that Defendants "presented him credit instruments" after approving two TTO requests.[4] (*Id.* at 10.) But Manley also alleges in the FAC that Defendants had Manley execute only *one* credit instrument "associated with the TTO increases." (*Id.* at 5.) Because questions exist as to how many credit instruments Manley executed in total, it is also unclear whether the $2,000,000 credit instrument deposited by Defendants encompasses all or one of the challenged transactions.

Considering these deficiencies in the FAC, the Court grants Defendants' Motion as to the NDTPA claim and declines to reach Defendants' argument that Manley failed to plead a legally cognizable injury under the statute. The NDTPA claim is therefore dismissed without prejudice.

C.   **Leave to Amend**

Plaintiff requests leave to amend if the Court dismisses any of his claims. (ECF No. 20 at 20 n.2.) The Court has discretion to grant leave to amend and should freely do so "when justice so requires." Fed. R. Civ. P. 15(a); *see also Allen v. City of Beverly Hills*, 911 F.2d 367, 373 (9th Cir. 1990). Nonetheless, the Court may deny leave to amend if it will cause: (1) undue delay; (2) undue prejudice to the opposing party; (3) the request is made in bad faith; (4) the party has repeatedly failed to cure deficiencies; or (5) the

---

[4]The allegations specifically underlying Manley's declaratory relief claim also assert that Defendants had him execute multiple credit instruments, not just one. (ECF No. 7 at 7-8.)

amendment would be futile. *See Leadsinger, Inc. v. BMG Music Publ'g*, 512 F.3d 522, 532 (9th Cir. 2008).

Although Manley has previously amended his complaint, amendment is unlikely to be futile or cause undue delay or prejudice. The Court thus finds leave to amend appropriate with respect to Manley's NDTPA claim. Manley must file his second amended complaint containing amended allegations against Defendants within 15 days.

## IV.    CONCLUSION

The Court notes that the parties made several arguments and cited to several cases not discussed above. The Court has reviewed these arguments and cases and determines that they do not warrant discussion as they do not affect the outcome of the motion before the Court.

It is therefore ordered that that Defendants' partial motion to dismiss (ECF No. 9) is granted in part and denied in part. With respect to the negligence claim, the motion to dismiss is granted only to the extent that Defendants argue they had no affirmative duty to stop serving Manley alcohol once he had become visibly "erratic." The motion to dismiss is also granted with respect to Manley's consumer fraud claim. Otherwise, the motion is denied.

It is further ordered that Manley has leave to file an amended complaint to assert his NDTPA claim if he is able to cure the deficiencies identified in this order. Manley has 15 days to file his amended complaint. Failure to do so will result in dismissal of the consumer fraud claim with prejudice.

DATED THIS 30th Day of May 2023.

MIRANDA M. DU
CHIEF UNITED STATES DISTRICT JUDGE