NICHOLAS J. SANTORO, ESQ.
Nevada Bar No. 532
JASON D. SMITH, ESQ.
Nevada Bar No. 9691
**HOLLEY DRIGGS**
300 South Fourt Street, Suite 1600
Las Vegas, Nevada 89101
Tel.: (702) 791-0308 / Fax: (702) 791-1912
Email: nsantoro@nevadafirm.com
       jsmith@nevadafirm.com

*Attorneys for Plaintiff*

**UNITED STATES DISTRICT COURT**

**DISTRICT OF NEVADA**

| | |
|---|---|
| DWIGHT MANLEY,<br><br>　　　　　　　Plaintiff,<br><br>v.<br><br>MGM RESORTS INTERNATIONAL; MGM GRAND HOTEL, LLC,<br><br>　　　　　　　Defendants. | Case No.: 2:22-cv-01906-MMD-DJA<br><br>**SECOND AMENDED COMPLAINT**<br><br>DEMAND FOR JURY TRIAL |

Plaintiff DWIGHT MANLEY ("*Plaintiff*"), by and through his undersigned counsel, and for his Second Amended Complaint ("*Complaint*") against MGM RESORTS INTERNATIONAL and MGM GRAND HOTEL, LLC, alleges as follows:

**PARTIES, JURISDICTION, AND VENUE**

1.　Plaintiff an individual who resides in the state of California.

2.　Upon information and belief, Defendant MGM RESORTS INTERNATIONAL ("*Company*") is a Delaware corporation registered to do business and with its principal place of business in Clark County, Nevada.

3.　Upon information and belief, Defendant MGM GRAND HOTEL, LLC ("*MGM Grand*") is a Nevada limited liability company registered to do business and with its principal place of business in Clark County, Nevada. Collectively, the Company and MGM Grand are hereinafter

referred to as "**MGM**".

4. This Court has diversity jurisdiction over the instant dispute pursuant to 28 USC 1332.

5. The amount in controversy is in excess of $75,000.00, exclusive of costs, interest and attorneys' fees.

6. There is complete diversity among the parties; Plaintiff is not a resident or domiciled in the same state as any Defendant in this action.

## GENERAL ALLEGATIONS

7. Plaintiff incorporates by reference all preceding paragraphs of this Complaint as though fully set forth herein.

8. Upon information and belief, as part of its global portfolio, the Company owns the casino resort commonly referred to as the MGM Grand Las Vegas.

9. Upon information and belief, the Company conducts its business operations at MGM Grand Las Vegas by and through MGM Grand.

10. Upon information and belief, MGM Grand employs the staff and employees at the MGM Grand Las Vegas who interacted with Plaintiff in the events described in more detail below.

11. MGM holds itself out to the public as endorsing Responsible Gaming. In fact, MGM's credit applications expressly state as much.

12. As one example, Plaintiff's Marker Limit Application to the Company expressly states that "MGM Resorts International and each of its subsidiaries and affiliates ("MGMRI") ENDORSES RESPONSIBLE GAMING…." (capitalized emphasis in original).

13. As another example, Plaintiff's Market Limit Increase Request for Nevada Properties also expressly states that "MGM RESORTS INTERNATIONAL AND EACH OF ITS SUBSIDIARIES ENDORSES RESPONSIBLE GAMING…." (capitalized emphasis in original).

14. From approximately 1990 to December 2021, Plaintiff had a long-standing relationship with MGM (including at its various casino properties in Las Vegas, NV) as a patron of the casino resort and a hotel guest.

15. Because of the level of gaming play by Plaintiff over the long history of his relationship with MGM, MGM treated Plaintiff as a VIP-level patron.

16. In connection with such status, from time to time, MGM coordinated and provided Plaintiff's travel to-and-from the MGM Grand Las Vegas without charge to Plaintiff to maintain his business and ensure his gaming play at their casino resort.

17. Plaintiff's level of gaming play allowed him privileges generally only permitted to certain high level, VIP casino patrons whereby MGM permitted Plaintiff to play on credit.

18. More specifically, from time to time, pursuant to written credit applications, MGM allowed Plaintiff to take monetary advances while gambling, and before signing a credit instrument (also referred to as a "*marker*,") in the amount of such credit advances.

19. The practice of advancing certain casino patrons credit while gambling and before a marker is signed is referred to as "rim credit" or "credit on the rim", which is well-established in the Nevada casino industry.

20. Upon information and belief, the process by which a patron increases his or her credit line is carefully decided by the casino and a patron's credit line is not routinely increased, certainly not in large increments.

21. Upon information and belief, an increase in a patron's credit line (especially one for a long-standing patron like Plaintiff) is normally granted (if at all) in minimal increments from the prior credit line maximum.

22. In or about November 2021, Plaintiff's assigned casino host from MGM contacted him to invite him to travel to Las Vegas to stay at the MGM Mansion.

23. Plaintiff had an approximate five-year business relationship with this assigned casino host, Vanessa Reboton.

24. Plaintiff was often provided complimentary lodging by MGM including at the MGM Mansion, a luxury, high-end hotel property located on the premises.

25. On December 10, 2021, MGM provided complimentary transportation for Plaintiff, his girlfriend, and three friends to travel from Orange County, CA to Las Vegas, NV via private

plane and luxury cars transport upon arrival.

26. MGM provided Plaintiff and his guests complimentary lodging at the Premises from December 10 – 12, 2021 so that Plaintiff would play table games and enter a poker tournament to be held at MGM Grand Las Vegas.

27. Plaintiff arrived at the MGM Mansion at approximately 1:15 p.m. on Friday December 10, 2021.

28. From the time Plaintiff boarded the private airplane in Orange County, CA at approximately 11:45 a.m. until Plaintiff collapsed as explained in more detail below, all food and drink that Plaintiff consumed was provided by MGM and/or its representatives or agents.

29. Immediately, after checking into his villa, Plaintiff arrived in the MGM Mansion high limit gaming salon at approximately 1:45 p.m.

30. Plaintiff's entire gaming session in the MGM Mansion high limit salon was approximately three (3) hours or less (from approximately 1:45 p.m. to approximately 4:45 p.m.). Plaintiff gambled alone at a blackjack table the entire session of his gaming play.

31. Shortly after first sitting down at a blackjack table, Plaintiff ordered an Old-Fashioned cocktail from the bar located in the high limit gaming salon.

32. Immediately upon tasting this first cocktail that was delivered to Plaintiff at approximately 1:54 p.m., he remarked that the cocktail tasted bitter.

33. One of Plaintiff's friends ordered Plaintiff a second cocktail as he nearly finished the first one at approximately 2:21 p.m., and Plaintiff approached the bar to ask them to not make the second drink the same as the first because the first one tasted dirty and bitter.

34. Upon information and belief, Plaintiff was drugged with ketamine, which as described in more detail below, led to his complete incapacity.

35. Shortly after consuming the first Old Fashioned, Plaintiff felt disoriented and "out of it." Upon information and belief, during Plaintiff's gaming play, he shattered an ashtray at approximately 4:02 p.m., cut his hand and bled onto the blackjack table's felt. Plaintiff does not recall cutting his hand, did not feel any pain, and was unaware that he was bleeding. Ketamine is

well known as a tranquilizer commonly used by veterinarians to sedate animals.

36. MGM noticed Plaintiff bled onto on the blackjack table felt and, in response, MGM moved Plaintiff to another blackjack table to continue his gaming play at approximately 4:07 p.m. MGM did not seek medical attention for Plaintiff, instead providing his friend with band-aids to apply to Plaintiff in the men's room before resuming his play at approximately 4:09 p.m.

37. Upon information and belief, Plaintiff was then presented and executed two separate applications for a temporary increase in his credit limit maximum (referred to as a "**TTO**" or "*this trip only*" request).

38. During Plaintiff's gaming play, his assigned casino host, Vanessa Reboton, spoke to Plaintiff's friends and commented that she was told by MGM pit personnel that Plaintiff "was acting erratic."

39. MGM did nothing to stop Plaintiff from further gaming play or to otherwise check on his well-being despite its casino host expressly commenting upon his "erratic" behavior.

40. Upon information and belief, MGM presented Plaintiff two separate TTO requests *after* pit personnel commented upon Plaintiff's erratic behavior and *after* he cut his hand on an ashtray.

41. More specifically, upon information and belief, MGM presented Plaintiff a TTO request at 4:26 p.m. and another TTO request at 4:36 p.m.

42. All three TTO requests from December 10, 2021 (the date in question) identify that Vanessa Reboton (Plaintiff's casino host, the same person who was informed by MGM pit personnel that Plaintiff was acting "erratic") signed as the "witness" to Plaintiff's TTO requests with the handwritten title "marketing exec."

43. The first TTO request produced by MGM indicates that Plaintiff's credit limit went from $0 to $2 Million[1], the second TTO request indicates Plaintiff's credit limit went from $2 Million

---

[1] Prior to December 10, 2021, Plaintiff is informed and believes his credit limit was $1 Million. Thus, the first TTO request appears to be an error by MGM since he already had a $1 Million credit limit in place.   MGM is in control of the documents and information to explain the discrepancy and/or apparent error in this first TTO request document.

- 5 -

to $3 Million, and the third TTO request indicates Plaintiff's credit limit went from $3 Million to $3.5 Million.

44. The specific information about who from MGM approved the increased credit limits and details of such requests from pit personnel are within MGM's exclusive knowledge, custody and control, and have not been identified to Plaintiff as of the date of this Second Amended Complaint.

45. Similarly, the identity of the MGM representative who presented the TTO requests to Plaintiff for signature is within the exclusive knowledge, custody and control of MGM, but the foregoing has been specified by Plaintiff to the full extent possible as of the date of this Second Amended Complaint.

46. Upon information and belief, the two TTO requests signed by Plaintiff after he shattered an ashtray and cut his hand were in the aggregate amount of $1.5 Million dollars (the second and third TTO requests which purportedly moved his credit limit from $2 Million to $3.5 Million in a matter of less than thirty minutes after MGM moved Plaintiff to a new blackjack table. Upon information and belief, Plaintiff executed the first TTO request (from $0 to $2 Million) prior to cutting his hand on the shattered ashtray but after he began feeling disoriented and "out of it" as described above.

47. Upon information and belief, Plaintiff lost the additional credit extended to him and does not recall asking his casino host to increase his credit limit maximum.

48. At or about 4:45 p.m., Plaintiff is informed and believes he told his friends they would leave MGM and intended to travel (by car arranged by MGM) to the Venetian.

49. Plaintiff does not recall playing at the second blackjack table, requesting the TTO increases, executing TTO increase documents, and also does not recall executing a credit instrument associated with the TTO increases.

50. Upon getting up from the blackjack table, Plaintiff's friends quickly realized something was seriously wrong with Plaintiff and took him back to his villa, keeping him from leaving the hotel (instead of traveling to the Venetian). Plaintiff was so disoriented that he could not stand or walk without assistance.

51. Plaintiff's friends needed to assist getting him back to his villa, and he fell multiple times on his way back to the villa and sustained severe bruises.

52. Plaintiff remarked to his friends that he felt dizzy and slow. Shortly after being assisted into his bed, Plaintiff collapsed shortly after 5:15 p.m. for the night.

53. Plaintiff awoke the next morning feeling nauseous and groggy, having almost no recollection of the events from the prior afternoon. Plaintiff sent a text message to his casino host in the morning of December 11, 2021, asking her what happened the prior afternoon and informing her that he believed he had been drugged and that something was wrong. Plaintiff's casino host responding by recommending Plaintiff to go get an IV drip treatment (a hydration treatment sometimes used by people to help with a perceived hangover). Plaintiff further responded by requesting that his casino host check the surveillance tapes regarding how his first Old Fashioned was prepared as Plaintiff specifically suspected that his drink was "spiked".

54. Upon Plaintiff's return to California, he immediately sought medical assistance for his condition.

55. Plaintiff later was required to grow out his hair in order to submit hair samples to a medical lab where the hair samples were tested. The test results demonstrated the presence of Ketamine in his system during the time period of the aforementioned gambling at MGM.

56. Upon information and belief, Ketamine is a dissociative anesthesia drug that can cause sedation, reduced sensation of pain, short term memory loss, incapacitation, and hallucinations.

57. Plaintiff has never knowingly consumed Ketamine in his entire life and did not knowingly consume Ketamine on or before December 10, 2021. Plaintiff's life was placed in danger by the malicious and surreptitious spiking of his Old Fashioned cocktail with Ketamine.

58. In the course of less than three hours and despite Plaintiff's condition, MGM increased Plaintiff's credit limit and extended him credit in an amount significantly higher than it ever had extended Plaintiff in more than 30 years of the casino/patron relationship.

59. Plaintiff promptly provided notice to MGM that he believed he had been drugged and took steps to disaffirm and disavow the obligations created by markers and marker increases that were executed while he had been drugged and lacked capacity. Plaintiff sent MGM two evidence preservation demands on Monday December 13, 2021 regarding Plaintiff's aforementioned trip from December 10 – 12, 2021 "in anticipation of potential litigation." Plaintiff has since sent an additional evidence preservation demand to MGM. Plaintiff was unknowingly and involuntarily under the influence of Ketamine during time periods of his gaming on December 10, 2021 and lacked capacity to enter into any requests for additional credit advances or credit instruments.

60. Plaintiff notified MGM of his condition immediately after he awoke on December 11, 2021 as noted above. Plaintiff further notified the appropriate authorities (including filing a police report regarding the above-referenced drugging) and submitted a written complaint to the Nevada Gaming Control Board.

61. MGM has failed and refused to acknowledge Plaintiff's explanation and, instead, deposited a credit instrument for $2,000,000 and has continued to demand payment of an additional sum of approximately Four Hundred Forty Thousand Dollars ($440,000).

62. More specifically, Plaintiff is informed and believes that he signed two credit instruments (or Markers) on December 10, 2021, one for $2 Million and one for $1 Million. The specifics as to the time and order that Plaintiff signed these Markers are in the knowledge, custody and control of MGM.

63. As of approximately April 8, 2022, Plaintiff is further informed and believes that MGM believed Plaintiff's account balance to be approximately $2,440,000.00 so MGM deposited the $2 Million Marker, bringing the purported account balance to $440,000.00.

64. Plaintiff is informed and believes that, after April 8, 2022, since MGM had an executed $1 Million Marker, but only a purported $440,000.00 balance owed (which Plaintiff disputes), MGM did not deposit the $1 Million Marker because it did not correlate to the amount MGM considered due and owing from Plaintiff as of that date.

65. The specific identity of the person or persons who deposited the $2 Million Marker

on or about April 8, 2022 is in the exclusive knowledge, custody and/or control of MGM.

66. This was the first time in an approximate 30-year long relationship that MGM ever deposited a credit instrument related to Plaintiff's gaming play.

## **FIRST CLAIM FOR RELIEF**

### **(Declaratory Relief)**

67. Plaintiff repeats and realleges all preceding paragraphs of this Complaint and by this reference incorporate the same as though fully set forth herein.

68. A case in controversy now exists between Plaintiff and MGM. This controversy is between parties whose interests are adverse. Plaintiff did not have legal capacity to enter into the credit limit increase requests or the credit instruments as set forth in more detail above.

69. Plaintiff was under the influence of Ketamine and was incapacitated as a result.

70. After awakening the next morning, Plaintiff notified MGM that he had been drugged and something was wrong.

71. Despite such lack of capacity and notice to MGM, MGM has failed and refused to acknowledge Plaintiff's condition.

72. If MGM's conduct is permitted to continue in this manner, it will continue to substantially injure Plaintiff and potentially have material adverse effects on casino patrons in Nevada.

73. Under NRS Chapter 30, Plaintiff is entitled to declaratory relief concerning the rights and duties of the parties with respect to two credit limit increase requests and the credit instruments, as well as MGM's conduct described herein, specifically, that:

    a. MGM failed to act responsibly toward Plaintiff when its casino host (with a long-tenured relationship with Plaintiff) identified "erratic" behavior and when Plaintiff was bleeding on the gaming table without even realizing it;

    b. MGM failed to act responsibly toward Plaintiff when, in the face of such observation, continued to allow him to gamble, did not seek medical attention for him,, twice increased his credit limit, and had him execute credit instruments;

- 9 -

    c. Plaintiff was unable to understand in a reasonable manner the nature and consequence of his actions and the transactions during this timeframe, as MGM knew or should have known;

    d. Plaintiff was unable to act in a reasonable manner in relation to the above-described transactions;

    e. Plaintiff lacked capacity to contract when signing the two TTO credit limit increases described above;

    f. Plaintiff lacked capacity to contract when he executed credit instruments;

    g. The above-referenced TTO credit limit increase requests and the credit instruments are invalid and/or unenforceable as a matter of law and, if necessary, rescinded; and

    h. Plaintiff is entitled to an award of damages and/or equitable relief (including without limitation setoff and/or offset) as a result of MGM's conduct described herein.

74. Plaintiff has, by reason of the foregoing, been required to utilize the services of an attorney and is entitled to recover his attorneys' fees and costs from MGM.

## SECOND CLAIM FOR RELIEF

### (Negligence)

75. Plaintiff repeats and realleges all preceding paragraphs of this Complaint and by this reference incorporate the same as though fully set forth herein.

76. MGM has a duty of care toward Plaintiff as an invited guest on the Premises as well as duties to Plaintiff as a gaming patron pursuant to Nevada Gaming Regulations.

77. By their conduct described in more detail above, MGM violated their duties to Plaintiff by refusing to properly address Plaintiff's incapacitated state while concurrently extending credit and significantly increasing his credit limit, failing to properly respond to him cutting his hand and bleeding on a blackjack table, and refusing to take any action after their own casino personnel observed him acting erratically.

78. As a direct and proximate result of the foregoing breaches of duties, Plaintiff suffered physical injuries and economic losses.

79. As a direct and proximate result of MGM's breaches of their duties described above, Plaintiff has been damaged in an amount in excess of $75,000, the exact amount to be proven at the trial of this matter.

80. Plaintiff has, by reason of the foregoing, been required to obtain the services of an attorney and is entitled to recover his reasonable attorneys' fees and costs from MGM.

### THIRD CLAIM FOR RELIEF

### (Unfair Trade Practices/Deceptive Trade Practices)

81. Plaintiff repeats and realleges all preceding paragraphs of this Complaint and by this reference incorporate the same as though fully set forth herein.

82. Through their actions described above, MGM has engaged in acts and conduct that constitute unfair trade practices and deceptive trade practices pursuant to NRS Chapter 598.

83. Plaintiff has a private right of action pursuant to NRS 41.600.

84. MGM is in the business of providing entertainment to patrons which includes gaming. MGM engages in transactions with patrons whereby they offer complimentary and/or discounted transportation and lodging to Plaintiff in consideration for Plaintiff deciding to gamble and lodge at MGM's properties.

85. MGM's conduct constituted unfair and deceptive trade practices by knowingly taking advantage of Plaintiff's condition and entering into transactions with him for significant amounts of money while their own agents considered him to be acting erratically.

86. More specifically, MGM was aware of Plaintiff's condition and, instead of taking action to allow him to obtain medical treatment and/or to fulfill its duty to promote and effectuate responsible gaming, MGM presented Plaintiff with two credit limit increase agreements which raised his credit limit significantly higher than it ever had been in more than 30 years of their relationship, and presented him credit instruments, all but ensuring MGM's opportunity to obtain additional monies from Plaintiff.

87. As noted above, while MGM pit personnel were aware of Plaintiff's erratic behavior, MGM presented Plaintiff with two separate credit limit increase agreements which raised his credit

- 11 -

limit in amount of at least $1.5 Million (Plaintiff contends that the his credit limit was increased $2.5 Million as aforesaid), all in a period of approximately 30 minutes after MGM noticed Plaintiff bled onto the blackjack table felt and MGM had moved him to a new table to continue gambling.

88.  As further noted above, MGM's casino host assigned to Plaintiff (and who had an approximate five-year relationship as his casino host) executed the TTO agreements as "witness" to Plaintiff's signature under the title "marketing exec."

89.  During the entire course of Plaintiff's gaming session described herein, MGM presented two credit instruments to Plaintiff (one in the amount of $2 Million and one in the amount of $1 Million). The specifics of when MGM presented these credit instruments to Plaintiff, who presented them to Plaintiff, and how they were maintained prior to MGM depositing the $2 Million credit instrument are in the exclusive knowledge, custody and control of MGM.

90.  As a direct and proximate result of MGM's, Plaintiff has been damaged in an amount in excess of $75,000, the exact amount to be proven at the trial of this matter.

91.  Plaintiff is entitled to treble damages pursuant to NRS 598.0999(3).

92.  Plaintiff has, by reason of the foregoing, been required to obtain the services of an attorney and is entitled to recover their reasonable attorneys' fees and costs from MGM.

## FOURTH CLAIM FOR RELIEF

**(Unjust Enrichment)**

93.  Plaintiffs repeat and reallege all preceding paragraphs of this Complaint and by this reference incorporate the same as though fully set forth herein.

94.  Plaintiff conferred a benefit upon MGM by choosing to patronize MGM's property during his December 10-12, 2021 trip, such benefit which was conferred with the knowledge of, and/or with the consent of MGM.

95.  MGM accepted the benefits by receiving Plaintiff's business and his agreement to play table games at MGM, including the $2,000,000 it obtained when it deposited Plaintiff's credit instruments despite being on express notice of Plaintiff's erratic behavior and incapacity.

96.  Notwithstanding Plaintiff's condition as described above, by way of MGM's conduct

toward Plaintiff, MGM was unjustly enriched in a substantial amount, in excess of $75,000, to the detriment of Plaintiff.

97. It is inequitable for MGM to retain funds of Plaintiff's that were procured and retained in the circumstances described above.

98. Plaintiff has, by reason of the foregoing, been required to obtain the services of an attorney and is entitled to recover its reasonable attorneys' fees and costs from MGM.

## FIFTH CLAIM FOR RELIEF

**(Breach of Implied Covenant of Good Faith and Fair Dealing)**

99. Plaintiff repeats and realleges all preceding paragraphs of this Complaint and by this reference incorporate the same as though fully set forth herein.

100. In every contract or agreement, each party thereto makes an implied covenant of good faith and fair dealing to the other.

101. To the extent any of the agreements between MGM and Plaintiff are determined to be valid and enforceable, through their actions described above, MGM took advantage of Plaintiff's long history of gaming play at MGM properties.

102. During December 10-12, 2021, MGM's conduct in having Plaintiff enter into written agreements in furtherance of their past business dealings constitutes breaches of the covenant of good faith and fair dealing.

103. MGM's conduct is unfaithful to the purpose of such contracts or agreements, and inconsistent with Plaintiff's justified expectations thereof.

104. As a direct and proximate result of MGM's breaches of the implied covenant of good faith and fair dealing, Plaintiff has been damaged in an amount in excess of $75,000, the exact amount to be proven at the trial of this matter.

105. Plaintiff has, by reason of the foregoing, been required to obtain the services of an attorney and is entitled to recover their reasonable attorneys' fees and costs from MGM.

/ / /

/ / /

**JURY DEMAND**

Pursuant to Fed. R. Civ. P. 38(b) and LR 38-1, Plaintiff demands a jury trial on all available matters in this action.

WHEREFORE, Plaintiff prays for the following:

1. For declaratory relief as set forth herein;

2. For a determination of liability in Plaintiff's favor and against MGM, jointly and severally, for all damages and remedies allowed by law as to each of his Claims for Relief including rescission, if necessary;

3. For pre-judgment and post-judgment interest, at the highest rate permitted by applicable law;

4. For all costs and expenses, including reasonable attorneys' fees, incurred by Plaintiff in connection with the commencement and prosecution of this action; and

5. For such other and further relief as the Court deems just and proper.

Dated this 7th day of July, 2023.

**HOLLEY DRIGGS**

*/s/ Jason D. Smith*
NICHOLAS J. SANTORO, ESQ. (NBN 532)
JASON D. SMITH, ESQ. (NBN 9691)
300 South Fourth Street, Suite 1600
Las Vegas, Nevada 89101
Tel.: (702) 791-0308 / Fax: (702) 791-1912
Email:  nsantoro@nevadafirm.com
　　　　　jsmith@nevadafirm.com

*Attorneys for Plaintiff*

**CERTIFICATE OF MAILING**

I HEREBY CERTIFY that on the 7th day of July 2023, and pursuant to Fed. R. Civ. P. 5(b) and LR IC 4-1(a)(b), I electronically filed the **SECOND AMENDED COMPLAINT** with the Clerk of the Court using the CM/ECF system which sent notification to the counsel of record in this matter:

Lawrence J. Semenza, III, Esq.
Katie L. Cannata, Esq.
**SEMENZA KIRCHER RICKARD**
10161 Park Run Drive, Suite 150
Las Vegas, Nevada 89145
Email:  ljs@skrlawyers.com
            klc@skrlawyers.com

*Attorneys for Defendants*

　　　　　　　　　　　　　　　　　　　　　　/s/ *Jana Chaffee*
　　　　　　　　　　　　　　　　　　　　　　An employee of HOLLEY DRIGGS