Paul R. Hejmanowski, Esq. (SBN #94)
Charles H. McCrea, Esq. (SBN #104)
PRHLAWLLC
520 South Fourth Street, Suite 360
Las Vegas, NV 89101
T | 702.834.6166
paul@prhlawllc.com
charles@prhlawllc.com

*Attorneys for DWIGHT MANLEY*

## UNITED STATES DISTRICT COURT
### DISTRICT OF NEVADA

| | |
|---|---|
| DWIGHT MANLEY,<br><br>        Plaintiff,<br><br>v.<br><br>MGM RESORTS INTERNATIONAL; MGM GRAND HOTEL, LLC,<br><br>        Defendants,<br><br>AND ALL RELATED ACTIONS. | Case No.  2:22-cv-01906-MMD-EJY<br><br>**<u>REDACTED</u>**<br><br>**PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT (ECF NO. 160)** |

## I.    INTRODUCTION

"At its core, this case involves a casino marker dispute" is the opening sentence of MGM's Motion for Summary Judgment. Nothing could be further from the truth.  If it were true, MGM, not Dwight Manley, would be the plaintiff in this case. In truth, the core of this case involves the Ketamine poisoning of a once valued and frequent VIP guest of MGM and MGM's total indifference to the actual and potential harm suffered by that guest – electing instead to take the route of avaricious exploitation of the guest's unfortunate plight. After observing behavior clearly manifesting a state of drug induced intoxication, MGM's treatment of him violated not only

MGM's written policies but also universally accepted norms and mores embodied in our law.

From the opening sentence of its Motion, MGM proceeds to attempt to build its case by ignoring the true facts that confront it in this case. For example, a continuous refrain of MGM is "there is no evidence to establish Manley's allegations." *E.g.*, Motion, 3:8-9. There are others that will be addressed in due course, but two of MGM's "no evidence" assertions are central to virtually all of MGM's arguments in its Motion: (1) there is no evidence that Dwight was poisoned by Ketamine the afternoon of December 10, 2021, while at the MGM; and (2) Dwight did not promptly disaffirm the credit transactions that resulted in the issuance of $3.5 million in gaming markers he executed while in a drug induced incapacitated state but instead ratified them. Because these false arguments are lynch pins to other arguments raised by MGM which cannot stand without them, they are addressed first.

## II.    ARGUMENT

### A.    <u>The Evidence in the Record Demonstrates that Dwight Was Drugged with Ketamine While at the MGM on December 10, 2021.</u>

On page 4 of its motion, MGM actually alleged:

Moreover, Defendants are entitled to summary judgment on Manley's Negligence claim. Among other reasons, Manley cannot establish that Defendants breached any duty of care on December 10, 2021. ***There is simply no evidence that Manley's drink was "spiked" with Ketamine by any MGM Grand bartender – or frankly – "spiked at all***. Indeed, even if Manley was purportedly drugged (he was not), the "spiking" of his drink with Ketamine and/or Ketamine contaminated ingredients **was not** foreseeable to Defendants. (Emphasis added.)

The Motion goes on at page 8 to allege "***Defendants deny that Manley was ever drugged with anything – let alone Ketamine – while at MGM Grand's property***." (Emphasis added.)

Contrary to the extreme position taken by MGM, the record contains ample evidence for a jury to conclude that Dwight was drugged with Ketamine on the afternoon of December 10 while he was at MGM VIP Casino.

After Dwight returned to southern California on December 12, one of his physicians, Dr.

Soltani, arranged for a hair test to analyze whether Dwight had been drugged. It was necessary to wait a period of time for Dwight's hair to grow out before the necessary sample could be taken. Dr. Soltani took the hair sample required and sent it to the Carlson Company.  The results were released January 31, 2022, and showed that a high level of Ketamine had been ingested by Dwight. The Carlson Company Inc. DFSA Test, Appendix Exhibit A at PAPP_008.  The results were analyzed by Dr. Michael Sucher.  Among his other qualifications, Dr. Sucher is a Medical Review Officer, which role includes interpreting drug results and their validity.  He is an expert in the interpretation of drugging tests, including hair tests.  Dr. Sucher reports that he has interpreted the validity and results of thousands of hair drug test results.  Expert Report of Michel A. Sucher MD DFSAM ("Sucher Report"), Appendix Exhibit B at PAPP_011, ¶¶ 2-4.  After his investigation, including review of the laboratory test results, he opined that:

> It is my professional medical opinion that all the observations and findings noted above are consistent with poisoning by Ketamine.  Further, based on the time frames involved it is also my professional medical opinion that Mr. Manley was drugged/poisoned at the beginning of the afternoon.  This opinion is based on the fact that Ketamine has a rapid onset of action and that the most significant behaviors occurred from shortly after Mr. Manley was served his first drink and lasted throughout his gambling episode at MGM Grand and into the evening and early morning hours of the next day.  This is consistent with the known onset of action and duration of action from Ketamine. My opinion is true to a reasonable degree of medical probability.[1]

*Id.*, at PAPP_017, ¶ 5. Dr. Sucher concluded his report expressing the following opinions:

In summary my professional medical opinions in this matter are:

1. Mr. Manley was poisoned with Ketamine in the early afternoon of 12/10/2021 at the MGM Grand Mansion.

2. Mr. Manley suffered mental and physical symptoms consistent with being poisoned by Ketamine as noted above and consistent with the onset and duration of action of Ketamine.

---

[1]  "Ketamine is dissociative anesthetic used both in medical practice and illicitly as a drug of abuse.  Ketamine has a half-life of 2.5-2.6 hours and its effects typically last 10-12.5 hours.  Onset of action occurs very quickly, although slightly lower with oral administration which I believe occurred in this case.  Ketamine comes in both powder or liquid forms." *Id.*, PAPP_017, ¶ 1.

3.  There is no other reasonable explanation for the events of 12/10/2021.

4.  Mr. Manley does not suffer from a substance use disorder.

5.  The drug test result from the Hair Drug Test collected on 1/3/2022 was positive for Ketamine and Norketamine.  These results are accurately reported as positive and support my opinion of Mr. Manley being poisoned by Ketamine at the MGM Grand Mansion on the afternoon of 12/10/2021.

*Id.*, at PAPP_018, ¶ 2.

Judge Philip Pro in *Neal-Lomax v Las Vegas Metropolitan Police Department*, 574 F.Supp.2d 1193 (D. Nev. 2008), assessed the applicable standards for expert medical testimony regarding causation.  He opined that under Nevada law:

> To establish causation, a plaintiff must produce medical expert testimony opining to a reasonable degree of medical certainty that the allegedly defective product caused the plaintiff's injury.  A possibility that the product caused the injury is insufficient. Nevada requires such expert testimony because "if the plaintiff's medical expert cannot form an opinion with sufficient certainty so as to make a medical judgment, there is nothing on the record with which a jury can make a decision with sufficient certainty so as to make a legal judgment."

*Id*. at 1198 (citations omitted).

This point becomes particularly important because MGM's expert, Dr. Daniel Overbeek, was so new to the role of expert witness that he did not know what was meant by the phrase "a reasonable degree of medical certainty."  Dr. Overbeek is an engaging young physician who has only recently begun acting as an expert witness.  When asked about his involvement in expert witness testimony, he unabashedly explained that he did it as a potential important source of revenue to someone confronted with medical school debt.  Underscoring his lack of familiarity with the role of expert witness was this exchange which began his deposition:

> Q.  Dr. Overbeek, is it your opinion to a reasonable medical certainty that Dwight Manley was not poisoned with Ketamine on the afternoon of December 10th, 2021?
> A.  I'm not sure what you mean by "a reasonable degree of medical certainty."
> Q.  As an expert, sir, what is the standard for your testimony if not a reasonable medical certainty or – well, what is the standard that you would follow?
> A.  I – I mean, the term "a reasonable degree of medical certainty" is not a

PRHLAWLLC
520 S. 4th Street, Suite. 360
LAS VEGAS, NEVADA 89101
702.834.6166

term I would use in a clinical scenario, right. I'm not really sure what it means, right. My – this is – these are my medical opinions based on my understanding of the evidence based on the information provided to me.

Deposition of Daniel L. Overbeek, M.D. taken on August 16, 2024 ("Overbeek Depo.") 5:8-24, Appendix Exhibit C at PAPP_046.

Working with the same information that was available to Dr. Sucher, Dr. Overbeek's report only went so far as to say, "I do not believe there is any definitive evidence showing that Mr. Manley was intoxicated with Ketamine on the 10th of December." Daniel Overbeek, MD Expert Report ("Overbeek Report"), Appendix Exhibit D at PAPP_063. In subsequent deposition testimony he retreated a bit:

> Q. Do you acknowledge that it is possible that Manley was poisoned on December 10th, 2021?
> A. Yes, it's possible.

Overbeek Depo. 9:13-15 Appendix Exhibit C at PAPP_047.

In at least two places in his report Dr. Overbeek opines that the symptoms displayed by Dwight can be explained by alcohol as easily as by Ketamine. Overbeek Report, pp.6-7 & 10. This is one of the reasons that alcohol remains an important issue in this case. Dr. Sucher presented a rebuttal report in response to Dr. Overbeek's report and explained that the symptoms he saw are very specific to Ketamine intoxication rather than alcohol. Rebuttal Expert Report of Sucher Medical Management, Ltd. ("Sucher Rebuttal Report"), Appendix Exhibit E at PAPP_068, ¶ 4: "While Dr. Overbeek did not witness any behavior specific to Ketamine intoxication I disagree and opine that his behaviors as stated in my initial report are very specific to Ketamine (or similar drugs) intoxication."

Dr. Sucher's conclusions are consistent with the observations of Tim Petropolus. Mr. Petropolus is a seasoned Expert Witness in the field of Drug Recognition. He has been accepted as a Drug Recognition Expert in more than 100 cases, many of which were homicides. He opined

that he could not issue a formal expert report because he only had the video and that was not sufficient for a Drug Recognition Expert methodology. He did say, however, based on what he could see on the video, Dwight's manner of walking and standing was much more consistent with Ketamine intoxication than alcohol. He concluded:

> It is my considered expert opinion that some of Mr. Manley's behaviors are consistent with the ingestion of ketamine-type drugs on the afternoon of December 10, 2021, as described above and not solely alcohol intoxication. However, because I did not observe Mr. Manley at the time, I cannot express a final conclusion consistent with Drug Recognition methodology.

Expert Report of Tim Petropulos ("Petropulos Report"), Appendix Exhibit F at PAPP_075. In his Rebuttal Report, Dr. Sucher concurred with Mr. Petropulos:

> I reviewed the report of Tim Petropulos who is a Drug Recognition Expert. His opinions which are mentioned above are fully consistent with my observations and opinions in this matter. He accurately describes findings and observations consistent with Ketamine intoxication and not caused by alcohol. I fully agree with his opinions and that agreement is true to a reasonable degree of medical probability.

Sucher Rebuttal Report, Appendix Exhibit E at PAPP_069 ¶ 6. Earlier in the same report Dr. Sucher reiterated his disagreement with Dr Overbeek:

> Again, I disagree with Dr. Overbeek regarding this conclusion and I believe there are signs specific to Ketamine intoxication on 12/10/2021 and that he was intoxicated by Ketamine on that date. This opinion is true to a reasonable degree of medical probability.

*Id.* at PAPP_069 ¶ 3.

Nonetheless, Defendants contend that there is no evidence in the record that Dwight was the victim of Ketamine poisoning!

### B.    The Jury Will Decide Whether Dwight Promptly Disaffirmed the Credit Transactions Upon Which MGM Bases It's Counterclaim and Are the Measure of a Large Portion of Dwight's Damages.

MGM argues at pages 13 through 16 of its Motion that it is entitled to summary judgment on Dwight's incapacity defense to MGM's counterclaim seeking to enforce the $1 million marker

PRHLAWLLC
520 S. 4th Street, Suite. 360
LAS VEGAS, NEVADA 89101
702.834.6166

signed by Dwight (which MGM claims has a remaining balance due of $440,000) because, as a matter of law, Dwight did not promptly disaffirm the transaction after awakening from his involuntarily drug induced stupor the morning of December 11, 2021, but instead proceeded to ratify the transaction. A page 16, MGM concludes by asserting:

> Because Manley (1) failed to promptly disaffirm the credit instruments at issue, and (2) instead, ratified them, any purported incapacity defense fails as a matter of law – and does not prevent the entry of summary judgment in MGM Grand's favor.

Motion,16:19-21.

MGM asserts this argument apparently forgetting that it has already been resolved in this case in Dwight's favor. In the Court's order granting Dwight's Motion for an Adverse Inference Jury Instruction (ECF No. 171) the Court stated:

> Defendants also argue that the missing text messages have no potential relevance to Plaintiff's intoxication defense because Plaintiff failed to promptly disaffirm his debt and in fact ratified it by continuing to take out credit and gamble on December 11 and 12, 2021. *Id.* at 11-12. Plaintiff responds by asserting that his preservation demand on December 13, 2021, served as a prompt disavowal of the validity of his gambling debt. ECF No. 147 at 9. Defendant is correct that under Nevada law, an intoxication defense to a contract claim seeking to collect a gambling debt can only be established when "the intoxicated person … act[s] promptly to disaffirm" the debt. *LaBarbera v. Wynn Las Vegas, LLC*, 422 P.3d 138, 141 (Nev. 2018) (citing Restatement (Second) of Contracts § 16 cmt.). However, ***the Court finds whether Plaintiff acted with sufficient promptness in disaffirming his debt to be a factual question inappropriate for resolution at this stage of litigation***. See Wynn Las Vegas, LLC v. Tofani, Case No. 69936, 2017 WL 6541827, at *1 (Nev. Ct. App. Dec. 14, 2017) ***("[W]hether [plaintiff] affirmed the full amount of debt claimed by Wynn, and whether he disaffirmed the debt 'within a reasonable time,'" are factual determinations.***). Because the validity of Plaintiff's defense cannot be determined at this stage, the Court finds it is at least possible that the missing texts may have been relevant and, therefore, that Plaintiff's ability to maintain his defense has been prejudiced by their loss.

> While the Court finds Plaintiff was prejudiced by the destruction of the text messages, the degree of prejudice must be determined with reference to other relevant evidence in the record. As explained above, ***Plaintiff contends he is prejudiced by the destruction of the text messages at issue because "Manacher's and Reboton's knowledge of [Plaintiff's] addled state at the time they approved large credit increases … is the very essence of [his] allegations."*** ECF No. 147 at 7. ***Yet, Defendants do not seem to dispute that these two employees were aware of Plaintiff's intoxication when additional credit was extended. In their Response,***

*Defendants acknowledge Reboton's testimony that "she texted Mr. Manacher that Manley 'looked drunk' or 'wasted,' and also communicated about Manley's credit line increase request."* ECF No. 135 at 14, 49 (cleaned up). *Manacher similarly testified Reboton informed him via text that Plaintiff was intoxicated. Id. at 42.*

*Given Defendants' acknowledgement that the missing texts contained comments on Plaintiff's inebriated state around the time the additional markers were signed, which supports what Plaintiff describes as "the very essence" of his claims, the missing texts would likely only offer further confirmation of this fact and at least potentially offer some more detail regarding the extent of the employees' knowledge.*

ECF No 171 7:22-8:24 (emphasis added). This ruling is well supported by the evidence and case law cited. It is now law of the case and should not be disturbed. *Zeyen v. Bonneville Joint District #93*, 114 F. 4th 1129 (9th Cir. 2024).

The preservation demand on December 13, 2021, referenced in the order that, according to the Court, "served as a prompt disavowal of the validity of [Dwight's] gambling debt'" is in the record as ECF No. 121-10 & 11. Additional evidence relevant to MGM's "failure to promptly disaffirm" defense will be Dwight's testimony at trial set forth in his attached declaration where he states:

1. On January 3, 2022, working under the auspices of Dr. Soltani, I submitted a hair sample for drug testing. On January 31, 2022, the test results came back from The Carlson Company. A copy of the test results showing that I tested positive for having Ketamine in my system on December 10, 2021, is attached as [Appendix Exhibit A at PAPP_008]. These test results were given to MGM representatives shortly after I received them.

2. Beginning in February 2022, I and my colleagues who accompanied me on the December 10 trip to the MGM were the subject of polygraph examinations conducted by two retired FBI agents. Natalie Nasongkhla's polygraph examination took place on February 20, 2022. John Hermann's polygraph examination was conducted on February 20, 2022. Chris Snyder's polygraph examination was conducted on February 21, 2022. Omar Brioso's polygraph examination was conducted on February 22, 2022. My first polygraph examination took place on April 2, 2022. My second polygraph examination was conducted on April 27, 2022. The second polygraph examination of me was requested by MGM's counsel, Ashley Eddy to clarify a point.

3. All of the polygraph results were disclosed to the MGM or its representative during the April/May time frame.

PRHLAWLLC
520 S. 4th Street, Suite. 360
LAS VEGAS, NEVADA 89101
702.834.6166

4. On March 24, 2022, the MGM notified me that they would be presenting the $2 million marker I had signed to my bank for payment. There were insufficient funds in that account at that moment. Working quickly with my bank, I arranged the transfer of sufficient money from another account so that the marker could and would be cleared by the bank. I did so for a couple of reasons: I thought the MGM was still investigating and would solve the question of who had poisoned me with Ketamine on December 10, 2021 and I knew that the MGM had more than sufficient assets to return the $2 million once they had ascertained that I had been wronged. Furthermore, I did not want to have a reputation as someone who wrote bad checks and I believed that under Nevada law writing a check with insufficient funds was a criminal act that could result in a criminal penalty.

5. Until March 24, 2022, I believed that MGM was conducting a good faith investigation of my claim of what had happened to me on December 10, 2021.

6. On March 30, 2022, through my legal counsel at the time, I advised the Nevada Gaming Control Board, who was also investigating the matter, that I had paid the $2 million marker but would be "pursuing the return of said funds based upon, among other things, the inability to consent to the transactions at issue due to impairment during the time frame of the gambling activity that gave rise to the Markers." See letter dated March 30, 2022 from Chesnoff & Schonfeld to Nevada Gaming Control Board attached hereto [Appendix Exhibit G at PAPP_076-078].

Declaration of Dwight Manley, Appendix Exhibit H at PAPP_079-081.

## C.    <u>Summary Judgment Is Not Appropriate in a Negligence Case</u>.

In Nevada, it is well settled that:

> The Courts are reluctant to grant summary judgment in negligence cases because foreseeability,[2] duty, proximate cause and reasonableness usually are questions of fact for the jury.

*Thomas v. Bokelman*, 86 Nev. 10, 13, 462 P.2d 1020, 1022 (1970).

In *Garcia v Wal-Mart Stores, Inc.* 2016 WL 3869845 (D. Nev.), the plaintiff was injured when she fell on a puddle of cooking oil on the floor.  Employee Fernando Rosa had spilled the oil and then ineffectively tried to clean it up.  District Judge Jennifer Dorsey framed the issue this way:

> Because it is uncontested that Rosa created and attempted to remedy the hazardous condition, the remaining question in this case is whether he acted reasonably under the circumstances.

---

[2] A detailed discussion of foreseeability in this case follows in the next section.

*Id.* at *1.

Judge Dorsey answered the question this way:

> Courts are hesitant to grant summary judgment in negligence cases, and I am similarly hesitant to do so in this case. 'Although an accident occurring on the premises does not itself establish negligence[,]' it is undisputed that the dangerous condition in this case was created by a Wal-Mart employee and that the same employee had taken steps to remedy the situation before the slip and fall occurred, Wal-Mart and Rosa genuinely believe that Rosa did everything in his power to guard and remedy the spill that he had mistakenly created, but their belief does not answer the question of whether Rosa's actions were reasonable. That Rosa had his back to Garcia and the spill when Garcia fell, and that Garcia was unaware of the spill and slipped and fell despite Rosa's precautions, demonstrate that the reasonableness of Rosa's actions is genuinely disputed. Because Wal-Mart demanded a jury trial consistent with FRCP 38(b) and L.R. 38-1 when it removed this case from state court, whether Rosa breached the duty of care or acted reasonably is a question that the jury must answer.

*Id.* at *2.

In *Garcia*, Judge Dorsey cited *Riley v. Opp IX, L.P.*, 112 Nec. 826, 919 P.2d 1071 (Nev. 1996), for the proposition that: "Issues of foreseeability, proximate cause, and reasonableness usually present questions of fact for the jury." *Garcia* at fn 22.

In *Riley*, the plaintiff was injured when he attempted to lift a heavy metal gate next to his place of employment. He filed suit against Opp IX, which was the landlord of the property leased by the plaintiff's employer. Opp IX filed not one, not two, but three successive motions for summary judgment. The district court granted the third summary judgment motion and an appeal followed. The Nevada Supreme Court, in a *per curium* decision reversed, holding:

> We have indicated that 'in order to survive a summary judgment motion in a negligence claim, there must be factual disputes as to: (1) duty; (2) breach; (3) actual causation; (4) legal causation; and (5) damages.' [Citation omitted.] The *Sims* court further stated that '[w]e have, in the past, indicated our hesitance to affirm the granting of summary judgment in negligence cases, because such claims generally present jury issues. *Id.*(citing *Van Cleave v. Kietz-Mill Minit Mart*, 97 Nev. 414, 417, 633 P.2d 1220, 1222 (1981). . . .

> The *Van Cleave* court, recognizing that inferences will be drawn in favor of the party opposing summary judgment, indicated that the party opposing the summary

PRHLAWLLC
520 S. 4th Street, Suite. 360
LAS VEGAS, NEVADA 89101
702.834.6166

judgment motion must show that he can produce evidence at trial to support his allegations. . . .

*Id.*, 112 Nev. at 830-31, 919 P.2d at 1074.

The negligence claim before the Cout in this case is replete with factual issues of foreseeability, proximate cause and reasonableness, which are questions for the jury—rendering summary judgment clearly inappropriate.

**D.    There Is Ample Evidence in the Record to Support a Jury Finding that Dwight's Ketamine Poisoning Was, or Reasonably Should Have Been, Foreseeable to the MGM.**

Even though NRS 651.015 is a  negligence statute, and even though the plaintiff, Dwight, clearly pled negligence and each of its elements the Court earlier concluded that because the Third Amended Complaint did not specifically refer to NRS 651.015, any discovery premised upon the foreseeability issues of NRS 651.015 were foreclosed even though Nevada is a notice pleading state. Accordingly, the Court restricted discovery to only those instances in which a report of involuntary drugging at an MGM property affirmatively asserted that an MGM *employee* was a suspect. The effect of Court's order was to limit discovery to only those security incident reports filed in the last five years where the guest specifically accused an employee of being responsible for the incident. Transcript of Motions Hearing, September 9, 2024, ECF No. 108 at 33:3-7; 35:4-37:3; 41:12-13.

This meant that any incident report of involuntary drugging that did not specifically identify an MGM employee as a suspect was excluded from discovery. If there were 10 cases of involuntary drugging alleged per week at the MGM Grand, that simple but important statistic was completely denied to the Plaintiff. Nonetheless, this unfairly constrained discovery did produce 11 instances in which patrons alleged that they were drugged by an MGM employee.[3] Of particular

---

[3]  These reports are filed under seal attached as Appendix Exhibit I at PAPP_082-148.

PRHLAWLLC
520 S. 4th Street, Suite. 360
LAS VEGAS, NEVADA 89101
702.834.6166

1    significance in this regard was the fate of PK and SD.[4]  In her deposition, PK relates the following

2    events:[5]

3    ███████████████████████████████████████

4    ██████████████████████████████████████████

5    ██████████████████████████████████████████

6    ██████████████████████████████████████████

7    ██████████████████████████████████████████

8    ██████████████████████████████████████████

9    ██████████████████████████████████████████

10   ██████████████████████████████████████████

11   ██████████████████████████████████████████

12   ██████████████████████████████████████████

13   ██████████████████████████████████████████

14   ██████████████████████████████████████████

15   ██████████████████████████████████████████

16   ██████████████████████████████████████████

17   ██████████████████████████████████████████

18   ██████████████████████████████████████████

19   ██████████████████████████████████████████

20   ██████████████████████████████████████████

21   ██████████████████████████████████████████

22   ██████████████████████████████████████████

23   ██████████████████████████████████████████

24   ███████████████████████

25

26   ─────────────────────────

     [4]  The events surrounding PK and SD are subject to a confidentiality order.  As support for
27   the factual arguments being made here, the Deposition of PK taken March 12, 2025 (attached as
     Appendix Exhibit J at PAPP_149-186 "PK Depo.") is filed under seal.

28   [5] PK Depo., 8:2-16:8, Appendix Exhibit J at PAPP_154-162 (filed under seal).

The incident is similar to Dwight's experience in that the cocktails involved were prepared by an MGM employee and presented directly to the patrons. ███████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████ Not an endorsement for how MGM security was "investigating" drugging allegations.

Mark Cassell is the Vice President of security operations for all of the MGM Las Vegas properties. Each of the hotel security departments report to him.

Throughout the MGM properties in Las Vegas, the security departments all use the same form of incident reports which are then put into a central database called iTrak. From that database, daily summaries are prepared and distributed to senior management of each hotel.

> Q Okay. Now, the daily security reports – I'm sorry, I shouldn't phrase it that way – the security reports are prepared incident by incident, correct?
> A Yes.
> Q Are there any reports given to management on a daily basis of what security incidents have occurred?
> A Can you clarify which management you're talking about?
> Q Sure. Let's start with something as simple as the MGM, if that's fair. Does the senior officers – excuse me, the senior executives receive daily reports of what security incidents have occurred in the preceding 24 hours?
> A They receive what we call an executive brief and that is an automated summary of iTrak incidents for that period of time.
> Q Is it usually done on a daily basis?
> A Typically it's done on a daily basis. Some properties have it set up to – there was a point in time when some properties had it set up to be Monday through Friday. I believe that they all have it set up every day now, but I'm not positive.
> Q And to what level of executive does the report go?
> A That is up to each property. Typically, it will be what we consider the senior executive team, which would be the property president, the CFO, other members of that executive committee that are – that have a need to know and like

---

[6] Exhibits 1-3 to PK Depo. attached as Appendix Exhibit J at PAPP_166-186 (filed under seal).

[7] PK Depo. 25:18-20 at PAPP_162-1 (filed under seal).

to review those.

There's also some folks from, like, our risk management groups that are on those.

Deposition of Marc Cassell taken March 5, 2025 ("Cassell Depo.") 22:10-23:17, Appendix Exhibit K at PAPP_192-193 .

Thus, senior management at the MGM received daily reports of all of the prior days' incident reports, which should include all reports of involuntary drugging such as that which befell PK, SD and Dwight.  It would also include all the other involuntary drugging incidents reported to security that Plaintiff has been denied access to because they were not permitted to see any reports that did not indicate that the victim was claiming that the perpetrator was an employee. In short, incidents of involuntary drugging of guests at MGM resorts in Las Vegas prior to December 10, 2021, occurred. Very likely they were not uncommon and a jury could easily find that MGM management was aware—or reasonably should have been aware—of that fact.

Based on the foregoing evidence in the record, a jury will very likely find that on December 10, 2021, it was reasonably foreseeable that any patron at MGM could be the victim of an involuntary drugging incident and as an innkeeper and holder of a Nevada gaming license MGM had a duty to exercise reasonable care to prevent such incidents from happening, to recognize behavior of patrons consistent with being in a drug induced state and, when so observed, take reasonable steps to prevent further harm to the patron and to certainly not take actions exacerbating the harm. *See* ECF No. 28, 5:14-21, *infra* next section.

As will be seen in sections that follow, MGM clearly breached the duty of care it owed to Dwight by not just ignoring his drug induced state – MGM knew he was "wasted"[8] – but actually took steps that seriously exacerbated the harm caused to Dwight by its failure to follow its own

---

[8] ECF No. 171, 8:16-18.

PRHLAWLLC
520 S. 4th Street, Suite. 360
LAS VEGAS, NEVADA 89101
702.834.6166

written policies dictating how a patron in Dwight's condition should be treated in a casino resort environment offering gambling and free alcohol to gamblers.

### E.    Nevada Law Recognizes that a Special Relationship Exists Between an Innkeeper and Its Guests.

In its Order granting in part and denying in part MGM's Motion to Dismiss the First Amended Complaint (ECF No. 28), this Court ruled:

> Manley has sufficiently pleaded the duty element of his negligence claim. The Court can reasonably infer from the FAC that Defendants owed Manley a duty of care in two ways: (1) Manley was an invited guest and patron on Defendants' premises when he sustained his injuries; or (2) the Nevada Gaming Regulations imposed a duty of care upon Defendants.[9] ***The Court can reasonably infer from the FAC that Manley-a VIP patron invited to gamble, eat, imbibe, and lodge at a casino resort owned and managed by Defendants-was an entrant to whom Defendants owed a "general duty of reasonable care*** ... regardless of the open and obvious nature of dangerous conditions."

*Id.* at 5:14-21 (citation omitted; emphasis added).

In Nevada a special relationship exists between an innkeeper, like MGM, and an invited guest, like Dwight, as a matter of law. An innkeeper is in a special position of trust and duty for its guests. The innkeeper is in control and responsible for the health and safety of its guests when on its premises. The innkeeper is responsible for:

---

[9] Nevada Gaming Commission Regulation 5.011 provides:

    The Board and the Commission deem any activity on the part of a licensee, registrant, or person found suitable by the Commission, or an agent or employee thereof, that is inimical to the public health, safety, morals, good order, or general welfare of the people of the State of Nevada, or that would reflect or tend to reflect discredit upon the State of Nevada or the gaming industry, to be an unsuitable method of operation and shall be grounds for disciplinary action by the Board and the Commission in accordance with the Nevada Gaming Control Act and the regulations of the Commission. ***The following acts or omissions, without limitation, may be determined to be unsuitable methods of operation:***

    (a) Failure to exercise discretion and sound judgment to prevent incidents which might reflect on the repute of the State of Nevada and act as a detriment to the development of the industry.

    (b) ***Permitting a person who is visibly impaired by alcohol or any other drug to participate in a gaming activity.***

    (c) ***Complimentary service of intoxicating beverages in the casino area to a person who is visibly impaired by alcohol or any other drug.*** [Emphasis added.]

1) Providing safe and affordable accommodations; when the guest is asleep, it is the innkeeper that is in charge of keeping the guest safe;

2) The innkeeper, not the guest, has control of the design, construction and maintenance of the premises;

3) The innkeeper, not the guest, is responsible for vetting and training all the staff;

4) The innkeeper, not the guest, is responsible for whatever systems and protocols for security and implementing them;

5) The innkeeper, not the guest, is responsible for determining who is allowed on the premises and who is not; and

6) It is the innkeeper and not the guest who sets whatever rules and regulations govern the use of the premises and its amenities such as gambling.

The guest is responsible for adhering to the innkeeper's regulations and protocols and for paying the appropriate charges – but nothing more. The power and the control of all aspects of the guest's experience, including health, well-being and security, all rest in the hands of the innkeeper. That may be why the courts are not hesitant to acknowledge this to be a special relationship different from a normal commercial transaction.

In *Morrison v MGM Grand Hotel*, 570 F. Supp. 1449 (1983), the plaintiff attended a hotel party as an invited guest of the MGM. When the guest went to his room carrying his gambling winnings, he was attacked in the elevator and robbed by an unknown assailant. The guest sued the hotel for negligence.

MGM responded by arguing there was no duty owed to protect someone from a criminal act. Judge Edward Reed disagreed, noting that if the crime is reasonably foreseeable, a duty may arise owed by the hotel to its invitee. Judge Reed pointed out that:

'[a] special relationship giving rise to [a duty to protect another from a criminal attack by a third person] does … exist, for example, between … innkeeper-guest

PRHLAWLLC
520 S. 4th Street, Suite. 360
LAS VEGAS, NEVADA 89101
702.834.6166

1    [and] landowner-invitee.'

2    Of course, that was not the end of the analysis:

3        Notwithstanding the existence of a special relationship, the duty of a landowner to
4        take affirmative action to control the wrongful acts of third persons arises only
         where he 'has reasonable cause to anticipate such acts and the probability of injury
5        resulting therefrom and fails to take affirmative steps to control the wrongful
6        conduct.' …

7        Denying the MGM's motion for summary judgment: [T]he court finds that plaintiff
         has made a sufficiently specific allegation that the defendant could reasonably have
8        foreseen or anticipated the criminal conduct in question….

9    It is unfortunately true that in today's world the threat of date rape drugs like Ketamine is all too

10   common and foreseeable. *See* ECF No. 84-4.

11        The following year the Nevada Supreme Court cited *Morrison* in *Early v N.L.V. Casino*

12   *Corp.*, 100 Nev. 200, 678 P.2d 683 (1984).  In that case, the plaintiff Mrs. Early was beaten and

13   robbed in a casino restaurant.  Mr. and Mrs. Early brought a negligence case against the defendant.

14   The casino asserted that it owed no duty to the plaintiffs and successfully moved for the dismissal

15   of the case at the district court level.  Plaintiffs appealed and the Nevada Supreme Court reversed,

16   

17   stating that:

18       In other words, if the evidence presented in the instant case provides a reasonable
19       inference of actionable negligence, involuntary dismissal is inappropriate.

20   The Supreme Court relied, in part, on the Restatement of Torts Section 344 comment f:

21       If the place or character of his business, or his past experience, is such that he should
22       reasonably anticipate careless or criminal conduct on the part of third persons,
         either generally or at some particular time, he may be under a duty to take
23       precautions against it, and to provide a reasonably sufficient number of servants to
         afford a reasonable protection.
24   

25   The Court went on to interpret *Morrison* to mean that when a hotel such as MGM had reasonable

26   cause to anticipate a criminal act, "the reasonableness of the hotel's efforts to discharge its duty"

27   was an issue for the jury to determine.

28        The Nevada Supreme Court returned to these issues in *Lee v GNLV Corp.*, 117 Nev. 291,

PRHLAW LLC
520 S. 4th Street, Suite. 360
LAS VEGAS, NEVADA 89101
702.834.6166

22 P.3d 209 (2001), a negligence case arising from a fatal chocking incident in a hotel restaurant.

> This court, however, has stated that, where a special relationship exists between the parties, such as with an innkeeper-guest, teacher-student or employer-employee, an affirmative duty to aid others in peril is imposed by law. …

> Because a special relationship exists between a restaurant and its patrons, and because there is no dispute that GLV was 'in control of the premises,' GLV's employees were under a legal duty to come to the aid of Sturms. . ..

> Thus, we have stated that '"[c]ourts are reluctant to grant summary judgment in negligence cases because foreseeability, duty, proximate cause and reasonableness usually are questions of fact for the jury….

*Boutwell v PHWLV, LLC*, 135 Nev. 616, 451 P3 83 (2019), was a negligence case brought by a hotel casino guest against the Planet Hollywood and Casino. Boutwell alleges that when he first went to his room at 3 in the morning, he put his luggage on the floor in the entry-way and moved into the unlit bedroom and, out of the corner of his eye, he saw a life-sized mannequin in a display case and thought it was a malevolent wrongdoer. He turned to flee and tripped over his own luggage and broke bones. For this he sued the hotel. The District Court dismissed the action arguing the hotel did not owe a duty. The Supreme Court reversed, holding:

> A proprietor of a hotel has a duty to use reasonable care to keep the premises safe for its patrons. [Citations omitted.] (acknowledging that certain relationships such as that of an innkeeper and guest gives rise to a heightened duty to exercise reasonable care). That includes that the owner or occupier of land 'take reasonable precautions to protect the invitee from dangers which are foreseeable from the arrangement or use.' [Citation omitted.] … That said, 'foreseeability, duty, proximate cause and reasonableness usually are questions of fact for the jury.'

F.    **Defendants Violated Their Own Written Policies When They Issued Two Large Denomination Markers to Dwight Late in the Afternoon of December 10, 2021**.

Defendants proudly tout their Responsible Gaming Best Practices which is a formal written policy applicable to all of the MGM properties, including the MGM Grand. Appendix Exhibit L, PAPP_197-201 (filed under seal). At page 3 of the Responsible Gaming Best Practices policy it provides:

[REDACTED]

Appendix Exhibit L at PAPP_200 (filed under seal; emphasis added).

A separate responsible beverage service policy is the Techniques of Alcohol Management Server/Seller Participation Manual (the "TAM Manual"), Appendix Exhibit M, PAPP_202-268. In her March 28, 2024, deposition, Jerilyn Koch, the bartender who prepared Dwight's first Old Fashioned cocktail, was shown the TAM Manual. She identified it as something that was made available to all the bartenders at the MGM. In addition to training on the TAM Manual, bartenders at the MGM also have an online program called Alcohol Awareness:

> Q. Okay. Does the MGM Alcohol Awareness Program disagree with the TAM program in any regard?
> A. No.
> Q. Do you expect the servers, the cocktail servers, to be bound by the TAM protocols?
> A. Yes.
> Q. And are they also bound by the Alcohol Awareness Program?
> A. Yes.

Deposition of Jerilyn Koch taken March 28, 2024 ("Koch Depo.") 36:20-37:3. Appendix Exhibit N at PAPP_277-278.

The TAM Manual has a whole section devoted to alcohol and drugs. Lesson 7 titled "Alcohol and Drugs" provides:

> ALCOHOL-MEDICATION INTERACTIONS
> Many medications can interact with alcohol, leading to increased risk of illness, injury or death. For example, it is estimated that alcohol-medication interactions may be a factor in at least 25 percent of all emergency room admissions.
>
> HOW ALCOHOL AND DRUGS INTERACT
> To exert its desired effect, a drug generally must travel through the bloodstream to its site or action, where it produces some change in an organ or tissue. The drug's

[REDACTED]

PRHLAWLLC
520 S. 4th Street, Suite. 360
LAS VEGAS, NEVADA 89101
702.834.6166

effects then diminish as it is processed (metabolized) by enzymes and eliminated from the body. Alcohol behaves similarly, traveling through the bloodstream, acting upon the brain to cause intoxication, and finally being metabolized and eliminated, principally by the liver. The extent to which an administered dose of a drug reaches its site of action may be termed its availability. Alcohol can influence the effectiveness of a drug by altering its availability.

Appendix Exhibit M at PAPP_206.

In other words, a mixture of drugs and alcohol can be dangerous and can lead to death. Among the drugs addressed by the TAM Manual are those commonly called "club drugs," which include cocaine, marijuana, morphine, heroin, methamphetamine, PCP, ecstasy, GHB, Rohypnol, Ketamine and LSD. *Id.* at PAPP_228-230. The manual describes the effects of Ketamine as follows:

Ketamine decreases awareness of general environment, sedation, dream-like state, vivid dreams, feelings of invulnerability, increased distractibility, disorientation and subjects are generally uncommunicative. Intense hallucinations, impaired thought processes, out-of-body experiences and changes in perception about body, surroundings, time and sounds. Delirium and hallucinations can be experienced after awakening from anesthesia.

*Id.* at PAPP_230.

The manual goes on to provide the basic practice to be followed to keep the customer and the establishment safe. In other words, the manual establishes a standard of care to be followed when serving alcohol at the MGM. *Id.* at PAPP_232-235. In summary, the principle elements in that standard of care are 1) sizing up the customer which basically means assessing age, sobriety, gender and body type; 2) conversing with the customer before every drink order is served so that the current state of sobriety can be ascertained; and 3) to "rate" the customer as to whether they are okay to be served, served with caution, or not to be served at all. This third step represents a process to be followed whenever a customer orders another drink.

None of these steps were performed with respect to Dwight on December 10. No one on behalf of MGM testified that Dwight had been sized up, interviewed or "rated" before being served

each of his six Old Fashioneds. In adopting the TAM Manual and requiring its employees to adhere to its directives, the TAM Manual represents the standard of care obviously considered reasonable by MGM in dealing with a patron in the "drunken" and "wasted" condition their management observed Dwight to be in on December 10. From this a jury could easily conclude that the manner in which Dwight was served cocktails repeatedly fell below the standard of care owed to Dwight. *See, Estate of Wilson by Wilson v. Las Vegas Metropolitan Police Department*, 2020 WL 6930099, *7 (D. Nev.).

Chris Snyder, who was part of Dwight's entourage, testified at page 45 of his deposition that he had a conversation with Vanessa in the late afternoon at which time she said that "they" felt that Dwight was being erratic but not to worry because she had it "handled." The reference to "they" appears to refer to some undisclosed persons in MGM management. The latter reference almost certainly relates to the two additional markers she presented to Dwight a few minutes later. Chris testified that Vanessa made these statements just before Chris took Dwight to the restroom to treat a cut he got from a broken ashtray. Deposition of Christopher R. Snyder taken March 22, 2024 ("Snyder Depo.") 45:9-46:17, Appendix Exhibit at PAPP_286-287.

MGM produced a timeline of events as they happened in chronological order prepared by MGM's surveillance department from the video tapes.[11] Timeline of events ("Timeline"), Appendix Exhibit P at PAPP_300-302 (filed under seal). That chronology shows that the ashtray was broken ████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

---

[11] Defendant MGM Grand Hotel, LLC's Responses to Plaintiff's Second Set of Requests for Admissions served March 8, 2024, 5:20-6:14, Exhibit P, PAPP_289-302, and Exhibit 3 thereto ("Timeline"), PAPP_300-302 (filed under seal).

PRHLAW LLC
520 S. 4th Street, Suite. 360
LAS VEGAS, NEVADA 89101
702.834.6166

1 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ In other words, Vanessa had things

2 handled so well that in ten minutes Dwight, who had been acting erratically, committed himself to

3 $1.5 million in additional markers.

4 It is noteworthy that Vanessa acknowledged in her deposition that she thought Dwight was

5 impaired at the end of the afternoon—even remarking in a text message to her superior, Justin

6 Manacher, that Dwight appeared "wasted." ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

7 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ Vanessa testified:

8

9         Q. On December 10th, did you have any conversations with Justin Manacher
about Dwight's behavior?

10         A. Via text, yes.
        Q. What do you recall being discussed in those texts?

11         A. I believe I said he looks – he looks drunk.
        Q. Okay.

12         A. Or wasted.  Or  I don't know the exact word.
        Q. Well, what did Justin say in response, if anything?

13         A. I don't -I don't remember his response.
        Q. Do you recall what time of day it was you told Justin that Dwight looked

14 drunk?
        A. I don't know the time, but after he had gotten up from the table and he

15 was a little wobbly.
        Q. Was that the first time you told somebody you thought Dwight was

16 drunk?
        A. Yes.

17         Q. Did you tell anybody else you thought Dwight was drunk?

18         A. Not that I recall.
        Q. Did you tell Dwight you thought he was drunk?

19         A. No.

20         Q. Did you tell anybody in his group you thought he was drunk?

21         A. I don't think I told them. They were observing him, so I don't believe I
said anything of that nature to them.

22

23 Deposition of Vanessa Reboton taken March 27, 2024, 59:7-60:11 ("Reboton Depo."), Appendix

24 Exhibit R at PAPP_314-1 & 314-2; ECF No. 171, 8:16-18. That testimony is consistent with what

25

26 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

27 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

28 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

she told Chris an hour earlier.

When Vanessa was asked about the erratic comment in her deposition, she equivocated in her answer, not denying the conversation but saying only that she did not remember it:

> Q. Okay. I want to go for just a moment to the issues about Dwight behaving erratically. While you're on the casino floor, the VIP casino, did you tell Chris Snyder that they thought Dwight was behaving erratically?
> A. No. I don't remember saying that.
> Q. And if you were going to ask me who they is, I don't know.
> A. Yeah.
> Q. Okay. Did you tell Chris Snyder at that time that not to worry, you had taken care of it?
> A. No.
> Q. So you don't remember the first part of the conversation, but this part, you're saying it didn't happen?
> A. No. I don't remember saying that.
> Q. You don't remember saying it?
> A. No.

Reboton Depo., 57:21-58:13, Appendix Exhibit R at PAPP_313-314. Inasmuch as Vanessa acknowledges telling Justin shortly after 5 pm that she thought Dwight was "wasted," it would not be difficult for the trier of fact to conclude that she *had* told Chris Snyder that Dwight was acting erratically an hour earlier. As noted by the Court in its Order granting Plaintiff's Motion for Adverse Inference Jury Instruction:

> [E]vidence that MGM employees continued to extend Plaintiff credit despite awareness of his intoxicated state is potentially probative of whether Defendants breached a duty towards Plaintiff. The fact that the subsequent extension of credit was never used would go to what, if any, damages Plaintiff suffered if negligence is found. ***Second, because the text messages were lost, it is impossible to know with certainty that they did not, by way of example only, include comments indicating Reboton was aware of Plaintiff's inebriated state well before the relevant texts were sent.*** It is this loss and the possibility that the text messages favored Plaintiff that renders the loss of the text messages prejudicial.

ECF No. 171,[13] 7:14-21 (emphasis added).

---

[13] Plaintiff notes that the Court's order (ECF No. 171) erroneously recites at page 2, lines 6-7 that Dwight had executed documents for a $2 million credit line **the day before his stay**. The cited authority for the Court's statement is Plaintiff's brief filed November 12, 2024 (ECF No. 121). That brief recites:

PRHLAW LLC
520 S. 4th Street, Suite. 360
LAS VEGAS, NEVADA 89101
702.834.6166

### G.    The Jury Should Decide Dwight's Claim for Unjust Enrichment.

MGM correctly recites the elements of an unjust enrichment claim articulated in *Topaz Mut. Co., Inc. v. Marsh*, 108 Nev. 845, 839 P.2d 606, 613 (1992), and *Unionamerica Mortg. & Equity Tr. v. McDonald*, 97 Nev. 210, 626 P.2d 1272, 1273 (1981):

> The essential elements of an unjust enrichment claim are: (1) a benefit conferred on the defendant by the plaintiff; (2) appreciation by the defendant of such a benefit; and (3) acceptance and retention by the defendant of such a benefit.

Motion, 28:20-22. MGM then posits that "unjust enrichment is not available when there is an express, written contract" which is true with this critical caveat: The "express, written contract" must be valid and enforceable. Where a contract is invalid and unenforceable, as in this case because of Dwight's incapacity, there simply is no contract that can be pursued: "***[U]njust enrichment applies*** in the contract context … when a party renders a valuable performance or confers a benefit upon another ***under a contract that is invalid, voidable, or otherwise ineffective*** to regulate the parties' obligations." Restatement (Third) of Restitution § 2(2) (emphasis added). As demonstrated in Section II(B) *supra*, MGM's credit instruments were promptly disaffirmed by Dwight and:

> Under Nevada law, a 'person incurs only voidable contractual duties by entering into a transaction if the other party has reason to know that by reason of intoxication' he is unable to 'understand ... the transaction' or to 'act in a reasonable manner in relation to the transaction.' *LaBarbera v. Wynn Las Vegas, LLC*, 422 P.3d 138, 141 (Nev. 2018) (quoting Restatement (Second) of Contracts § 16 (Am. L. Inst. 1981)).

---

> The first involvement was just before Dwight's travel to the MGM. On December 9, Dwight Manley was approved for a $2 million corporate credit fund with the express approval of Justin Manacher. MGM00160.

*Id.* at 8:14-16. This is correct. Dwight was ***approved*** for a temporary increase in his credit line from $0 to $2 million on December 9 but no documents effectuating that increase were executed by him that day. It was not until he arrived on property ***on December 10 that he executed*** a Marker Limit Increase Request for Nevada Properties which bears that same date. MGM Appendix (ECF No. 161) Exhibit 7, p. 039. Dwight could not have executed this document earlier as he was in California. At this juncture, the timing issue by itself does not appear to be terribly relevant, but we do not want this to complicate a timeline prepared in the future.

*MGM Grand Hotel v. Long*, 2024 WL 302187 (January 26, 2024, D. Nev.) *1.

Ultimately, whether Dwight lacked the capacity to contract due to his drug induced intoxication on December 10, 2021, when he executed the credit instruments upon which MGM relies for its breach of contract claim is a question of fact for the jury.

> ***Whether the intoxication was so great as to suspend or destroy the power of intelligent assent, is a question of fact***. Nor does it make any difference that the drunkenness was voluntary and willful, for ***the legal theory is, that, without the capacity of giving a deliberate assent, no contract can be made***. Story on Contr. (5th ed.) 86.

*Johnson v. Harmon*, 94 U.S. 371, 382 (1876) (emphasis added). Likewise, the issue of whether MGM was unjustly enriched is a determination to be made by the jury.

> We conclude that this conflicting evidence regarding whether or not a benefit was conferred upon the Brooks Trust created a genuine issue of material fact, and that the district court erred in granting summary judgement in favor of Brooks Trust on this issue but was correct in denying LeasePartners' motion on the same. Therefore, this issue must be remanded to the district court for the trier of fact to determine whether Brooks Trust was unjustly enriched, and if so, to what extent.

*Leasepartners Corp. v. Robert L. Brooks Trust*, 113 Nev. 747, 756, 942 P.2d 182, 187-88 (1997).

### III.    CONCLUSION

At its core, this is a negligence case involving the exploitation of a long-time VIP gaming patron who became unknowingly incapacitated through no fault of his own. In facing this predicament, with MGM management having observed behavior that was "erratic" to the point Dwight was described as being "wasted," MGM elected to ignore its own written policies embodying reasonable common sense, cultural norms and mores designed to prevent the harm suffered here by Dwight in favor of an avaricious pursuit of profit greatly exacerbating that harm. Plaintiff has marshalled more than sufficient evidence to demonstrate genuine issues of material facts that can only be resolved by the jury in this case. Summary judgment is clearly inappropriate, and MGM's Motion should be denied in all respects.

PRHLAW LLC
520 S. 4th Street, Suite. 360
Las Vegas, Nevada 89101
702.834.6166

1     DATED:  July 7, 2025                    Respectfully submitted,

2                                             PRHLAWLLC

3
                                              By: *Paul R. Hejmanowski*
4                                             Paul R. Hejmanowski, Esq. (SBN #94)
                                              Charles H. McCrea, Esq. (SBN #104)
5                                             520 South Fourth Street, Suite 360
                                              Las Vegas, NV 89101
6
7                                             *Attorneys for DWIGHT MANLEY*

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## INDEX TO APPENDIX OF EXHIBITS

| Exhibit | Description | No. of Pages | Bates Nos. |
|---|---|---|---|
| A | The Carlson Company, Inc. DFSA Drug Test Results | 8 | PAPP_001-009 |
| B | Expert Report of Michel Sucher MD DFSAM | 30 | PAPP_010-040 |
| C | Portions of Deposition of Daniel L. Overbeek, MD | 11 | PAPP_41-052 |
| D | Expert Report of Daniel L. Overbeek, MD | 10 | PAPP_053-063 |
| E | Rebuttal Expert Report of Sucher Medical Management, Ltd. | 6 | PAPP_064-070 |
| F | Expert Report of Tim Petropulos | 4 | PAPP_071-075 |
| G | March 30, 2022 Letter from Chesnoff & Schonfeld to Nevada Gaming Control Board | 2 | PAPP_076-078 |
| H | Declaration of Dwight Manley | 2 | PAPP_079-081 |
| I | MGM Security Department Incident Reports **CONFIDENTIAL - FILED UNDER SEAL** | 66 | PAPP_082-148 |
| J | Portions of Deposition of PK **CONFIDENTIAL – FILED UNDER SEAL** | 37 | PAPP_149-186 |
| K | Portions of Deposition of Marc Cassell | 9 | PAPP_187-196 |
| L | **MGM Resorts International Responsible Gaming Best Practices CONFIDENTIAL – FILED UNDER SEAL** | 4 | PAPP_197-201 |
| M | Techniques of Alcohol Management Server/Seller Participation Manual | 66 | PAPP_202-268 |
| N | Portions of Deposition of Jerilyn Koch | 13 | PAPP_269-282 |
| O | Portions of Deposition of Christopher R. Snyder | 5 | PAPP_283-288 |
| P | Timeline **CONFIDENTIAL – FILED UNDER SEAL** | 13 | PAPP_289-302 |
| Q | MGM's TTO Policy **CONFIDENTIAL – FILED UNDER SEAL** | 2 | PAPP_303-305 |
| R | Portions of Deposition of Vanessa Reboton | 11 | PAPP_306-317 |

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## CERTIFICATE OF SERVICE

Pursuant to Federal Rule of Civil Procedure 5(b), I hereby certify that on this 7th day of July 7, 2025, I caused the foregoing **REDACTED PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT (ECF NO. 160)** to be served by the Court's CM/ECF System to all parties and counsel of record.

*/s/Charles H. McCrea*

**PRHLAW**LLC
520 S. 4th Street, Suite. 360
LAS VEGAS, NEVADA 89101
702.834.6166