1  Lawrence J. Semenza, III, Esq., Bar No. 7174
   Email: ljs@semenzarickard.com
2  Katie L. Cannata, Esq., Bar No. 14848
   Email: klc@semenzarickard.com
3  SEMENZA RICKARD LAW
   10161 Park Run Drive, Suite 150
4  Las Vegas, Nevada 89145
   Telephone:  (702) 835-6803
5  Facsimile:  (702) 920-8669
6
7  *Attorneys for Defendant MGM Resorts International
   & Defendant/Counterclaimant MGM Grand Hotel, LLC*
8

SEMENZA RICKARD LAW
10161 Park Run Drive, Suite 150
Las Vegas, Nevada 89145
Telephone: (702) 835-6803

9           **UNITED STATES DISTRICT COURT**

10            **DISTRICT OF NEVADA**

11 DWIGHT MANLEY,                          Case No.  2:22-cv-01906-MMD-EJY

12              Plaintiff,               **DEFENDANT MGM RESORTS**
                                         **INTERNATIONAL AND**
13 v.                                    **DEFENDANT/COUNTERCLAIMANT**
                                         **MGM GRAND HOTEL, LLC'S REPLY**
14 MGM RESORTS INTERNATIONAL; MGM        **IN SUPPORT OF MOTION FOR**
   GRAND HOTEL, LLC,                     **SUMMARY JUDGMENT [ECF NO. 160]**
15
16              Defendants.

17 ──────────────────────────────

18 MGM GRAND HOTEL, LLC, a Nevada
   limited liability company,
19
20              Counterclaimant,

21 v.

22 DWIGHT MANLEY, an individual,

23              Counter-Defendant.

24

25 **I.     INTRODUCTION**

26        Plaintiff Dwight Manley's ("Manley") claims collapse under the weight of their own

27 contradictions, legal deficiencies and the undisputed facts in this matter.  In fact, his Response to

28 the Motion fails to meaningfully address many of the arguments raised by Defendants in favor of

                                    1

SEMENZA RICKARD LAW
10161 Park Run Drive, Suite 150
Las Vegas, Nevada 89145
Telephone: (702) 835-6803

1    summary judgment.  Ultimately, the Response confirms that there are no genuine issues of

2    material fact preventing summary judgment on each of Manley's claims or MGM Grand's

3    counterclaims.  The Motion must be granted in its entirety.

4        First, Manley's claim under the Nevada Deceptive Trade Practices Act (the "NDTPA") is

5    dead on arrival.  Indeed, Manley fails to even address this claim in his Response.  His silence on

6    this issue is dispositive.  Among other reasons, the NDTPA does not and cannot apply to the

7    extension of casino credit, which is governed by Nevada's Gaming Control Act.  Manley offers

8    no authority to the contrary.  Even if the statute somehow applied (it does not), Manley cannot

9    establish legally cognizable damages under NRS 41.600.  As such, summary judgment must be

10    entered on Manley's NDTPA claim.

11        Next, Manley's purported incapacity defense fails as a matter of law for one simple

12    reason: he repeatedly acted inconsistently with any intent to disaffirm the credit instruments, and

13    by doing so, ratified them.  Those inconsistent acts are not in dispute.  Manley's ratification of

14    the credit instruments proves fatal to his purported incapacity defense in this matter.  Notably,

15    Manley fails to address any of Defendants' arguments concerning ratification, and instead solely

16    argues disaffirmance.  However, even if Manley had not ratified the credit instruments (he

17    clearly did), the Response confirms that Manley did not promptly disaffirm them.  Rather,

18    Manley took a "wait and see" approach to his outstanding debt to MGM Grand, which is clearly

19    **contrary** to what is required to disaffirm a contract.  Absent a viable incapacity defense, there is

20    no genuine dispute that Manley breached the express terms of the credit instruments, as well as

21    the implied covenant of good faith and fair dealing, by failing to remit the $440,000.00

22    outstanding balance owed to MGM Grand.  Accordingly, summary judgment must be entered on

23    MGM Grand's contract-based claims against Manley.

24        The same is true of Manley's claims for Declaratory Relief and Breach of the Implied

25    Covenant of Good Faith and Fair Dealing.  Because he has no incapacity defense, the gravamen

26    of Manley's Declaratory Relief claim fails.  Similarly, Manley's ratification of the credit

27    instruments confirms that he does not have a viable claim for Breach of the Implied Covenant of

28    Good Faith and Fair Dealing.  There is simply no evidence that Defendants acted in any way

inconsistent with the purpose of the credit instruments, or Manley's expectations concerning those contracts. Thus, summary judgment must also be entered in Defendants' favor on these claims.

In addition, Manley cannot establish a claim for Negligence against Defendants. First, there is simply no evidence that Manley's drink was "spiked" with Ketamine by an MGM Grand bartender. There is similarly no evidence that Manley was "drugged" by some unknown third party by way of contaminated bar ingredients. Even assuming, arguendo, that Manley **was** purportedly "drugged," his "drugging" by a third party was not – and could not have been – foreseeable under NRS 651.015 as a matter of law. Moreover, Manley's alternative theory – that Defendants were negligent in serving him alcohol after he became visibly "erratic" – was already rejected by this Court, and as such, cannot serve as the basis of his Negligence claim. As such, Defendants are entitled to summary judgment on this claim as well.

Finally, Manley's Unjust Enrichment claim cannot survive where valid, enforceable written contracts govern the subject matter of the dispute. Even if his claim were viable, the evidence shows that Manley – not Defendants – received the benefit of the transactions at issue (*i.e.* credit which he used to gamble at the MGM Mansion salon). Indeed, Manley's use of his credit line and subsequent refusal to pay the remaining balance to MGM Grand only undermines any equitable theory of relief. Therefore, the Court must enter summary judgment on Manley's claim for Unjust Enrichment.

For these reasons, and those discussed below, Defendants' Motion must be granted in its entirety.

## II.    ARGUMENT

### A.    Manley's Response Fails to Address Defendants' Request for Summary Judgment on His Nevada Deceptive Trade Practices Claim

Notably absent from Manley's Response is **any** discussion concerning his NDTPA claim against Defendants. (*See* ECF No. 188.) This is despite the fact that the Motion addresses the NDTPA (and the grounds for summary judgment in Defendants' favor) at length. (ECF No. 160, pgs. 19-23.) Specifically, as set forth in the Motion, Manley's NDTPA claim fails for three (3)

SEMENZA RICKARD LAW
10161 Park Run Drive, Suite 150
Las Vegas, Nevada 89145
Telephone: (702) 835-6803

SEMENZA RICKARD LAW
10161 Park Run Drive, Suite 150
Las Vegas, Nevada 89145
Telephone: (702) 835-6803

reasons.  First, Manley's NDTPA claim is premised upon MGM Grand's extension of credit to him, which he used to gamble.   The NDTPA, however, does ***not*** encompass a gaming licensee's extension of credit to a patron.  Again, as stated in NRS 598.0955(a), "[t]he provisions of NRS 598.0903 to 598.0999, inclusive, ***do not apply to … [c]onduct in compliance with the orders or rules of, or a statute administered by, a federal, state or local governmental agency***." (Emphasis added.)  Because the Nevada Gaming Control Board, and Nevada's Gaming Control Act, clearly regulate and control casinos' extensions of credit to patrons, an extension of credit would not constitute the type of "consumer transaction" contemplated by the NDTPA.  Manley does not cite to authorities – or even argue – to the contrary.

Next, even if the NDTPA applied to a licensee's extension of credit (it does not), Manley has not suffered legally cognizable damages under NRS 41.600.  As set forth in *Leigh-Pink v. Rio Properties, LLC*, 138 Nev. Adv. Op. 48, 512 P.3d 322, 327 (2022), a plaintiff who receives the true value of the goods or services purchased has not suffered damages under NRS 41.600, which is precisely what occurred here.  There is no dispute that Manley received the "true value" of the credit instruments he executed in favor of MGM Grand.  Given that Manley's NDTPA claim is exclusively premised upon related economic damages (*i.e.* the $2 million that was withdrawn from his bank account upon depositing Credit Instrument No. 782928177, the $560,000.00 in gaming chips he paid toward his debt to MGM Grand, and the $440,000.00 balance he currently owes on Credit Instrument No. 782929189) he has not – and cannot – establish legally cognizable damages under NRS 41.600 as a matter of law.

Finally, and as discussed in detail below, Manley's NDTPA claim – which is premised upon allegations of "tak[ing] advantage of another person's inability to reasonably protect his or her own rights or interests in a consumer transaction" – fails, given he ratified his credit instruments with MGM Grand.  Put differently, because Manley did not promptly disaffirm the credit instruments – but instead, ratified them – he cannot establish that he was purportedly incapable of "protecting his . . . own rights in a consumer transaction" as required.

The foregoing, paired with the fact that Manley's Response wholly fails to address Defendants' arguments concerning his NDTPA claim, requires that summary judgment be entered in their favor.

**B.**    **Manley Did Not Promptly Disaffirm His Debt, But Rather, Ratified It as a Matter of Law, and As Such, MGM Grand Is Entitled to Summary Judgment on Its Contract-Based Claims**

While Manley's Response generally argues whether he disaffirmed his debt to MGM Grand (he did not), it completely ignores the issue of ratification presented in this matter.  As discussed in the Motion, and as detailed below, Manley clearly failed to promptly disaffirm the credit instruments at issue.  In fact, Manley took ***a number*** of material acts that were inconsistent with any intent to disaffirm the credit instruments – and by doing so – ratified them.  The underlying facts confirming Manley's ratification are not in dispute.  Accordingly, summary judgment must be entered in MGM Grand's favor on its claims for Breach of Contract and Breach of the Implied Covenant of Good Faith and Fair Dealing.

**1.**    ***The Record Confirms that Manley Ratified the Credit Instruments***

As stated in Defendants' Motion, the power of a party to avoid a contract for incapacity is lost if "he manifests to the other party his intention to affirm it ***or acts with respect to anything that he has received in a manner inconsistent with disaffirmance***."  *See* Restatement (Second) of Contracts § 380 (1981) (emphasis added); 17A C.J.S. Contracts § 185 (stating that ratification of a contract may be found under a variety of circumstances, such as "***taking any material act inconsistent with the intent to avoid the contract***, or recognizing the validity of the contract by acting upon it, performing under it, or affirmatively acknowledging it.") (Emphasis added.)  Importantly, "[o]nce a party ratifies a contract, it may not later withdraw its ratification and seek to avoid the contract." *Mo. Pac. R.R. Co. v. Lely Dev. Corp.*, 86 S.W.3d 787, 792-93 (Tex. Ct. App. 2002); *Techs. Consultants, Inc. v. Pilkington PLC*, 137 F.3d 1382, 1391 (9th Cir. 1998) (finding ratification where alleged victim failed to claim voidability until filing the lawsuit).

The Response outright ignores the fact that Manley's undisputed acts of ratification – which were ***entirely*** inconsistent with disaffirmance – proves fatal to any purported incapacity

SEMENZA RICKARD LAW
10161 Park Run Drive, Suite 150
Las Vegas, Nevada 89145
Telephone: (702) 835-6803

defense in this matter.  Indeed, Manley provides no response to Defendants' argument that he ratified the credit instruments by, among other things: (1) continuing to gamble at MGM Grand's property on December 11 and 12, 2021; (2) utilizing his credit line to gamble on December 11 and 12, 2021;[1] (3) continuing to accept comped accommodations from Defendants during his December 2021 stay; and – most importantly –  (4) remitting $560,000.00 worth of gambling chips to be applied as a partial payment to the outstanding balance owed to MGM Grand.[2]  (ECF No. 160, Ex. 2 at 143:11-16, 162:9-13; Ex. 11.)  What's more, the Response further confirms that Manley ratified the credit instruments by transferring money to his bank account so that the $2 million marker would be cleared by his bank – which demonstrates that he ***knew*** his debt had to be paid.  (ECF No. 178, 9:2-4.)

Each of the foregoing acts are ***materially inconsistent*** with any intent to disaffirm the credit instruments at issue – and as such – constitute acts of ratification.  Moreover, these facts are not in dispute – which is precisely why Manley did not address them in his Response.  Manley's partial payment toward his outstanding debt with MGM Grand – as well as his use of his credit line to gamble on the days immediately following the incident – clearly confirm that Manley ratified the credit instruments as a matter of law.

The Court's analysis of whether Manley has a viable incapacity defense ends here.  *See Mo. Pac. R.R. Co*, 86 S.W.3d at 792-93 ("Whether a party has ratified a contract may be determined as a matter of law if the evidence is not controverted or is incontrovertible."); *Sununu v. Philippine Airlines, Inc*., 792 F. Supp. 2d 39, 56 (D.D.C. 2011) ("By seeking to fulfill the contract, they foreclosed their opportunity to invalidate it.") Even assuming, *arguendo*, that Manley lacked capacity on December 10, 2021, his ratification of those credit instruments on the days that followed proves fatal to any purported incapacity defense in this action.

---

[1] As stated in the Motion, Manley did not utilize the additional $500,000.00 in credit he requested and received by way of the third Marker Limit Increase Request until December 11 and 12, 2021.

[2] Indeed, even if this Court were to somehow construe Manley's December 13, 2021 preservation letter as an act of disaffirmance (which it clearly is not), Manley undertook the foregoing ratifying acts ***prior*** to sending that letter.

SEMENZA RICKARD LAW
10161 Park Run Drive, Suite 150
Las Vegas, Nevada 89145
Telephone: (702) 835-6803

SEMENZA RICKARD LAW
10161 Park Run Drive, Suite 150
Las Vegas, Nevada 89145
Telephone: (702) 835-6803

**2.** *The Response Confirms that Manley Did Not Promptly Disaffirm the Credit Instruments*

While Manley fails to address the issue of ratification, his Response attempts (but fails) to argue disaffirmance of the credit instruments in question.  However, even if Manley had not ratified the credit instruments (which he clearly did), he ***did not*** promptly disaffirm them.  In fact, the foregoing is only underscored by his Response.

The Response apparently argues that Manley took a "wait and see approach" to his outstanding debt to MGM Grand.  Among other things, Manley contends that instead of ***promptly*** disaffirming the credit instruments, he (1) underwent drug testing, (2) subjected his wife and friends to polygraph examinations and (3) submitted a statement to the Nevada Gaming Control Board.  (ECF No. 188, 8:22-9:6.)  In fact, Manley acknowledges that he did not attempt to disaffirm the credit instruments even upon receiving notice that MGM Grand intended to deposit the $2 million marker.  Rather, Manley transferred "sufficient money from another account so that the marker could and would be cleared by the bank."[3]  (*Id.* at 9:6-11.)

A purportedly incapacitated party, however, is not afforded a "wait and see" approach to disaffirmance.  In fact, the law requires the exact ***opposite***.  Nevada courts have adopted the Restatement (Second) of Contracts, which states that "[o]n becoming sober, the intoxicated person ***must act promptly*** to disaffirm [the contract]." Restatement (Second) of Contracts § 16 cmt. C (emphasis added).  By his own admissions, Manley's "wait and see" approach confirms that he ***did not*** promptly disaffirm the credit instruments.  The foregoing is further confirmed by the fact that Manley (1) made no mention of the credit instruments to Ms. Reboton on December 11 or 12, 2021, (2) continued to gamble at MGM Grand's casino for two days after the alleged incident,[4] and (3) even executed two ***additional*** credit instruments during that time.  (ECF No.

---

[3] Notwithstanding Manley's various explanations for transferring funds to satisfy the $2 million credit instrument, his act of doing so should be construed as an act of ratification – ***not*** disaffirmance.

[4] During this time, Manley also continued to receive comped goods and services from Defendants, including a comped entry to a Texas Hold 'Em Tournament, use of MGM Resorts' bunker for a UFC fight and use of MGM Resorts' private jet to return home on December 12, 2021.  (ECF No. 160, Ex. 2 at 100:19-24.)

160, Exhibits 10-11.) What's more, neither Manley's statement to the NVGCB – nor his police report with the Las Vegas Metropolitan Police Department ("LVMPD") – made any mention of his intent to disaffirm the credit instruments at issue. Thus, the record in this matter leads to only one conclusion: Manley did not promptly disaffirm the credit instruments at issue, including Credit Instrument No. 782928189, which has an unpaid balance of $440,000.00 due and owing to MGM Grand.

Finally, Manley erroneously claims that the issue of disaffirmance has "already been resolved in this case in Dwight's favor" by way of this Court's Order Granting his Motion for Adverse Inference. (ECF No. 188, 7:13-15.) Manley, however, ***completely*** misconstrues that Order by claiming that the Court found that his December 13, 2021 preservation of evidence letter "served as prompt disavowal of the validity of [Manley's] gambling debt." (*Id.* at 8:16-17.) The Court made no such finding, and Manley's assertion that the foregoing is now "the law of the case" is absurd. Indeed, that order ***actually*** states that Manley responded "by asserting that his preservation demand on December 13, 2021 served as prompt disavowal of the validity of his gambling debt. (*See* ECF No. 171.) Thus, Manley falsely claims that the Court's mere recapitulation of his argument is the Court ruling. Moreover, at that juncture, the Court was not tasked with examining the evidence produced in this matter to determine the issue of disaffirmance (or more importantly, ratification).[5] Now, however, having been presented with ***no*** evidence to support disaffirmance – but rather, evidence confirming ***ratification*** – it is clear that Manley does not have a viable incapacity defense.

### 3. *Under Any Scenario, Manley Is Without Clear and Convincing Evidence to Prove Incapacity*

Even if there was a triable issue of fact concerning Manley's ratification of the credit instruments or his failure to promptly disaffirm (which there are not), Manley has no means of establishing lack of capacity by clear and convincing evidence. *See* 17B C.J.S. Contracts § 988

---

[5] Manley's Motion for Adverse Inference, and this Court's related Order, has no bearing on whether summary judgment must be entered in Defendants' favor as a matter of law (which it must).

SEMENZA RICKARD LAW
10161 Park Run Drive, Suite 150
Las Vegas, Nevada 89145
Telephone: (702) 835-6803

(2018) (stating that a "party must present convincing proof of claims that due to intoxication at the time of making a contract, the party was bereft of mental faculties.")  While the Response goes to great lengths to defend the hair test performed by Carlson Company – each of Manley's arguments are unavailing.  Indeed, the Response solely discusses the various opinions of the parties' experts as it relates to the hair test results – but ignores the fact that the hair test is wholly unreliable and inadmissible.[6]

What's more, and as discussed in the Motion, the purported hair test results do not establish that Manley was – in fact – drugged with Ketamine on December 10, 2021.  Among other reasons, the hair test's baseline sample (reflecting a time period between October 25, 2021 to November 22, 2021) returned positive for Ketamine.  (ECF No. 179-1.)  In other words, the hair test results confirm that Manley had Ketamine in his system the month ***prior*** to his visit to MGM Grand's property.  Thus, at ***best*** the purported hair test results detected Ketamine in Manley's system between a window of October 25, 2021 and December 20, 2021.  The foregoing does not – and cannot – establish that Manley was purportedly drugged ***on*** December 10, 2021 as he alleges in this action.[7]

---

[6] "[W]hen ruling on a motion for summary judgment, the district court is limited to considering admissible evidence." *Gypsum Res., LLC v. Clark Cnty.*, 674 F. Supp. 3d 985, 1001 (D. Nev. 2023), *appeal dismissed*, No. 23-15924, 2024 WL 5274612 (9th Cir. July 24, 2024) (citing *Orr v. Bank of Am., NT & SA*, 285 F.3d 764, 773 (9th Cir. 2002)); FRCP 56(c)(2) ("A party may object that the material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence.") The hair test results proffered by Manley purport to come from the Carlson Company.  (ECF No. 179-1.)  The Carlson Company, however, did not perform any testing of the hair sample.  In fact, during the deposition of Kaily Bissani ("Mr. Bissani") – owner of the Carlson Company – Mr. Bissani confirmed that the Carlson Company is not even ***qualified*** to conduct hair testing, and therefore, have never performed such tests.  (Portions of Kaily Bissani Deposition Transcript, 57:25-58:5, 77:15-20, a true and correct copy is attached hereto as 64:9-11 1.) Instead, the Carlson Company sends hair samples to a third-party laboratory – ExperTox.  (*Id.*)  The Carlson Company merely places its company header at the top of ExperTox's results.  (64:9-11.)  Because Mr. Bissani did not perform the hair testing nor did he rely on ExperTox's result in developing any expert opinion of her own – and has ***no*** personal knowledge as to how the test preformed – he is not qualified to testify to (or authenticate) its results.  The same is true of Manley's retained experts.  They should not (and cannot) be permitted to rely upon wholly unreliable data.  What's more, Manley has not identified a witness and/or custodian of records from ExperTox who would be qualified to testify and/or authenticate the hair test results at the time of trial.

[7] Moreover, the purported hair test results expressly state that they are "***not*** for forensic purposes."  (ECF No. 179-1.)

Accordingly, under any scenario, Manley cannot avoid his repayment obligations to MGM Grand.

### 4. *Because Manley's Purported Incapacity Defense Fails, MGM Grand Is Entitled to Summary Judgment on its Contract-Based Claims*

Considering that Manley's purported incapacity defense fails, he is without any means of preventing summary judgment on MGM's contract-based claims.  Indeed, as evidenced by the Response, Manley does not dispute that he (1) signed the credit instrument at issue (*i.e.* Credit Instrument No. 782928189, which has a remaining balance of $440,000.00), (2) received $1,000,000.00 in credit as evidenced by that credit instrument on December 10, 2021, and (3) has since refused to remit the remaining balance owed to MGM Grand.  (ECF No. 160, Ex. 13.) There is also no question that the credit instruments executed by Manley evidence valid and enforceable gaming debts under Nevada law. NRS 463.368(1); *Nguyen v. State*, 116 Nev. 1171, 1175, 14 P.3d 515, 518 (2000); *Zoggolis v. Wynn Las Vegas, LLC*, 768 F.3d 919, 923 (9th Cir. 2014).

By failing to timely repay the remaining balance of Credit Instrument No. 782928189 in full – and because he is without ***any*** defense that would otherwise excuse his performance – Manley breached his contracts with MGM Grand.[8]  Moreover, because Manley has attempted (and continues to attempt) to avoid liability for his debt, he has similarly breached the duty of good faith and fair dealing implied in all contracts. Therefore, summary judgment must be entered in MGM Grand's favor on its claims for Breach of Contract and Breach of the Implied Covenant of Good Faith and Fair Dealing as a matter of law.

### C. Given Manley's Ratification of the Credit Instruments, Summary Judgment Must Be Entered on His Claims for Declaratory Relief and Breach of the Implied Covenant of Good Faith and Fair Dealing

Just as he ignores his ratification of the credit instruments, Manley makes no mention of his claims for Declaratory Relief and Breach of the Implied Covenant of Good Faith and Fair

---

[8] In addition to the credit instruments at issue, Manley also executed a Credit Application with MGM Grand, by which he agreed that he had "the ability and intent to legally pay through [his] bank or financial institution the funds represented by the markers signed by [him] . . . ."  (ECF No. 160, Ex. 14.)

SEMENZA RICKARD LAW
10161 Park Run Drive, Suite 150
Las Vegas, Nevada 89145
Telephone: (702) 835-6803

SEMENZA RICKARD LAW
10161 Park Run Drive, Suite 150
Las Vegas, Nevada 89145
Telephone: (702) 835-6803

Dealing in his Response.  By doing so, Manley overlooks the fact that his ratification proves fatal to the foregoing claims.  As detailed in Defendants' Motion, Manley seeks judicial declarations concerning (1) his incapacity to contract and (2) the invalidity of the Marker Limit Increase Requests and credit instruments at issue.  (See ECF No. 64, ¶¶ 73(c)-(g).)  Because Manley's purported incapacity defense fails as a matter of law, it goes without saying that he is *not* entitled to the foregoing judicial declarations.  Thus, summary judgment must be entered on the foregoing portions of Manley's Declaratory Relief claim.

Given that he ratified the credit instruments at issue, Manley is similarly without any means of establishing his Breach of the Implied Covenant of Good Faith and Fair Dealing claim. Again, Defendants have only acted in a manner consistent with the terms of the credit instruments – including, but not limited to – their deposit of the $2 million marker.  (*See* ECF No. 161-6.)  Moreover, Defendants did not act inconsistent with Manley's expectations concerning his contracts with MGM Grand.  The foregoing is confirmed by Manley's (1) deposit of the $560,000.00 toward the outstanding balance, and as he now acknowledges, (2) "transfer of sufficient money from another account so that the [$2 million] marker could and would be cleared by the bank." (ECF No. 188, 9:6-8.)  Accordingly, Defendants are entitled to summary judgment on Manley's claim for Breach of the Implied Covenant of Good Faith and Fair Dealing.

    **D.**    <u>Summary Judgment Is Warranted on Manley's Negligence Claim</u>

    **1.**    ***Manley Cannot Establish His Negligence Claim Under NRS 651.015***

The Response conveniently ignores the fact that Manley has maintained – since the alleged incident occurred – that he was purportedly drugged by the MGM Grand Mansion bartender on December 10, 2021.[9]  (ECF No. 161-2 at 94:14-95:7; ECF No. 161-10; ECF No. 161-12.)  As set forth in the Motion, the video surveillance footage confirms the foregoing to be untrue.  (ECF No. 163, Camera 2868 at 13:51-13:54.)  The footage ***does not*** depict the MGM Grand Mansion bartender putting anything out of the ordinary into Manley's first Old Fashioned

---

[9] Under this theory of liability, NRS 651.015 would not apply, given that it is only applicable to foreseeable wrongful acts of ***third parties.***

11

Cocktail.  (*Id.*)  In fact, after investigating the alleged incident, LVMPD found the same. (ECF No. 161-12.)

Knowing that the evidence produced in this matter dispels his belief that an MGM Grand bartender allegedly "drugged him," Manley has since shifted his theory of liability in this case and erroneously argues that his purported "drugging" by an unknown third party was foreseeable to Defendants.  The Response, however, fails to provide any explanation as to ***how*** Manley was purportedly "drugged" by way of his first Old Fashioned on December 10, 2021.  In fact, as evidenced by his shifting theories in this case, Manley has not – and cannot – present a cogent argument as to what precisely happened and/or how the alleged incident occurred.  This alone confirms that his alleged "drugging" ***could not*** have been foreseeable to Defendants.  Put simply, there is no way that Defendants could have foreseen and/or prevented (1) an unknown third party, (2) allegedly "drugging" Manley by some ***unknown*** means.

Nevertheless, because Manley now purportedly claims that he was "drugged" by an unknown third party, NRS 651.015 sets forth the applicable standard for his Negligence claim. Importantly, NRS 651.015(2) states that the Court "shall determine ***as a matter of law*** whether the wrongful act was foreseeable and whether the owner or keeper had a duty to take reasonable precautions against the foreseeable wrongful act of the person who caused the death or injury." (Emphasis added.)  The record in this case confirms that Manley's purported "drugging" by a third party was not – and could not have been – foreseeable as a matter of law.

First, and as stated in the Motion, Manley previously testified that that the ingredients of his first Old Fashioned Cocktail "must have" contained Ketamine.  (ECF No. 161-2 at 95:16-96:4.)  In other words, Manley maintains that Defendants could have foreseen that the MGM Mansion bar ingredients were somehow contaminated with Ketamine by an unknown third party on December 10, 2021.  It goes without saying that the foregoing assertion is absurd.[10]  There is

---

[10] The chain of custody of Manley's first Old Fashioned cocktail further negates any foreseeability argument in this case.  The only two people who came into contact with Manley's first drink were (1) the MGM Mansion bartender, and (2) Manley's wife.  The video surveillance dispels does not depict either individual putting any unknown substance in Manley's drink.  (ECF No. 163, Camera 2809 at 13:54, Camera 2851 at 1354.)

SEMENZA RICKARD LAW
10161 Park Run Drive, Suite 150
Las Vegas, Nevada 89145
Telephone: (702) 835-6803

SEMENZA RICKARD LAW
10161 Park Run Drive, Suite 150
Las Vegas, Nevada 89145
Telephone: (702) 835-6803

simply no evidence to suggest that any of the alcohol and/or ingredients utilized in Manley's first cocktail were contaminated with Ketamine by a third party (because they were not). There is similarly no evidence that Defendants were aware of the use of purported drug-contaminated bar ingredients in the past and failed to take reasonable precautions to prevent the same from allegedly occurring on December 10, 2021. Unsurprisingly, Manley proffers no explanation as to how and/or why ***any*** bar ingredients would be contaminated with Ketamine – let alone ***who*** would have the ability and/or intent of doing so.

What's more, Manley is without evidence of any prior incidents that would ***remotely*** make his alleged drugging by an unknown third party (particularly by "spiked" bar ingredients") foreseeable to Defendants. While the Response points to an unrelated incident in which patrons alleged to have been involuntarily drugged, that incident is not sufficiently similar enough to the alleged incident in this action to establish foreseeability. *Humphries v. New York-New York Hotel & Casino*, 133 Nev. 607, 612 403 P.3d 358, 362 (2017) (When determining whether prior wrongful acts are sufficiently similar, district courts should consider, among other things, ***the location***, ***the level of violence***, and ***security concerns implicated*** between the wrongful act in the lawsuit and any prior wrongful acts on the premises.") (Emphasis added). Among other reasons, the incident cited in the Response did not involve (1) MGM Grand's property, (2) allegations of an alleged third-party drugging (as opposed to unsubstantiated allegations against an employee), (3) purportedly contaminated bar ingredients, or (4) the issuance of credit and/or gambling. Moreover, the patrons involved in that incident never underwent drug testing, filed a police report or lawsuit. As such, that prior incident alone ***does not*** establish foreseeability in this action.

Finally, and despite NRS 651.015's express language to the contrary, Manley erroneously insists that the issue of foreseeability and/or Defendants' exercise of due care are questions of fact for the jury. In doing so, Manley cites a number of cases that are factually inapposite and/or inapplicable to this case. For instance, the Response cites *Early v N.L.V. Casino Corp.*, 100 Nev.

SEMENZA RICKARD LAW
10161 Park Run Drive, Suite 150
Las Vegas, Nevada 89145
Telephone: (702) 835-6803

200, 678 P.2d 683 (1984) for the premise that "the reasonableness of the hotel's efforts to discharge its duty was an issue for the jury to determine." *Early,* however, was decided before NRS 651.015 was enacted in 1995.   The same is true of *Morrison v MGM Grand Hotel*, 570 F. Supp. 1449 (1983).  As such, neither of these cases involved NRS 651.015 – or its requirement that the Court "determine as a matter of law" the issues of foreseeability and whether the landowner had a duty to take reasonable precautions.  *See* NRS 651.015(2).   Manley's reliance on *Lee v GNLV Corp*., 117 Nev. 291, 22 P.3d 209 (2001) and *Boutwell v PHWLV, LLC*, 135 Nev. 616, 451 P3 83 (2019) is similarly misplaced.  Neither *Lee* nor *Boutwell* involved wrongful third-party acts – and therefore – did not implicate NRS 651.015 in any way.

Considering the foregoing, Manley has not – and cannot – establish that his alleged drugging was foreseeable as a matter of law.  It thereby follows that he cannot establish that Defendants breached any duty of care as it relates to his alleged "drugging."  *See Blanco v. Circus Circus Casinos, Inc.*, No. 2:10-CV-02198-RLH, 2012 WL 1900942, at *4 (D. Nev. May 24, 2012) (finding that where a third-party criminal act was unforeseeable, "Circus Circus owed Blanco no duty under Nevada's Innkeeper Statute, NRS 651.015, as a matter of law.")  Put simply, Defendants are not insurers of the safety of persons on their premises,[11] and without foreseeable or duty, there can be *no* finding of liability.

Accordingly, summary judgment must be entered on Manley's claim for Negligence.

### 2.   *This Court Has Already Determined that Manley Cannot Premise His Negligence Claim on Defendants' Furnishing of Alcohol*

Manley spends a significant portion of his Response arguing that Defendants purportedly violated internal policies – and a TAM Manual – concerning the furnishing of alcohol to visibly intoxicated guests.   (ECF No. 188: 18:25-23:27.)  Specifically, the Response alleges that "the manner in which Dwight was served cocktails repeatedly fell below the standard of care owed to Dwight." (*Id.* at 21:7-10.)  Manley's effort to argue negligence on this basis is futile.

By way of its May 30, 2023 Order Granting in Part and Denying in Part Defendants' Motion to Dismiss Manley's FAC [ECF No. 28], the Court found that Defendants *did not* owe a

---

[11] *Sprague v. Lucy Stores, Inc*., 109 Nev. 247, 250, 849 P.2d 320, 322 (1993).

SEMENZA RICKARD LAW
10161 Park Run Drive, Suite 150
Las Vegas, Nevada 89145
Telephone: (702) 835-6803

duty to stop serving Manley alcohol once he had become visibly "erratic." *See Rodriguez v. Primadonna Co., LLC,* 216 P.3d 793, 798 (Nev. 2009) ("[I]t is well settled in Nevada that commercial liquor vendors, including hotel proprietors, cannot be held liable for damages related to any injuries caused by the intoxicated person, which are sustained by either the intoxicated patron or a third party.")*; Mehta v. Victoria Partners*, Case No. 2:21-cv-01493-CDS-VCF,2023WL 205758, at *3 (D. Nev. Jan. 17, 2023) (finding the plaintiff's negligence claim "cannot proceed" in part because he failed to plead a duty owed to him by the defendant casino resort—a result of Nevada's commitment to the nonliability principle.) As such, the Court found that Manley's "negligence claim fails . . . to the extent that Manley alleges Defendants had an affirmative duty to stop serving him alcohol once he became visibly intoxicated." (ECF No. 28, 8:5-7.)

Because Defendants did not owe a duty of care to Manley to stop serving him alcohol on December 10, 2021, he cannot rely upon the furnishing of alcohol – or testimony that he appeared "drunk" or "wasted" – to establish his Negligence claim in this matter. The same is true of any argument that Defendants had an affirmative duty of care to prevent him from requesting credit and continuing to gamble after he purportedly became "erratic." As stated in Defendants' Motion, there is no such common law duty of care that has been entertained – let alone adopted – by Nevada courts. Manley presents no argument or authority to the contrary.

Finally, considering that Defendants did not owe Manley a duty of care as it relates to the furnishing of alcohol on December 10, 2021, they ***cannot*** be held liable for any of Manley's purported physical injuries in this matter.[12] *Rodriguez*, 125 Nev. at 585 ("[C]ommercial liquor vendors, including hotel proprietors, cannot be held liable for damages related to any injuries caused by the intoxicated patron, which are sustained by either the intoxicated patron or a third party.") (citing *Hamm v. Carson City Nugget, Inc.*, 85 Nev. 99, 101, 450 P.2d 358, 359 (1969).

---

[12] Indeed, apart from complaints of a cut on his hand and alleged bruising, Manley has not identified any medical expenses associated with those injuries. Manley's retained experts similarly do not opine to any medical treatment for his physical injuries – or purported emotional damages. Rather, the gravamen of Manley's Negligence claim is based upon ***economic*** damages, *i.e.* his gambling losses, which are clearly contractual in nature.

SEMENZA RICKARD LAW
10161 Park Run Drive, Suite 150
Las Vegas, Nevada 89145
Telephone: (702) 835-6803

For these reasons, the Court must enter summary judgment in Defendants' favor on Manley's claim for Negligence.

**E.    Manley Does Not Have a Viable Claim for Unjust Enrichment**

As set forth in the Motion, a claim for unjust enrichment is unavailable where there is an express written contract. *See* 66 Am.Jur.2d Restitution §§ 6, 11 (1973). Nevertheless, Manley's sole argument against the entry of summary judgment on this claim is premised upon his (erroneous) belief that the credit instruments are void and unenforceable by virtue of his incapacity defense. As established herein, that defense fails as a matter of law – and does ***not*** render the credit instruments at issue as "invalid, voidable or otherwise ineffective" as Manley suggests. (ECF No. 188:11-15.) Again, the record in this matter confirms that Manley did not promptly disaffirm those credit instruments – but instead – ratified them as a matter of law. Moreover, the credit instruments directly inform the gambling debt Manley seeks to recoup in this case. Because the credit instruments are express written contracts – which are both valid and enforceable – Manley's claim for Unjust Enrichment fails.

What's more, Manley has no means of establishing that Defendants have been unjustly enriched. Indeed, it was ***Manley*** who (1) received credit in the form of gambling chips on December 10, 2021, (2) gambled with those chips, and (3) lost those chips through the course of his gameplay. Moreover, it is ***Manley*** who has – to date – refused to remit the remaining $440,000.00 balance owed to MGM Grand. Thus, if any party was conferred a benefit for purposes of an unjust enrichment claim, it was Manley – ***not*** Defendants. Defendants ***could not*** have been unjustly enriched by their extension of credit (*i.e.* gambling chips) to Manley, which he used, lost and failed to repay in full.

Accordingly, summary judgment is warranted on Manley's Unjust Enrichment claim as well.

///

///

///

///

III.    **CONCLUSION**

Considering the foregoing, Defendants respectfully request that the Court grant the instant Motion in its entirety.

DATED this 15th day of August 2025.

SEMENZA RICKARD LAW

*/s/ Lawrence J. Semenza, III*
Lawrence J. Semenza, III, Esq., Bar No. 7174
Katie L. Cannata, Esq., Bar No. 14848
10161 Park Run Drive, Suite 150
Las Vegas, Nevada 89145
*Attorneys for Defendant MGM Resorts International*
*& Defendant/Counterclaimant MGM Grand Hotel,*
*LLC*

SEMENZA RICKARD LAW
10161 Park Run Drive, Suite 150
Las Vegas, Nevada 89145
Telephone: (702) 835-6803

## CERTIFICATE OF SERVICE

I am employed by the law firm of Semenza Rickard Law in Clark County, Nevada. I am over the age of 18 and not a party to this action. The business address is 10161 Park Run Drive, Suite 150, Las Vegas, Nevada 89145.

I hereby certify that on the 15th day of August 2025, I served the document(s), described as:

**DEFENDANT MGM RESORTS INTERNATIONAL AND DEFENDANT/COUNTERCLAIMANT MGM GRAND HOTEL, LLC'S REPLY IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT [ECF NO. 160]**

☒    by placing the ☐ original ☒ a true copy thereof enclosed/attached and delivered:

☒ a. via **ECF System** *(You must attach the "Notice of Electronic Filing", or list all persons and addresses and attach additional paper if necessary)*

**PRHLAW LLC**
Charles H. McCrea, charles@prhlawllc.com, tlc@hmlawlv.com
Paul R. Hejmanowski, paul@prhlawllc.com, tc@hmlawlv.com
*Attorneys for Plaintiff*

☐ b. **BY U.S. MAIL.** I deposited such envelope in the mail at Las Vegas, Nevada. The envelope(s) were mailed with postage thereon fully prepaid. I am readily familiar with Semenza Rickard Law's practice of collection and processing correspondence for mailing. Under that practice, documents are deposited with the U.S. Postal Service on the same day which is stated in the proof of service, with postage fully prepaid at Las Vegas, Nevada in the ordinary course of business. I am aware that on motion of party served, service is presumed invalid if the postal cancellation date or postage meter date is more than one day after the date stated in this proof of service.

☐ c. **BY PERSONAL SERVICE.**

☐ d. **BY DIRECT EMAIL**

☐ e. **BY FACSIMILE TRANSMISSION.**

I declare under penalty of perjury that the foregoing is true and correct.

*/s/ Olivia A. Kelly*
An Employee of Semenza Rickard Law

# EXHIBIT 1

# EXHIBIT 1

**Dwight Manley**

**v.**

**MGM Resorts International, et al.**

**Transcript of**

**Kaily Bissani**

**Volume II**

**September 19, 2024**



**Our Services**

- Court Reporting
- Record Retrieval
- Legal Talent Outsourcing
- Registered Agent
- Process Services
- Investigations
- eLaw® Case Tracking
- Alternative Dispute Resolutions

lexitaslegal.com | 702-476-4500

Kaily Bissani                                    Dwight Manley v. MGM Resorts International, et al.

Page 19

1                    UNITED  STATES  DISTRICT  COURT

2                         DISTRICT  OF  NEVADA

3

4    DWIGHT MANLEY,                      )
                                         )
5                                        )
             Plaintiff,                  )
6                                        )
     vs.                                 )CASE NO.:
7                                        )2:22-cv-01906-MMD-DJA
     MGM RESORTS INTERNATIONAL;          )
8    MGM GRAND HOTEL, LLC,               )
                                         )
9                                        )
             Defendants.                 )
10   _____). . .

11

12

13

14          VIDEOTAPED DEPOSITION OF KAILY BISSANI

15                         VOLUME II

16          Taken on Thursday, September 19, 2024

17                       At 1:24 p.m.

18            By a Certified Court Reporter

19          Taken remotely via Zoom Videoconference

20

21

22

23

24   Reported by: Johanna Vorce, CCR No. 913

25   Job No.: 58302, Firm No. 116F

Kaily Bissani                               Dwight Manley v. MGM Resorts International, et al.

56

1  have to pay, for example, ExperTox to perform the test.
2     A.  Correct.
3     Q.  And then there's a margin whereby The Carlson
4  Company will get a certain fee for sending along the
5  material or the -- the sample to be tested, right?
6     A.  Yes.
7     Q.  Is there a typical percentage or markup from the
8  hard cost that you guys have?
9     A.  I don't want to just come up with numbers, to be
10  honest with you.  I -- I need to look at the data, and I'll
11  give you the right information.  I can email it to you right
12  after this, but I need to locate -- we -- we closed '22 a
13  long time ago.
14     Q.  Okay.
15     A.  So I -- I don't have that information in front of
16  me, and I don't want to just come up with -- with numbers.
17     Q.  All right.  In that same paragraph, there's
18  reference to "ExperTox is CLIA certified."
19        What does "CLIA" stand for?
20     A.  It's called "CLIA certified."  That means they are
21  capable of testing, drug testing using urine, blood, hair,
22  hair sample.  And -- and it's -- it's -- basically, it's a
23  Clinical Lab Improvement Amendment, and that's what their
24  certification is.
25     Q.  And how often does ExperTox have to renew their

57

1  certification?
2     A.  I believe that the -- the -- the Clinical Lab
3  Improvement Amendment is -- is every two years they probably
4  have to retest again or recertify again.  That's the same
5  thing for the ISO, the ISO certification.
6     Q.  And what is the ISO certificate?  What does that
7  stand for, ISO/IEC?
8     A.  Well, the -- it's -- it's -- it's a standard --
9  just -- just like when we talked about we have a standard
10  for chain of custody.  So you have to certify it as an
11  ISO -- ISO is just -- it's a -- it's an international
12  standard of operation.  You -- you got to certify that --
13  that you -- that you follow it 100 percent.
14     Q.  All right.  Is The Carlson Company ISO/IEC
15  certified?
16     A.  No, we're not.
17     Q.  Okay.  Is --
18     A.  And we -- and we don't -- we don't need to.  So
19  that's . . .
20     Q.  All right.  Is The Carlson Company CLIA certified?
21     A.  No, we're not.  That's -- that's -- that's one of
22  the reasons why we partner with -- with -- with labs that
23  have certifications to do this kind of testing.  It's
24  important, yeah.
25     Q.  Is it fair to say that, for example, in this

58

1  particular test that -- that was performed on behalf of
2  Mr. Manley, that The Carlson Company would not be qualified
3  to conduct the type of test that was undertaken by ExperTox?
4     A.  That -- absolutely.  Yes.  That's why we -- we use
5  ExperTox for that.
6     Q.  Okay.  And what is in that next paragraph down,
7  sorry, CAP -- the CAP numbers?
8     A.  It's -- it's an -- an accreditation.  It's called
9  "CAP accreditation program."
10        I'm sorry?
11     Q.  No, you got it.
12        And does The Carlson Company have any CAP
13  accreditation?
14     A.  No, we don't.
15     Q.  All right.  I want to walk through -- there's a
16  number of -- almost like an outline, a list of certain
17  things.  And, for example, it says "sample preparation,
18  extraction, derivatization," and so on and so forth.
19        Where did this information come from that is
20  contained in Nos. 1 through 8?
21     A.  That's -- that's how the testing is -- is
22  accomplished, and that's what we agreed on with ExperTox to
23  follow to test hair samples like that.  It has to be -- they
24  have to follow that -- that specific preparation,
25  extraction.  All -- all of those, they have to be followed.

59

1     Q.  Okay.
2     A.  That's (inaudible).
3     Q.  Is this --
4        I'm sorry.  I didn't mean to cut you off.
5        Is this --
6     A.  No.
7     Q.  -- list something that The Carlson Company
8  created, or is this list something that the ExperTox
9  folks -- ExperTox --
10     A.  It's --
11     Q.  -- folks created?
12     A.  It's -- it's the standard of testing a hair
13  sample.  It's not just ExperTox or any -- any lab that's
14  going to be testing hair sample needs to follow the exact
15  procedure.
16     Q.  And where does this come from, though?  Where does
17  this standard come from?
18     A.  It's -- that's what we have in our documentation,
19  and that's what ExperTox will use, regardless.
20     Q.  I understand that.
21        But if -- you had mentioned -- I think you had
22  testified that this is the standard.
23        Where is this published that it is the standard
24  for drug testing companies to utilize?
25     A.  I -- maybe I shouldn't -- maybe standard is -- is

Kaily Bissani                  Dwight Manley v. MGM Resorts International, et al.

64

1   test.  We want to make sure that whatever questions that the
2   customer have would come to us.
3       Q.  Okay.  So do you get this report and then you
4   modify the report to put your --
5       A.  We -- yeah, we just add --
6       Q.  -- (inaudible) at the top?
7       A.  We just add our logo on top.  That's it.
8       Q.  Okay.  So your testimony here today is the only
9   thing that you add to this document when you receive it from
10  the ExperTox is you put a header at the top?
11      A.  That is correct.
12      Q.  Okay.  And can you see what's on -- what I'm
13  screen sharing right now that I'm showing you the report?
14      A.  I have the report in front of me on my screen, on
15  my computer, so I can -- I can -- is that -- is that okay?
16      Q.  It is.  I just want to see if you can --
17      Can you also see what I'm showing you on the
18  screen share?
19      A.  Let me see.  Yes.
20      Q.  Okay.
21      A.  Yes.
22      Q.  All right.  And at the top there's reference to
23  you.
24      Do you see that?
25      A.  Yes.  That shows we are the clients, my contact,

65

1   the patient's name, and the testing that was done.
2       Q.  Okay.  Is your name spelled correctly?
3       A.  That is correct, yes.
4       Q.  All right.  Looking over at the test name, what
5   does "DFSA" stand for in the center?
6       A.  That's the -- the drug facilitated assault.
7       Q.  Okay.  What is -- tell me, though.  I -- I
8   appreciate that.
9       What does DFSA stand for?
10      A.  Drug Facilitated Sexual Assault.
11      Q.  Okay.  And is it your understanding that there was
12  an allegation of sexual assault in this case?
13      A.  No.  The testing name does -- doesn't reflect
14  exactly that there is -- there is an assault.
15      DFSA is -- is a panel that tests for drugs that
16  are used for date rape, for example, as -- as a -- so,
17  for example, you can see GHB, which is gamma-hydroxy butyric
18  acid, GHB, or ketamine, for example, or any stimulants that
19  are used for date rape.
20      Q.  This panel is typically utilized for allegations
21  of sexual assault by virtue of the things that they're
22  looking for and -- and the -- the substances, correct?
23      A.  Yes.
24      Q.  Okay.  What does the profile number HFC9129 stand
25  for?

66

1       A.  The profile is -- is done by the -- the system.
2   The DFSA is the panel, and the -- the profile is the -- the
3   exact -- we're talking about hair sample testing using DFSA.
4   That's the profile.  And -- and it would be the same for
5   any --
6       (Indiscernible.)
7       THE WITNESS:  I hear a lot of noise on the -- I'm
8   sorry?
9       MR. SEMENZA:  No.  We didn't say anything.
10      THE COURT REPORTER:  I think it's Mr. Hejmanowski.
11  Maybe he can mute if he's not talking.  I'm sorry.
12      THE WITNESS:  Okay.  That is -- that's okay.
13      So that -- that's the profile is -- takes all the
14  information, as far as the -- the -- the right panel, the --
15  the right media, which is the hair sample, and they name it
16  as -- it's -- it's a system populated by ExperTox.
17  BY MR. SEMENZA:
18      Q.  Okay.  Do you know --
19      MR. HEJMANOWSKI:  Excuse me.  Excuse me for a
20  moment.  I keep hearing voices in the background.
21      THE WITNESS:  Me -- me -- me too.  That's why --
22  the reason I stopped, so . . .
23      MR. HEJMANOWSKI:  It's very difficult to hear
24  what's going on.
25      Does anybody know where that's coming from?

67

1       MR. SEMENZA:  I don't.  I'm not hearing anything.
2       MR. HEJMANOWSKI:  I'm not hearing it now, but I --
3       THE WITNESS:  I -- I don't hear it now either.
4   That's the reason I said -- I stopped because I hear -- I
5   thought that they were questions, but -- okay.  Not in my
6   office.  I don't have anyone in my office.
7   BY MR. SEMENZA:
8       Q.  Okay.  So in -- the profile reference that is on
9   the top of the page, that's something that ExperTox creates,
10  correct?
11      A.  Correct.  That's their profile for this kind of
12  testing using the -- the hair media and the panel called
13  "DFSA."
14      Q.  Let's drop down to the test comment section.
15      Do you see that?
16      A.  Yes.
17      Q.  All right.  So in this particular case there was
18  an inch of hair taken from the head; is that correct?
19      A.  It's a half an inch.
20      Are you talking about the first comment; is that
21  what it's talking about or . . .
22      Q.  Well, the sample was an inch-long hair strand,
23  correct?
24      A.  That is correct.
25      Q.  And it was subsequently -- based upon this



Case 2:22-cv-01906-MMD-EJY    Document 190    Filed 08/15/25    Page 24 of 25

Kaily Bissani                                    Dwight Manley v. MGM Resorts International, et al.

76

1  hair test sample is not reliable?
2      A.  That's not -- that's not true.
3          Why would you say that?
4      Q.  Well, it -- it depends on whether -- where you cut
5  the hair.  It depends on whether there was, quote/unquote,
6  bleed through.  It depends on a number of different factors.
7  We have --
8      A.  Hair testing -- go ahead, sir.
9      Q.  We have a test result that shows there was
10  exposure to ketamine outside of the period of time at issue
11  in this case.
12      A.  Okay.
13      Q.  You would agree with that, right?
14      A.  I mean, I agree, but -- but I explained exactly
15  why you would have that amount showing up in the baseline
16  when they tested the second half inch of the hair sample.
17          As I said, the scenarios could be the hair growth
18  cycle.  The second one is delayed or deposition of -- or
19  deposition of the -- of the -- of the ketamine in the hair
20  that could have been quickly deposited that could contribute
21  to showing up with the same -- almost the same level.
22          Yeah.  It's -- it's -- it's -- think about
23  picogram per milligram.  It's 0.054 or less, picogram per
24  milligram.  That's 10 to the mi- --
25      Q.  The Carlson Company --

77

1      A.  That's -- that's 10 to the minus 12.
2          THE COURT REPORTER:  I'm sorry.  That's what minus
3  12?
4          THE WITNESS:  Ten to the minus twelve picogram per
5  milliliter.
6  BY MR. SEMENZA:
7      Q.  Now, the Carlson Company has never performed this
8  specific test; is that fair?
9      A.  No.  But we have -- we have experience in -- in
10  this test.  We have experience in drug testing.  We have
11  experience on how the testing should be done.  That's why
12  Dr. Soltani --
13      Q.  Okay.
14      A.  -- used us to -- to do the sample of the testing.
15      Q.  I just want to understand.
16      A.  -- The Carlson Company has never performed
17  this type of test before, correct?
18      A.  Us performing it or us --
19      Q.  Yes.
20      A.  Okay.  No.
21          Can I -- can I put you guys on hold?  My -- my
22  battery is literally at 10 percent.  Let me just -- I'll be
23  right back.  I promise.
24          MR. SEMENZA:  All right.  We'll go off the record
25  for a moment.

78

1          THE WITNESS:  All right.  Thanks.
2          THE VIDEOGRAPHER:  We are off record as of
3  2:55 p.m.
4          (Off the record.)
5          THE VIDEOGRAPHER:  We are back on record as of
6  2:55 p.m.
7  BY MR. SEMENZA:
8      Q.  All right.  I want to move on to this portion of
9  the test results, sorry, where it says, "Reference:
10  Kerekes, Yegles, Grimm and Wenning, 2009."
11          What is that?
12      A.  That's a reference on -- on ETG, which is alcohol
13  testing.  That -- that is referenced just to that -- to
14  that -- to that test.
15          ETG, which is -- which is alcohol testing, that
16  was done also on -- on a sample, and it was negative, I
17  guess.  Yes.
18      Q.  Was that testing for ethyl glucuronide?
19      A.  Ethyl glucuronide, which is -- which is alcohol
20  testing.
21      Q.  Okay.  Do you see --
22      A.  It was negative.  It didn't -- it didn't even
23  show, and it shows that -- that it probably -- not -- not
24  detected in here.
25      Q.  Do you see where it says at the bottom of the

79

1  page, second to last bullet point, "Result" -- "Results are
2  for clinical use only, not for forensic purposes"?
3          Do you see that?
4      A.  Correct.  Yeah.
5      Q.  What does it mean -- what does the words or the
6  phrase "clinical use" mean?
7      A.  For -- for us, it's -- this was -- it's the
8  same -- it's the same test.  It's the same equipment.  It's
9  the same standards.
10          ExperTox decided to put the comment on here.  I
11  have no idea why, but it's -- for us, it's the same.
12  It's -- the clinical or forensic purposes, the testing has
13  been done exactly the same way regardless.
14      Q.  Okay.  I didn't ask you that question.
15          What I asked you was:  What does the phrase
16  "clinical use" mean?
17      A.  Clin- -- clinical -- clinical use is -- if
18  you're -- if you're looking for employment testing or for --
19  you know, if someone is -- a doctor is monitoring their --
20  their drug use and so forth, that's clinical use.
21          Forensic is for -- if -- if this is for a legal --
22  for legal prospective.
23      Q.  Correct.  Okay.  So --
24      A.  That means -- that means they have to follow the
25  chain of custody, they have to follow the testing standards,



Kaily Bissani                                    Dwight Manley v. MGM Resorts International, et al.

```
                                                                    112
1                        CERTIFICATE OF WITNESS
2    PAGE     LINE     CHANGE              REASON
3         _____
4         _____
5         _____
6         _____
7         _____
8         _____
9         _____
10        _____
11        _____
12        _____
13        _____
14        _____
15        _____
16        _____
17        _____
18        _____
19                        * * * * *
20        I, Kaily Bissani, witness herein, do hereby
     certify and declare under penalty of perjury the within and
21   foregoing transcription to be my deposition in said action;
     that I have read, corrected and do hereby affix my signature
22   to said deposition.
23
24        _____   _____
                Kaily Bissani
25              Witness                  Date
```

```
                                                                    113
1                        REPORTER'S CERTIFICATE
2    STATE OF NEVADA  )
                      )  SS
3    COUNTY OF CLARK  )
4
5         I, Johanna Vorce, a duly certified court reporter
     licensed in and for the State of Nevada, do hereby certify:
6         That I reported the taking of the deposition of
7    the witness, Kaily Bissani, at the time and place aforesaid;
8         That prior to being examined, the witness was by
     me duly sworn to testify to the truth, the whole truth, and
9    nothing but the truth;
10        That I thereafter transcribed my shorthand notes
     into typewriting and that the typewritten transcript of said
11   deposition is a complete, true, and accurate record of
     testimony provided by the witness at said time to the best
12   of my ability.
13        I further certify (1) that I am not a relative,
     employee, or independent contractor of counsel of any of the
14   parties; nor a relative, employee or independent contractor
     of the parties involved in said action; nor a person
15   financially interested in the action; nor do I have any
     other relationship with any of the parties or with counsel
16   of any of the parties involved in the action that may
     reasonably cause my impartiality to be questioned; and (2)
17   that transcript review pursuant to NRCP 30(e) was not
     requested.
18
19        IN WITNESS WHEREOF, I have hereunto set my hand in
     the County of Clark, State of Nevada, this 3rd day of
     October, 2024.
20
21
22        _____
                Johanna Vorce, CCR No. 913
23
24
25
```

