Paul R. Hejmanowski, Esq. (SBN #94)
Charles H. McCrea, Esq. (SBN #104)
PRHLAWLLC
520 South Fourth Street, Suite 360
Las Vegas, NV 89101
T 702.834.6166
paul@prhlawllc.com
charles@prhlawllc.com

Christopher W. Madel, Esq. (*pro hac vice*)
Jennifer M. Robbins, Esq. (*pro hac vice*)
MADEL PA
434 Lake Street
Excelsior, MN 55331
Telephone: (612) 605-0630
cmadel@madellaw.com
jmrobbins@madellaw.com
*Attorneys for DWIGHT MANLEY*

**UNITED STATES DISTRICT COURT**

**DISTRICT OF NEVADA**

| | |
|---|---|
| DWIGHT MANLEY,<br><br>Plaintiff,<br><br>vs.<br><br>MGM RESORTS INTERNATIONAL; MGM GRAND HOTEL, LLC,<br><br>Defendants. | Case No. 2:22-cv-01906-MMD-EJY<br><br>**PLAINTIFF DWIGHT MANLEY'S MOTIONS IN LIMINE AND SUPPORTING MEMORANDUM OF LAW [REDACTED]** |
| AND ALL RELATED ACTIONS. | |

**PLAINTIFF'S OMNIBUS MOTION IN LIMINE**

Plaintiff Dwight Manley ("Manley") respectfully submits this Omnibus Motion in Limine[1] requesting that the Court enter an order, before voir dire, precluding Defendants, their counsel, and their witnesses from directly or indirectly commenting on, mentioning, communicating, publishing, or attempting to introduce evidence of the matters set forth below in the presence of the prospective jury panel during voir dire, opening statement, the presentation of evidence, or closing argument.

As argued further below with respect to motion in limine #5, Manley also requests an order admitting certain evidence ahead of trial.

**ARGUMENT AND CITATION TO AUTHORITY**

Because the matters set forth below are irrelevant, speculative, unfairly prejudicial, hearsay, improper opinion, or otherwise inadmissible testimony and exhibits, disclosure to the jury of any of the matters set forth below, whether through a party, an attorney, or a witness, would risk irreparable harm to Plaintiff, which no subsequent jury instruction would cure, Plaintiff moves the Court to enter an order in limine. Specifically, Plaintiff seeks exclusion in limine of the following evidence in motions 1 through 4. And in motion #5 below, Plaintiff seeks admissibility of certain evidence.

**I. Motion in Limine #1 (to exclude testimony and other evidence related to past alleged conduct of Manley, including but not limited to allegations that Manley kicked a pillar at Defendants' property on a past visit)**

Defendants intend to put Manley's character on trial. In the Joint Pretrial Order, Defendants list as a contested issue of fact "Manley's prior conduct and behavior during visits to

[1] Following the Court's denial of the parties' requests to submit reply briefs related to their motions in limine (ECF No. 262), and consistent with the Court's order requiring filing of each side's motions in limine in one document (ECF No. 259), the parties agreed to submit their respective motions in limine in omnibus briefing on an agreed-upon schedule as follows: opening briefs on November 10, 2026, and response briefs on December 16, 2026.

Additionally, Plaintiff notes that while a sixth motion in limine was contemplated in the Joint Pretrial Order, Plaintiff has chosen not to move forward with what was motion in limine #6. (ECF No. 258 at 59.)

Defendants' casino properties before December 10, 2021, including but not limited to an incident in which Manley kicked a hole in a wall." (ECF No. 258 at 8 (Defs.' Add'l Contested Fact No. 9).) Defendants' proposed trial exhibits 523, 524, 527, and 528, which are provided here at Exhibits A, B, C, and D, respectively, demonstrate Defendants' intent: a text message among three people regarding the "hole-in-wall incident" (Ex. A (Trial Ex. 523), MGM00013–14), a photograph of an MGM pillar with a hole in it (Ex. B (Trial Ex. 524), MGM00015), and two security incident reports from 2010 and 2014 (Exs. C & D (Trial Exs. 527 & 528), MGM00246–61). None of this evidence bears on any question the jury must decide, and all of it invites the jury to do what the Federal Rules of Evidence forbid: infer from prior, unrelated acts that Manley acted "in character" on December 10, 2021.

The pillar incident occurred during a trip a full year earlier, on December 7, 2020. (*See* Ex. A (Trial Ex. 523) at MGM00013.) [redacted]. (Ex. C (Trial Ex. 527) at MGM00246.) Manley [redacted] (*Id.*) And the [redacted] (Ex. D (Trial Ex. 528) at MGM00249–50.) [redacted]. (*Id.*)

None of these events has anything to do with whether Manley was served a ketamine-contaminated drink on December 10, 2021, whether Defendants' personnel observed and disregarded his incapacitation, or whether Defendants should have kept extending him millions of dollars in credit that afternoon.

### A. The Prior-Conduct Evidence Is Irrelevant and Even Assuming *Arguendo* That There Is Marginal Relevance, Any Such Limited Probative Value Is Substantially Outweighed Under Rule 403.

Evidence is relevant only if it has "any tendency to make a fact more or less probable than it would be without the evidence" and "the fact is of consequence in determining the action." Fed. R. Evid. 401. Irrelevant evidence is not admissible. Fed. R. Evid. 402. [redacted] (Ex. D), does not make any facts in *this* matter more or less probable.

Even relevant evidence may be excluded "if its probative value is substantially outweighed by a danger of . . . unfair prejudice, confusing the issues, misleading the jury, undue delay, [or] wasting time." Fed. R. Evid. 403. Unfair prejudice means "an undue tendency to suggest decision on an improper basis, commonly, though not necessarily, an emotional one." *Old Chief v. United States*, 519 U.S. 172, 180 (1997) (quoting Fed. R. Evid. 403 advisory committee's note). A photograph of a damaged pillar and [redacted]. (Exs. C & D.) Admitting this evidence would also require a series of mini-trials about what happened on each prior occasion, who was responsible, and what Defendants did in response, consuming trial time on collateral matters. Rule 403 independently requires exclusion.

### B. Rule 404 Bars the Evidence Because Its Only Real Use Is a Propensity Inference.

"Evidence of a person's character or character trait is not admissible to prove that on a particular occasion the person acted in accordance with the character or trait." Fed. R. Evid. 404(a)(1). Likewise, "[e]vidence of any other crime, wrong, or act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character." Fed. R. Evid. 404(b)(1).

The obvious purpose of the pillar evidence is to suggest that Manley is a volatile person, so

his erratic behavior on December 10, 2021—including shattering an ashtray and injuring his hand at the blackjack table without realizing it—was nothing more than Manley being Manley, rather than the effect of a drug. That is prohibited by Rule 404 [redacted] which is precisely the "character" inference the Rule excludes. (Exs. C & D.)

The proponent of other-act evidence bears the burden of articulating a proper, non-propensity purpose and showing that the evidence is actually probative of it. In the Ninth Circuit, other-act evidence is admissible under Rule 404(b) only if (1) it tends to prove a material point, (2) the other act is not too remote in time, (3) the evidence is sufficient to support a finding that the person committed the act, and (4) where knowledge or intent is at issue, the act is similar to the conduct at issue. *See United States v. Romero*, 282 F.3d 683, 688 (9th Cir. 2002). Defendants cannot satisfy that test. No intent, motive, plan, or knowledge of Manley's is at issue that a pillar incident could illuminate. To the extent Defendants contend the evidence goes to their own employees' state of mind—*i.e.*, [redacted] (Exs. A–D)—that theory simply restates the propensity inference from the employees' perspective and, in any event, is undercut by Defendants' own conduct: after the December 2020 trip, Defendants continued to court Manley as a valued patron, comped his travel and lodging, and extended him a $2 million line of credit before he ever arrived in December 2021. (*See* ECF No. 258 at 4, 7; ECF No. 120 ¶¶ 24–26 (admitting that Manley's lodging was at times comped and that MGM provided comped transportation and lodging for the December 10–12, 2021 trip); Ex. E (Trial Ex. 31) at MGM00160–61, MGM00165; Ex. F (Reboton Dep.) 70:7–13, 78:11–17; Ex. G (Manacher Dep.) 20:7–17 (testifying that he invited Manley to gamble at MGM and provided him company planes, complimentary rooms, and food and beverage); *id.* at 47:18–48:12 ([redacted], as reflected in Ex. H (Trial Ex. 21) at MGM00143–46).) Defendants also knew of the pillar incident when it happened and did not treat it as significant: Manley sent Reboton a picture of the damage "immediately" and told her what happened, and she "made a funny comment about it." (Ex. I (Manley Dep. (Vol. I)) 61:9–12,

61:22–62:4.) Nor does the record support any suggestion that Manley's condition on December 10, 2021 was typical of him. Defendants' own casino host, who had worked with Manley since about 2018, testified that when he left the table on December 10, 2021, he "was not walking like he normally does." (Ex. F (Reboton Dep.) 28:22–29:1, 49:3–5.) Christopher Snyder, who had accompanied Manley on approximately 20 Las Vegas trips over 15 years, had never seen him "falling down drunk" or intoxicated "to a point of losing control," and described Manley that evening as "in a place that I've never seen him before." (Ex. J (Snyder Dep.) 14:15–20, 21:25–22:15, 57:7–12.) Defendants' deposition questioning confirms the propensity purpose: they asked Manley's experts whether they knew about the pillar incident, even though neither had any connection to it or reason to consider it. (Ex. K (Sucher Dep.) 53:3–8; Ex. L (Petropulos Dep.) 45:14–17.)

### C. The Documents Are Also Inadmissible Hearsay and Improper Impeachment.

The text messages and incident reports are out-of-court statements that Defendants would offer for their truth—[redacted] (Exs. C &D). Fed. R. Evid. 801(c), 802. To the extent Defendants contend the incident reports are business records, many of the statements within them are recorded from third parties and are therefore hearsay within hearsay. Fed. R. Evid. 803(6), 805. And to the extent Defendants would use any of this material to attack Manley's credibility, Rule 608(b) bars extrinsic evidence of specific instances of conduct to attack a witness's character for truthfulness, and none of these acts is probative of truthfulness in any event. Fed. R. Evid. 608(b).

Accordingly, the Court should preclude Defendants, their counsel, and their witnesses from offering, referencing, or eliciting testimony regarding [redacted], including Trial Exhibits 523, 524, 527, and 528 (Exs. A-D), as well as Reboton's testimony that she had heard that Manley kicked a hole in a wall, her testimony describing Manley's demeanor at a charity poker event at Soho House in West Hollywood a year or two before the trip, and her testimony that Manley purportedly yelled at her when she declined a

credit increase on an earlier trip to the Mirage (Ex. F (Reboton Dep.) 39:20–40:4, 54:23–55:16, 68:15–18, 68:22–69:2).

## II. Motion in Limine #2 (to exclude testimony and other evidence from Defendants' expert Adam Rains)

Defendants disclosed Adam Rains as a retained expert who will testify to the opinions in his Initial Expert Report, "including, among other things, his review, analysis and opinions of the alcoholic beverages served to Plaintiff on December 10, 2021, how those beverages were made, and the proper processes of preparing such beverages." (Ex. M (Defs.' 16th Supp. Disclosures) at 6.) Rains is a mixologist with bar and restaurant experience; his formal education consists of a bachelor's degree in international business and a series of wine, beer, spirits, and bartending certifications. (Ex. N (Rains Rep. & CV).) Based solely on his review of surveillance video, Rains narrates how each of the six Old Fashioneds served to Manley was prepared and delivered (Ex. N at 1–2); provides general background on the Old Fashioned, Angostura bitters, WhistlePig rye whiskey, cherries, and sweeteners (*id.* at 2–4); and concludes that the cocktails "were all potable beverages," that "there was nothing that was out of line or scope to what modern bartenders do when preparing Old Fashioneds," and that he "saw nothing out of the ordinary and no ingredients that were out of line in making each of the six cocktails" (*id.* at 4). Rains's opinions should be excluded because they exceed his qualifications, rest on no reliable methodology, would not help the jury, and improperly vouch for the bartender.

### A. Legal Standard

Under Rule 702, a qualified expert may testify only if "the proponent demonstrates to the court that it is more likely than not that" (a) the expert's specialized knowledge will help the trier of fact; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert's opinion reflects a reliable application of those principles and methods to the facts of the case. Fed. R. Evid. 702. The Court acts as gatekeeper to ensure that all expert testimony, including testimony based on experience, is both relevant and reliable. *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 589 (1993); *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 147–49 (1999). "[N]othing in either *Daubert* or the

Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert." *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997). Defendants bear the burden on each element.

**B. Rains Is Not Qualified to Opine on Whether the Drink Was Contaminated, Whether Ketamine Can Be Detected or Masked by Taste, or Manley's Condition.**

According to Defendants, the central disputed questions concerning Manley's first drink are whether it contained ketamine, whether ketamine tastes bitter, whether that taste can be masked in an Old Fashioned, and whether the bartender altered her preparation of the drink and, if so, why. (ECF No. 258 at 8–9 (Defs.' Add'l Contested Fact Nos. 16, 19–21).) Those are questions of pharmacology, toxicology, and fact—not bartending. Whatever experience Rains has in preparing cocktails, it does not qualify him to opine on the presence or effects of a drug in a beverage, the taste profile of ketamine, or whether any particular combination of ingredients would mask it. Rains's report confirms this. It does not mention ketamine, any other drug, or Manley's condition, and his CV reflects no training or experience in pharmacology, toxicology, or medicine. (*See generally* Ex. N.) Yet the report devotes a section to Angostura bitters, explaining that "Bitters have a bitter taste" and are known for their "strong and distinct aromas." (Ex. N at 2.) Manley noticed that his first drink tasted bitter (e.g., Ex. I (Manley Dep. (Vol. I)) 91:4–14 (testifying that he "repeatedly commented that it tasted bitter and dirty to everybody afterwards")), and Defendants have identified ketamine's taste and whether it can be masked as contested issues (ECF No. 258 at 8–9; *see also* Ex. K (Sucher Dep.) 52:15–18.) Rains has no qualifications to suggest—directly or by implication—that any bitterness Manley noticed came from the bitters rather than a drug, or that the drink's ingredients would or would not mask ketamine. An expert's qualifications in one field do not license opinions in another, and Rule 702 requires the Court to match the opinion to the expertise. *See Kumho Tire*, 526 U.S. at 152 (asking whether the expert brings "the same level of intellectual rigor that characterizes the practice of an expert in the relevant field").

**C. Rains's Opinions Are Not Based on a Reliable Methodology.**

To the extent Rains opines that the drinks served to Manley were prepared in a "proper" or "standard" manner, he must identify the standard he applies and explain how he reliably applied it to the facts. Fed. R. Evid. 702(c)–(d). Rains does neither. By his own account, his opinions rest on "the cocktail preparations that I saw from the surveillance tapes" and on his "experience in making cocktails." (Ex. N at 1, 4.) He did not taste, test, or re-create any of the drinks; he did not examine the ingredients, bottles, or garnishes used at the Mansion bar that day; and he cites no recipe, industry publication, or written standard against which he measured the bartenders' work. (*See generally id.*) He does not reference the Bartenders Union Local 165 specifications, even though his CV lists the Local 165 "Craft Exam" among his credentials. (Ex. N.) To the contrary, he concedes that the Old Fashioned "is made a number of different ways," that the bartenders here used "3+ ways to execute them," and that "[t]he amount of bitters and sugar can be to the guest's preference." (Ex. N at 2.) There is no single "proper" recipe for an Old Fashioned, and an opinion that a bartender's preparation was not "out of line or scope to what modern bartenders do" (Ex. N at 4), is the type of *ipse dixit* that *Joiner* forbids. Nor can Rains reliably determine from surveillance video the ingredients, quantities, or contents of a drink he never tasted, tested, or saw in person. His report is itself replete with hedges: the first drink "appears to be an old-fashioned," a bartender added "what appears to be simple syrup," the whiskey "appears to be the WhistlePig 10 year," the bitters were "approximately four dashes," and the remaining whiskey "looked to be in about a half an ounce." (Ex. N at 1–2.) He also asserts that "Manley consumed six cocktails" (*id.* at 1), although the surveillance timeline shows that several of the drinks were removed "not completely empty" (Ex. O (Trial Ex. 138); Ex. F (Reboton Dep.) 115:13–116:15). Indeed, the bartender who prepared Manley's first drink, Jerilyn Koch, testified that bartenders are expected to follow the Bartenders Union Local 165 recipe for an Old Fashioned, but that she departed from it in preparing Manley's drink by adding extra cherry juice "to make it a little bit sweeter" as a matter of "personal preference," and that she "[s]ometimes" varies from the union recipes for other cocktails as well; and Defendants failed to preserve or produce the first 48 minutes of surveillance video of her shift at The Mansion bar. (Ex. P (Koch Dep.) 29:2–17,

39:20–40:7, 47:22–48:12, 70:1–71:15.) An opinion that the drink was "properly" prepared cannot account for the bartender's own admitted departures from the standard, or for footage that does not exist.

**D. Rains's Testimony Would Not Help the Jury and Would Improperly Narrate the Video and Vouch for Defendants' Bartender.**

Expert testimony is admissible only if it will help the jury understand the evidence or determine a fact in issue. Fed. R. Evid. 702(a). Testimony is not helpful when it addresses matters the jury can evaluate on its own. *See* Fed. R. Evid. 702 advisory committee's note to 1972 proposed rules (expert testimony is unhelpful where "the untrained layman would be qualified to determine intelligently and to the best possible degree the particular issue without enlightenment from those having a specialized understanding of the subject"). The jury will see the surveillance video of the MGM Mansion bar and will hear from the bartender herself. To the extent Rains intends to describe what the video depicts—who handled the drink, what the bartender poured, or how long the preparation took (as Rains's report does)—that is lay narration dressed up as expert opinion, and it risks lending an expert's imprimatur to Defendants' interpretation of the video. *See United States v. Freeman*, 498 F.3d 893, 902–05 (9th Cir. 2007) (cautioning against witness testimony that strays from specialized knowledge into interpretation of evidence the jury can assess itself).

Rains likewise may not testify, directly or by implication, about the bartender's intent, motive, or state of mind, including whether she "intentionally altered" Manley's drink or why. (ECF No. 258 at 9 (Defs.' Add'l Contested Fact No. 21).) Expert opinions on another person's intent or state of mind are not a proper subject of expert testimony and improperly usurp the jury's role in assessing credibility. *See, e.g.*, *In re Rezulin Prods. Liab. Litig.*, 309 F. Supp. 2d 531, 546–47 (S.D.N.Y. 2004); *In re Bard Implanted Port Catheter Prods. Liab. Litig.*, No. MDL No. 3081, 2026 U.S. Dist. LEXIS 34804, at *458 (D. Ariz. Feb. 20, 2026) ("The Court previously ruled that '[i]nferences about the intent or motive of parties or others lie outside the bounds of expert testimony.' *In re Bard IVC Filters Prods. Liab. Litig.*, 2017 U.S. Dist. LEXIS 210162, 2017 WL 6523833, at *9 (quoting *In re Rezulin Prods. Liab. Litig.*, 309 F. Supp. 2d 531, 547

(S.D.N.Y. 2004)). No expert may render opinions on the intent or state of mind of either party."). Nor may Rains offer opinions suggesting that someone other than the bartender—such as Manley or his companion—introduced a substance into the drink, which would be speculative and outside any expertise in beverage preparation. (*See* Ex. N at 1 (describing which members of Manley's party handled each drink after it left the bar—for example, that "Female #1" carried the first drink to the gaming table and "puts it behind Manley").)

**E. Rule 403 Independently Warrants Exclusion.**

Even if some sliver of Rains's testimony were admissible, its minimal probative value would be substantially outweighed by the risk that the jury will give undue weight to an "expert" assurance that the drink was "properly" made—an assurance that cannot answer whether ketamine was in it. Fed. R. Evid. 403; *see Daubert*, 509 U.S. at 595 ("Expert evidence can be both powerful and quite misleading because of the difficulty in evaluating it.") (citation omitted). Rains's ultimate conclusion—that the drinks were "potable beverages" (Ex. N at 4)—means only that they were drinkable. It does not, and cannot, address whether any of them contained ketamine, yet it would reach the jury bearing an expert's imprimatur.

**III. Motion in Limine #3 (to exclude testimony and other evidence from Defendants' expert Daniel Overbeek, MD)**

A critical issue that will be put to the jury in this case is whether Plaintiff was under the influence of the drug ketamine while gambling in the high-limit casino at the MGM Grand Mansion on the afternoon of December 10, 2021. Both Plaintiff and MGM have designated medical experts to offer opinions on this issue. Plaintiff's designated expert is Michael A. Sucher, MD DFASAM. MGM's designated expert is Daniel L. Overbeek, MD.

Among the opinions that Dr. Sucher will offer are: (1) Plaintiff was poisoned with ketamine in the early afternoon of December 10, 2021; (2) Plaintiff suffered mental and physical symptoms consistent with being poisoned by ketamine and consistent with the onset and duration of action of ketamine; and (3) there is no other reasonable explanation for the events of December 10, 2021. Dr. Sucher will also testify that these opinions are true to a reasonable degree of medical

probability and certainty,[2] which is the legal standard required under Nevada law for such opinions to be admitted at trial.

On the other hand, and if permitted at trial to do so, Dr. Overbeek would offer opinions that there is no "definitive evidence" showing that Plaintiff was under the influence of ketamine on the afternoon of December 10, 2021. Dr. Overbeek concedes, however, he does not know what "a reasonable degree of medical certainty" means and did not offer his opinions to that standard.[3] Accordingly, Dr. Overbeek should be precluded from testifying at trial.

### A. Dr. Overbeek cannot meet the legal standard.

*Morsicato v. Sav-On Drug Stores, Inc.*, 121 Nev. 153, 111 P.3d 1112 (2005), sets forth the legal standard required for the admissibility of expert medical opinions:

> Since 1989, this court has held that "a medical expert is expected to testify only to matters that conform to the reasonable degree of medical probability standard." Furthermore, in dictum, this court has observed that expert testimony regarding causation must also rise to this level of certainty. As the Pennsylvania Supreme Court has recognized, one rationale for requiring such specificity with expert opinions is that "if the plaintiffs medical expert cannot form an opinion with sufficient certainty so as to make a medical judgment, there is nothing on the record with which a jury can make a decision with sufficient certainty so as to make a legal judgment."
>
> We conclude that medical expert testimony regarding standard of care and causation must be stated to a reasonable degree of medical probability. In this case, Dr. Schneck testified concerning an ultimate issue in the case, causation. He was not certain what caused Morsicato's injuries; however, he stated that he could offer a theory that was just as plausible as the theory that lindane caused the injury. He further testified that he ranked an autoimmune response as the most likely cause of the injury and recognized that this was inconsistent with Nevada's evidentiary standard. Only after the court explained that Dr. Schneck's testimony would be stricken unless he testified in accordance with Nevada law, did he state that more likely than not an autoimmune response was the most likely cause of the injuries.

[2] (Ex. Q (Expert Report of Dr. Sucher) at 8; Ex. R (Expert Rebuttal Report of Dr. Sucher) at 6; Ex. K (Sucher Dep.) at 73:15–74:7, 78:9–13, 81:5–12.)

[3] (Ex. S (Expert Report of Dr. Overbeek) at 9; Ex. T (Expert Rebuttal Report of Dr. Overbeek) at 12; Ex. U (Overbeek Dep.) at 5:8–9:15.)

> Dr. Schneck never stated his medical opinion to a reasonable degree of medical probability, however.
>
> Dr. Schneck's testimony was highly speculative and failed to meet the admissibility standard. Therefore, we conclude that the district court abused its discretion in failing to strike the testimony, and we reverse the district court's judgment and remand for a new trial on the issues of causation, contributory negligence, and damages, if any.

*Id.* at 1116 (footnotes omitted). Citing *Morsicato*, this Court (Judge Pro) has acknowledged and enforced this legal standard:

> Nevada requires such expert testimony because "if the plaintiff's medical expert cannot form an opinion with sufficient certainty so as to make a medical judgment, there is nothing on the record with which a jury can make a decision with sufficient certainty so as to make a legal judgment." *Morsicato*. 111 P.3d at 1116 (quotation omitted).

*Neal-Lomax v. Las Vegas Metro., Police Dep't,* 574 F. Supp. 2d 1193, 1198 (D. Nev. 2008).

As to Dr. Overbeek's opinion on whether Plaintiff was poisoned by ketamine on the afternoon of December 10, 2021, he admitted in his deposition that he could not render an opinion to a reasonable degree of medical certainty:

> Q. Dr. Overbeek, is it your opinion to a reasonable medical certainty that Dwight Manley was not poisoned with ketamine on the afternoon of December 10th, 2021?
>
> A. I'm not sure what you mean by "a reasonable degree of medical certainty."
>
> Q. As an expert, sir, what is the standard for your testimony if not a reasonable medical certainty or -- well, what is the standard that you would follow?
>
> A. ***I -- I mean, the term "a reasonable degree of medical certainty" is not a term I would use in a clinical scenario, right. I'm not really sure what it means, right. My -- this is -- these are my medical opinions based on my understanding of the evidence based on the information provided to me.***

(Ex. U (Overbeek Dep.) 5:8–24 (emphasis added).) In fact, when asked directly, ***"Do you acknowledge that it is possible that Manley was poisoned on December 10th, 2021?"*** Dr. Overbeek's response was unequivocal: ***"Yes, it's possible."*** (*Id.* at 9:13–15 (emphasis added).)

Since his deposition, Dr. Overbeek has made no effort to correct or modify this testimony.

Based on the record before this Court, Dr. Overbeek's opinions clearly do not meet the applicable legal standard for admissibility. The Nevada Supreme Court's holding in *Morsicato* and Judge Pro's decision in *Neal-Lomax*, make clear that it would be reversible error for the Court to allow Dr. Overbeek's opinions to be presented to the jury. Accordingly, the Court should preclude Dr. Overbeek from testifying.

## IV. Motion in Limine #4 (to preclude argument that Defendants' spoliation of evidence was not in bad faith)

Three days after Manley's December 10, 2021 gaming session, his counsel sent Defendants a preservation demand (Ex. V (Trial Ex. 47)), followed the same day by an email extending the request to "all communications related to Mr. Manley on December 10, 2021 and thereafter." (Ex. W (Trial Ex. 53).) Defendants nevertheless failed to preserve the December 10, 2021 text messages between Manley's casino host, Vanessa Reboton, and the executive who approved his credit increases, Justin Manacher—the very messages exchanged while Manley's credit limit was raised from $2 million to $3 million and then to $3.5 million. (ECF No. 171 at 1–2, 7–8.) After full briefing, Magistrate Judge Youchah held that Defendants had a duty to preserve the messages as of December 13, 2021, that Defendants "acted with negligence" by failing to direct employees to disable automatic deletion or back up their phones, that a litigation hold, by itself, did not discharge that duty, and that Manley was prejudiced by the loss. (*Id.* at 4–8.) As a sanction under Rule 37(e)(1), the Court ordered that Manley "is permitted to present evidence and argument to the jury regarding the loss of information allowing the jury to draw reasonable inferences from this argument," while Defendants may make "counter arguments seeking alternative inferences." (*Id.* at 9.)

Defendants have made clear that they intend to contest at trial "[t]he circumstances surrounding the loss" of the text messages. (ECF No. 258 at 10–11 (Defs.' Add'l Contested Fact No. 36).) The Court should not permit Defendants to use trial to tell the jury that the loss was innocent, in good faith, or blessed by the Court when the evidence shows the opposite.

**A. Defendants May Not Relitigate the Court's Findings on Duty and Negligence.**

The Court has already decided that Defendants owed a duty to preserve the text messages, that they failed to take reasonable steps to do so, and that their litigation hold did not satisfy their obligations. (ECF No. 171 at 4–6.) Defendants should therefore be precluded from offering evidence or argument that they took reasonable steps to preserve the messages, that issuing a litigation hold was sufficient, that the loss was caused by a phone transition or automatic-deletion setting for which they bear no responsibility, or otherwise that the loss was "innocent." Permitting such argument would invite the jury to reject findings the Court has already made and would undermine the remedy the Court fashioned to cure the prejudice to Manley. *See* Fed. R. Civ. P. 37(e)(1) (court may order measures "no greater than necessary to cure the prejudice"); *id.* advisory committee's note to 2015 amendment (identifying "permitting the parties to present evidence and argument to the jury regarding the loss of information" as such a measure).

Nor did Defendants ever substantiate the "innocent" explanation they would now offer the jury. In opposing Manley's spoliation motion, Defendants asserted that the text messages were "lost due to purely technological issues"—that Reboton's messages were not transferred when she received a new work phone, and that Manacher "believes" his messages "may have been lost due to a phone setting." (ECF No. 135 at 3, 16–17.) Defendants cited no testimony from Manacher for that assertion, and Manacher testified that he did not recall anyone asking him to preserve his text messages and that no one advised him of a litigation hold; he also confirmed that his December 10, 2021 text messages no longer exist. (Ex. G (Manacher Dep.) 29:6–30:6.)

The record further confirms that Defendants' litigation hold was not implemented in any meaningful way. Defendants' Rule 30(b)(6) designee was not aware of any written MGM practices or procedures governing litigation preservation obligations. (Ex. X (Johnson Dep.) 8:18–21.) Recipients of Defendants' December 2021 hold notices either did not recall receiving them or took no action in response. The director of food and beverage whose responsibilities included the bar in the VIP casino did not recall receiving either notice, and the only documents she set aside were staff schedules. (Ex. Y (Hart Dep.) 5:15–25, 8:6–14, 17:22–18:1.) MGM

Grand's executive director of gaming surveillance did not recall receiving the notice or anyone asking him to preserve evidence relating to Manley. (Ex. Z (Buono Dep.) 6:16–23, 7:7–12, 46:11–18.) Another recipient, a vice president of customer development, testified that "to be honest, I thought it did not pertain to me. I had left the L.A. office, and I just didn't do anything," and that he did not look at his computer or phone for responsive material. (Ex. AA (Durlej Dep.) 7:3–13, 10:10–11:7.) And Defendants' director of credit, who communicated with Manacher about Manley's credit, was not aware of any effort to preserve her email, text-message, or telephone history with him. (Ex. BB (Bilbao Dep.) 30:3–14.) The general manager of The Mansion (Ex. EE (Patchefsky Dep.) 5:14–6:4) [redacted] (Ex. CC (Trial Ex. 50) & Ex. DD (Trial Ex. 52)); he does not recall receiving them, did not discuss them with anyone, did not search for, collect, or set aside any documents, and agreed that it was fair to say he "got these two notices and [he] did nothing with either of them." (Ex. EE (Patchefsky Dep.) 5:16–19, 7:19–8:23.) Defendants should not be permitted to tell the jury that their litigation hold was a reasonable preservation step when their own witnesses confirm it was not followed.

### B. Defendants May Not Tell the Jury That the Court Found No Bad Faith or Declined to Give an Adverse-Inference Instruction.

Defendants should also be precluded from referring to the Court's spoliation ruling to suggest that the Court found the loss to be in good faith, found no bad faith, or rejected Manley's request for an adverse-inference instruction. The Court's determination that the record did not establish "intent to deprive" under Rule 37(e)(2) was a threshold finding that governed which sanctions the Court could impose at that stage of the case; it was not a finding that Defendants acted in good faith, and it did not limit the inferences the jury may reasonably draw from the evidence and argument the Court expressly authorized. (ECF No. 171 at 9.) Telling the jury about the Court's rulings would carry an aura of judicial authority that the jury would likely treat as conclusive. Courts routinely recognize that judicial findings are hearsay when offered for their truth and pose a serious risk that jurors will defer to them rather than weigh the evidence themselves. *See United States v. Sine*, 493 F.3d 1021, 1033–34 (9th Cir. 2007); *see also Nipper v. Snipes*, 7 F.3d 415, 417–18 (4th Cir. 1993). Any such reference should be excluded under Rules

402, 403, and 802.

### C. Defendants' "Alternative Inferences" Must Be Grounded in the Evidence.

Manley does not ask the Court to bar Defendants from arguing alternative inferences about what the missing messages said, as the Court's Order permits. (ECF No. 171 at 9.) But those counter-arguments must rest on admissible evidence about the *content* of the lost messages—for example, Reboton's testimony that her messages reported that Manley "looked drunk" or "wasted,"[4]—not on unsupported assertions that the loss was blameless or that Defendants acted in good faith. The Court should therefore preclude Defendants, their counsel, and their witnesses from (1) offering evidence or argument that Defendants took reasonable steps to preserve the December 10, 2021 text messages or that the loss was innocent, accidental, or in good faith; (2) referencing the Court's finding of no intent to deprive or its denial of an adverse-inference instruction; and (3) suggesting that the Court has found that Defendants did not act in bad faith.

## V. Motion in Limine #5 (to admit polygraph evidence)

Manley and the members of his party—Natalie Nasongkhla Manley, Omar Brioso, Christopher Snyder, and John Herman—each submitted to video-recorded polygraph examinations administered by George Olivo and Associates, conducted by two retired FBI polygraph examiners. (ECF No. 258 at 20–21, 24; Exs. FF–KK (Trial Exs. 64, 65, 66, 67, 71, 74[5]).) Nasongkhla Manley and Herman were examined on February 20, 2022; Snyder on February 21, 2022; and Brioso on February 22, 2022. Manley was examined on April 2, 2022, and again on April 27, 2022—the second examination at the request of *Defendants'* in-house counsel, Ashley Eddy, to clarify a point. (ECF No. 179-8 ¶ 3.) The results of the polygraphs were disclosed to Defendants or their representatives in April and May 2022. (ECF No. 179-8 ¶ 4.)

---

[4] (Ex. F (Reboton Dep.) 59:7–60:3 (testifying that she texted Manacher that Manley "looks drunk" or "wasted" after he got up from the table); *see also* Ex. G (Manacher Dep.) 78:3–14 (testifying that Reboton texted that she was helping Manley to his room "because he seemed like he had been intoxicated or he couldn't get to his room").)

[5] Plaintiff does not submit the videos of the polygraph examinations here due to the file size, but the videos are included on Plaintiff's proposed exhibit list and were produced in discovery.

The Ninth Circuit does not apply a per se rule excluding polygraph evidence. In *United States v. Cordoba*, 104 F.3d 225, 227–28 (9th Cir. 1997), the court held that *Daubert* abrogated the circuit's prior per se bar and that the admissibility of polygraph evidence is committed to the district court's discretion under Rules 702 and 403. Manley acknowledges that courts have often excluded polygraph evidence after applying that framework, *see, e.g.*, *United States v. Cordoba*, 194 F.3d 1053 (9th Cir. 1999) (affirming exclusion on remand), and that the Supreme Court has observed that there is no scientific consensus on polygraph reliability, *United States v. Scheffer*, 523 U.S. 303, 309 (1998). But those decisions confirm that admissibility turns on the particular examination, the examiner, and the purpose for which the evidence is offered—not on a categorical rule. Several features of this case weigh in favor of admission.

*First*, Defendants have put the honesty of Manley and his companions at issue by contending that Manley or his friends introduced ketamine into his drink, and that Manley may have used ketamine before December 10, 2021. (ECF No. 258 at 9 (Defs.' Add'l Contested Fact Nos. 17–18).) Indeed, Manley testified that he and his companions took the examinations at counsel's direction "because the MGM accused my friends and myself of drugging me." (Ex. I (Manley Dep. (Vol. I)) 173:6–13.) Defendants pressed the same theme in discovery: their counsel asked Dr. Sucher whether he knew if Manley's girlfriend had drugged him, and asked Snyder to agree that Manley's counsel would not have requested his polygraph if they knew he had not spiked Manley's drink. (Ex. K (Sucher Dep.) 81:18–21; Ex. J (Snyder Dep.) 76:14–77:7.) The Rules contemplate that a witness whose truthfulness has been attacked may respond with supporting evidence. *Cf.* Fed. R. Evid. 608(a) (regarding reputation and opinion testimony).

*Second*, the polygraph examinations are independently relevant for a non-truth purpose. Defendants have identified Manley's investigative efforts—including his retention of investigators, his communications with law enforcement and the Nevada Gaming Control Board, and the rewards he offered—as contested issues for trial. (ECF No. 258 at 10 (Defs.' Add'l Contested Fact Nos. 33–35).) Manley's decision to submit himself and his friends to examinations by former FBI examiners is part of that investigative history and bears on Manley's good faith, his prompt repudiation of the debt, and the sincerity of his belief that he was drugged.

That use does not depend on the accuracy of the results. Snyder, for example, understood the examinations to be part of that effort: Manley's counsel was "giving polygraph tests to every individual that was with him to assure that it wasn't so." (Ex. J (Snyder Dep.) 74:24–76:13, 77:5–7.) Manley's declaration describing these examinations was also part of the record on which the Court denied summary judgment on Defendants' ratification theory, finding that a rational trier of fact could conclude that Manley promptly disaffirmed the debt. (ECF No. 221 at 32–34 (citing ECF No. 179-8).)

*Third*, the reliability concerns that animate exclusion in other cases are mitigated here. The examinations were administered by experienced former FBI examiners (Exs. FF–KK (Trial Exs. 64, 65, 66, 67, 71, 74)), and each examination was video-recorded, permitting Defendants and the Court to scrutinize the questions, procedures, and conduct of the examinations. Moreover, Defendants' own in-house counsel requested Manley's second examination, and Defendants received all of the results in the spring of 2022. (ECF No. 179-8 ¶ 3.) Defendants should not be heard to argue that examinations—one of which they themselves sought—are too unreliable for the jury to consider.

Accordingly, the Court should admit the polygraph evidence or, alternatively, set a Rule 104(a) hearing at which Manley may establish the reliability of the examinations before the Court rules on Defendants' anticipated motion in limine.

## **CONCLUSION**

For the foregoing reasons, Manley respectfully requests that the Court enter an order in limine (1) excluding evidence, testimony, and argument regarding Manley's alleged prior conduct, including the December 2020 pillar incident, the 2010 and 2014 incident reports, Trial Exhibits 523, 524, 527, and 528, and related testimony such as Reboton's testimony identified in motion in limine #1; (2) excluding the testimony and opinions of Adam Rains; (3) precluding Daniel Overbeek, MD from testifying; (4) precluding Defendants, their counsel, and their witnesses from offering evidence or argument that Defendants took reasonable steps to preserve evidence, or that the loss of evidence was innocent, accidental, or in good faith, or referencing the Court's findings on whether there was an intent to deprive and denial of an adverse-inference instruction; and

(5) admitting the polygraph evidence, or, alternatively, setting a Rule 104(a) hearing.

DATED: November 10, 2026

Respectfully submitted,

/s/ Charles H. McCrea

PRH LAW LLC
Paul R. Hejmanowski, Esq., Bar No. 94
Charles H. McCrea, Esq., Bar No. 104
520 S. Fourth St., Ste. 360
Las Vegas, Nevada 89101
-
MADEL PA
Christopher W. Madel, Esq. (*pro hac vice)*
Jennifer M. Robbins, Esq. (*pro hac vice)*
434 Lake Street
Excelsior, MN 55331

*Attorneys for Plaintiff/Counter-Defendant Dwight Manley*

**INDEX TO EXHIBITS**

| Exhibit Letter | Description |
|---|---|
| **A** | Trial Exhibit 523 - Text Messages dated December 7, 2020, Bates-labeled MGM00013 - MG00014 - **FILED UNDER SEAL** |
| **B** | Trial Exhibit 524 - Photo of MGM pillar with hole, Bates-labeled MGM00015 - **FILED UNDER SEAL** |
| **C** | Trial Exhibit 527 - Incident File Summary Report for 2010-06-13, Bates-labeled MGM00246 - MGM00248 - **FILED UNDER SEAL** |
| **D** | Trial Exhibit 528 - Incident File Summary Report for 2014-07-07, Bates-labeled MGM00249 - MGM0000261 - **FILED UNDER SEAL** |
| **E** | Trial Exhibit 31 - Compilation of emails between L. Bilbao, J. Manacher, V. Reboton et al. re D. Manley corporate line, Bates-labeled MGM00160 - MGM00166 - **FILED UNDER SEAL** |
| **F** | Excerpts of the Deposition of Vanessa Reboton that occurred on March 27, 2024 |
| **G** | Excerpts of the Deposition of Justin Manacher that occurred on April 24, 2024 |
| **H** | Trial Exhibit 21 - MGM Resorts International Marker Limit Change in Customer Information/Reactivation for D. Manley and Central Credit, LLC Full Gaming Report, Bates-labeled MGM00143 - MGM00146 - **FILED UNDER SEAL** |

| | |
|---|---|
| **I** | Excerpts of the Deposition of Dwight Manley, Volume 1, that occurred on July 29, 2024 |
| **J** | Excerpts of the Deposition of Christopher R. Snyder that occurred on March 22, 2024 |
| **K** | Excerpts of the Deposition of Dr. Michel A. Sucher that occurred on August 22, 2024 |
| **L** | Excerpts of the Deposition of Tim Petropulos that occurred on August 23, 2024 |
| **M** | Defendants' Rule 26(a)(1) Sixteenth Supplemental Disclosures dated April 9, 2025 |
| **N** | Expert Report of Adam Rains with Curriculum Vitae attached |
| **O** | Trial Exhibit 138 - Timeline of events based on security camera footage, Bates-labeled P000248 - P000250 and marked as Overbeek Deposition Exhibit 3 |
| **P** | Excerpts of the Deposition of Jerilyn Koch that occurred on March 28, 2024 |
| **Q** | Expert Report of Dr. Michel A. Sucher with attachments, dated January 25, 2024 |
| **R** | Rebuttal Expert Report of Dr. Michel A. Sucher, dated March 26, 2024 |
| **S** | Expert Report of Dr. Daniel Overbeek with attachments |
| **T** | Rebuttal Expert Report of Dr. Daniel Overbeek |
| **U** | Excerpts of the Deposition of Dr. Daniel L. Overbeek that occurred on August 16, 2024 |
| **V** | Trial Exhibit 47 - Email from R. Schonfeld to A. Eddy re Dwight Manley - Preservation Demand [attachment: Letter from R. Schonfeld to A. Eddy re Preservation Demand], Bates-labeled P000071 - P000073 |
| **W** | Trial Exhibit 53 - Email chain between R. Schonfeld and A. Eddy re Re: Dwight Manley - Preservation Demand, Bates-labeled P000075 - P000076 |
| **X** | Excerpts of the Deposition of Zachary Clarence Johnson, Volume 1, that occurred on March 5, 2025 |
| **Y** | Excerpts of the Deposition of Kendall Hart that occurred on April 29, 2026 |
| **Z** | Excerpts of the Deposition of Ronald Buono that occurred on May 14, 2026 |
| **AA** | Excerpts of the Deposition of Chris Durlej that occurred on May 14, 2026 |
| **BB** | Excerpts of the Deposition of Lynda Bilbao that occurred on March 5, 2025 |
| **CC** | Trial Exhibit 50 - Legal Hold Notification, Bates-labeled MGM01050 - MGM01054 - **FILED UNDER SEAL** |
| **DD** | Trial Exhibit 52 - Revised Legal Hold Notification, Bates-labeled MGM01056 - MGM01060 - **FILED UNDER SEAL** |
| **EE** | Excerpts of the Deposition of Stewart Patchefsky that occurred on April 28, 2026 |
| **FF** | Trial Exhibit 64 - George Olivo and Associates Polygraph Examination Report on N. Nasongkhla, Bates-labeled P000177 - P000179 - **FILED UNDER SEAL** |
| **GG** | Trial Exhibit 65 - George Olivo and Associates Polygraph Examination Report on O. Brioso, Bates-labeled P000180 - P000182 - **FILED UNDER SEAL** |

| | |
|---|---|
| **HH** | Trial Exhibit 66 - George Olivo and Associates Polygraph Examination Report on C. Snyder, Bates-labeled P000183 - P000185 - **FILED UNDER SEAL** |
| **II** | Trial Exhibit 67 - George Olivo and Associates Polygraph Examination Report on J. Hermann, Bates-labeled P000186 - P000188 - **FILED UNDER SEAL** |
| **JJ** | Trial Exhibit 71 - George Olivo and Associates Polygraph Examination Report on D. Manley, dated April 2, 2022, Bates-labeled P000174 - P000176 - **FILED UNDER SEAL** |
| **KK** | Trial Exhibit 71 - George Olivo and Associates Polygraph Examination Report on D. Manley, dated April 27, 2022 - **FILED UNDER SEAL** |

## CERTIFICATE OF MEET-AND-CONFER COMPLIANCE

Pursuant to LR 16-3(a) and the Court's Order Regarding Trial (ECF No. 259 ¶ 2), undersigned counsel certifies that counsel for the parties met and conferred regarding the issues raised in these motions in limine on October 29, 2026 via videoconference. Counsel engaged in additional conversations regarding the motions in limine via videoconference and email both before the October 29 videoconference and after that date, as well.

## CERTIFICATE OF SERVICE

Pursuant to Federal Rule of Civil Procedure 5(b), I hereby certify that on this 10th day of November, 2026, I caused the foregoing **PLAINTIFF DWIGHT MANLEY'S MOTIONS IN LIMINE AND SUPPORTING MEMORANDUM OF LAW** to be served by the Court's CM/ECF System to all parties and counsel of record.

*/s/ Charles H. McCrea*