Lawrence J. Semenza, III, Esq. (Bar No. 7174)
ljs@semenzarickard.com
Katie L. Cannata, Esq. (Bar No. 14848)
klc@semenzarickard.com
SEMENZA RICKARD LAW
10161 Park Run Drive, Suite 150
Las Vegas, Nevada 89145
Telephone: (702) 835-6803
Facsimile: (702) 920-8669

Bethany W. Kristovich, Esq. (*pro hac vice*)
bethany.kristovich@mto.com
John Schwab, Esq. (*pro hac vice*)
john.schwab@mto.com
Graham J. Wyatt (*pro hac vice*)
graham.wyatt@mto.com
MUNGER, TOLLES & OLSON LLP
350 South Grand Avenue, Fiftieth Floor
Los Angeles, California 90071-3426
Telephone: (213) 683-9100
Facsimile: (213) 687-3702

*Attorneys for Defendant MGM Resorts International & Defendant/Counterclaimant MGM Grand Hotel, LLC*

**UNITED STATES DISTRICT COURT**

**DISTRICT OF NEVADA**

DWIGHT MANLEY,

Plaintiff,

v.

MGM RESORTS INTERNATIONAL; MGM GRAND HOTEL, LLC,

Defendants.

MGM GRAND HOTEL, LLC, a Nevada limited liability company,

Counterclaimant,

v.

DWIGHT MANLEY, an individual,

Counter-Defendant.

Case No. 2:22-cv-01906-MMD-EJY

**DEFENDANTS' CONSOLIDATED MOTIONS IN LIMINE NOS. 1–12**

Judge: Hon. Miranda M. Du
Date of Hearing: TBD
Time of Hearing: TBD
Crtrm.: TBD

# INDEX OF DEFENDANTS' MOTIONS IN LIMINE

**Page**


I. MOTION IN LIMINE NO. 1 TO EXCLUDE EVIDENCE, TESTIMONY, OR ARGUMENT REGARDING POLYGRAPH EXAMINATIONS ........ 1

II. MOTION IN LIMINE NO. 2 TO EXCLUDE EVIDENCE, TESTIMONY, OR ARGUMENT REGARDING MANLEY'S HAIR DRUG TEST, INCLUDING THE OPINIONS AND REPORT OF KAILY BISSANI AND DR. MICHEL SUCHER'S RELATED OPINIONS AND TESTIMONY ........ 8

III. MOTION IN LIMINE NO. 3 TO EXCLUDE IN PART DR. MICHEL SUCHER'S OPINION REGARDING INVOLUNTARY KETAMINE INGESTION ........ 21

IV. MOTION IN LIMINE NO. 4 TO EXCLUDE EVIDENCE, TESTIMONY, OR ARGUMENT OF (1) ALLEGED DRUGGING BY ANYONE OTHER THAN KOCH; (2) KETAMINE INGESTION OTHER THAN THROUGH MANLEY'S FIRST DRINK; OR (3) NEGLIGENCE LIABILITY WITHOUT PROOF OF DRUGGING. ........ 27

V. MOTION IN LIMINE NO. 5 TO EXCLUDE UNDISCLOSED MEDICAL EVIDENCE AND LIMIT EMOTIONAL-DISTRESS DAMAGES AND ARGUMENT ........ 36

VI. MOTION IN LIMINE NO. 6 TO EXCLUDE TESTIMONY FROM MANLEY'S SIX UNDISCLOSED FACT WITNESSES ........ 43

VII. MOTION IN LIMINE NO. 7 TO EXCLUDE THE FINANCIAL REPORT PRODUCED IN MANLEY'S EIGHTH SUPPLEMENT TO HIS INITIAL DISCLOSURES AS UNTIMELY ........ 46

VIII. MOTION IN LIMINE NO. 8 TO LIMIT USE OF EVIDENCE OF MANLEY'S CONDITION AFTER 3:39 P.M. ON DECEMBER 10, 2021 TO HIS NEGLIGENCE CLAIM ........ 47

IX. MOTION IN LIMINE NO. 9 TO PRECLUDE MANLEY'S NEGLIGENCE THEORY BASED ON DEFENDANTS' EXTENSION OF GAMING CREDIT ........ 54

X. MOTION IN LIMINE NO. 10 TO EXCLUDE EVIDENCE, TESTIMONY, AND ARGUMENT REGARDING DEFENDANTS' POLICIES AND INVESTIGATION ........ 56

XI. MOTION IN LIMINE NO. 11 TO EXCLUDE EVIDENCE, TESTIMONY, OR ARGUMENT REGARDING ALLEGATIONS OF OTHER DRUGGING INCIDENTS AT MGM-AFFILIATED PROPERTIES ........ 61

XII. MOTION IN LIMINE NO. 12 TO EXCLUDE APPEALS TO JURORS' PERSONAL SAFETY AND OTHER "GOLDEN RULE" ARGUMENTS ........ 69

## PRELIMINARY STATEMENT

The Court ordered that "motions in limine be filed as one consolidated motion (as opposed to numerous separate motions)" and that "[m]otions in limine must be fully briefed and submitted no later than 30 days before trial." Dkt. No. 259 at 1. Trial is scheduled to begin on Tuesday, February 9, 2027. *Id.* The parties agreed among themselves to file their respective opening briefs on November 10, 2026, and opposition briefs on December 16, 2026, so that all motions in limine would be fully briefed and submitted more than 30 days before trial. Consistent with that agreement, Defendant MGM Resorts International and Defendant/Counterclaimant MGM Grand Hotel, LLC submit the following motions in limine in this one consolidated motion.

On October 29, 2026, Defendants met and conferred with Plaintiff Dwight Manley regarding the motions in limine presented in this consolidated filing pursuant to Local Rule 16-3(a) and were unable to resolve these matters without Court action. Ex. 1 (Declaration of Lawrence J. Semenza, III, Esq.) ¶ 3.[1]

### I. MOTION IN LIMINE NO. 1 TO EXCLUDE EVIDENCE, TESTIMONY, OR ARGUMENT REGARDING POLYGRAPH EXAMINATIONS

#### A. Introduction

In an effort to bolster his allegations against MGM Resorts International and MGM Grand Hotel, LLC (collectively, "MGM" or "Defendants"), Plaintiff Dwight Manley ("Manley") seeks to admit at trial unvetted evidence of polygraph examinations taken by himself and his companions, including video recordings of each examination and the exams' supposed results. The polygraph examinations are inadmissible under binding Ninth Circuit precedent and, in any event, should not be admitted because their potential for prejudice and confusion far outweighs any probative value.

*First*, Manley seeks to admit the polygraph evidence in order to bolster his own testimony, and the testimony of his friends; Manley wants the jury to credit his and his friends' trial testimony because they gave similar answers in the polygraph examination and were deemed (by Manley's hand-selected examiner) to be telling the truth. Polygraph examinations may not be used as Manley

[1] All references to "Ex." are to the exhibits attached to the Appendix filed concurrently with Defendants' Consolidated Motions in Limine Nos. 1–12.

intends to use the evidence here.

*Second*, polygraph evidence is scientific evidence that is inadmissible without expert testimony establishing that the examination satisfies Rule 702 and *Daubert.* Manley failed to provide *any* expert testimony in support of the examinations. And unstipulated[2] polygraph examinations are routinely excluded under Rule 702 because of their inherent unreliability.

*Third*, as the Ninth Circuit has repeatedly held, the admission of polygraph evidence is disfavored because any limited probative value is nearly always outweighed by the substantial likelihood of prejudice inherent in any polygraph.

*Fourth*, the statements made by Manley, his wife, and his friends during the polygraph examinations are inadmissible hearsay.

For each of these independent reasons, this Court should exclude all evidence[3] of Manley's privately-conducted, self-serving polygraph examinations.

**B. Background**

To bolster his claim that he was drugged with ketamine, and therefore too incapacitated to have executed certain casino credit instruments, Dkt. No. 64 ("TAC") ¶¶ 61, 73, Manley and the friends that accompanied him to the MGM Mansion underwent polygraph examinations regarding the trip. Ex. 2 (Manley Vol. 1 Dep.) at 173:6–25. The polygraphs were administered through George Olivo, Inc., a private polygraph practice, by private examiners George Olivo and Jim Stern. Ex. 3 (TX071) at 1. Manley first retained Stern as a private investigator, then Stern identified and engaged Olivo to administer the polygraphs. *Id.*; Ex. 2 (Manley Vol. 1 Dep.) at 208:15–209:7.

---

[2] A stipulated examination is one in which the parties agree in advance to the test and its parameters, including the questions to be asked. That did not occur here. To the extent Manley relies on cases discussing stipulated exams in his opposition, those cases are distinguishable on this basis and should be discounted.

[3] Defendants specifically ask for exclusion of Manley's Exhibits TX064, TX064A, TX065, TX065A, TX066, TX066A, TX067, TX067A, TX071, TX071A, TX074, and TX074A. Exhibits TX064, TX065, TX066, TX067, TX071, and TX074 are written reports of each of the polygraphs Manley is offering into evidence ("Polygraph Reports"), while the remaining Exhibits are video recordings of the same ("Polygraph Videos"). The reports consist of the specific questions and answers and the alleged results of a particular examination. The videos are footage of the complete examinations, including preparatory discussions and additional commentary.

Manley's friends were examined months after their trip, in February 2022, while Manley himself was examined twice, in April 2022. Exs. 3 (TX071), 4 (TX064), 5 (TX065), 6 (TX066), 7 (TX067), 8 (TX074).

The examinations focused on Manley's drug consumption. Among other questions, Manley was asked whether he knowingly consumed ketamine or any other illegal substances at the MGM Mansion, or whether he had ever knowingly consumed ketamine. *See* Exs. 3 (TX071), 8 (TX074). He responded in the negative, with the polygraph reporting no deception. *Id.* The remaining reports document his companions' denials of witnessing anyone add anything to Manley's drink, or adding any substance to his drink themselves. *See, e.g.*, Exs. 4 (TX064), 5 (TX065), 6 (TX066), 7 (TX067). Manley seeks to offer all six polygraph reports, as well as full-length video recordings of each of the examinations, into evidence at trial.

But, far from the examinations being neutral, Stern briefed Olivo on Manley's narrative prior to retaining him. Ex. 3 (TX071) at 1. Manley paid for his friends' examinations. Ex. 9 (TX064A) at 3:20:00–27:00. Olivo offered the examinees a preview of the questions he would ask, so "there [were] no surprises." *See, e.g.*, Ex. 10 (TX071A) at 1:05:38–05:43. In one of Manley's examinations, he gave Olivo feedback on the questions he proposed, and Olivo coached Manley on how to respond. *Id.* at 1:07:10–22:48. That examination ended with a declaration of "attack mode" on Defendants. *Id.* at 1:52:55–52:58. In another, Olivo vowed to write "a bulletproof report for Dwight and his attorney." Ex. 11 (TX066A) at 2:08:25–08:35.

Now, Manley seeks to admit this unvetted evidence without having disclosed Olivo or Stern as expert witnesses, or submitting an expert report on the methodology underlying their polygraph examinations. Instead, Manley designated Olivo and Stern as fact witnesses, without having disclosed them during discovery,[4] and now seeks to rely on them to admit one-sided polygraph evidence at trial. Dkt. No. 258 (Joint Pretrial Order) at 54–55.

[4] Defendants separately move to exclude the testimony of Olivo, Stern, and other witnesses on the ground that they were not timely disclosed. *See infra* Defendants' Motion in Limine No. 6.

**C. Argument**

The Ninth Circuit has long recognized the "inherent problematic nature" of polygraph evidence. *United States v. Cordoba*, 104 F.3d 225, 228 (9th Cir. 1997) ("*Cordoba I*"). The intrinsic unreliability of polygraph evidence "presents a 'special risk that the jury might give excessive weight to the polygrapher's conclusions.'" *Dixon v. City of Coeur D'Alene*, 547 F. App'x 817, 818 (9th Cir. 2013) (citation omitted). Admission of polygraph evidence is disfavored precisely because of its "questionable reliability" and "overwhelming potential for prejudic[ing]" the jury. *Granite State Ins. Co. v. Smart Modular Techs., Inc.*, 76 F.3d 1023, 1031 (9th Cir. 1996) (citation omitted); *see also United States v. Scheffer*, 523 U.S. 303, 312 (1998) ("[C]ertain doubts and uncertainties plague even the best polygraph exams."); *Cordoba I*, 104 F.3d at 228 ("[P]olygraph evidence has grave potential for interfering with the deliberative process."). "A trial court will rarely abuse its discretion by refusing to admit the [polygraph] evidence, even for a limited purpose and under limited conditions." *United States v. Marshall,* 526 F.2d 1349, 1360 (9th Cir. 1975).

Manley's polygraph evidence must be excluded for four independent reasons: (1) Manley seeks to introduce it for an impermissible purpose; (2) it is unsupported by any expert opinion, much less an expert opinion sufficient to meet the standards of Rule 702; (3) any probative value is outweighed by the inherent prejudice in presenting polygraph evidence to a jury; and (4) Manley seeks to use the polygraph evidence to smuggle in impermissible hearsay.[5]

**1. Manley's Polygraph Evidence Is Not An Operative Fact And Therefore Inadmissible.**

Manley seeks to introduce polygraph evidence in order to convince the jury that his testimony, and the testimony of his wife and his friends, is truthful. He cannot do so. Although polygraph examinations are not per se inadmissible, "[i]n th[e] [Ninth Circuit], it is well-established that a polygraph examination may not be admitted to prove the veracity of statements

[5] Exhibits TX064A, TX065A, TX066A, TX067A, TX071A, TX074, and TX074A must be excluded for yet another reason: Manley did not produce them in discovery as required by Rule 26(a). *Yeti by Molly, Ltd. v. Deckers Outdoor Corp.*, 259 F.3d 1101, 1106 (9th Cir. 2001) (holding "exclusion is an appropriate remedy for failing to fulfill the required disclosure requirements of Rule 26(a)"). Manley's failure to timely disclose these exhibits had no justification and has harmed Defendants' ability to develop their defenses.

made during the examination." *United States v. Alvirez*, 831 F.3d 1115, 1125 (9th Cir. 2016). Polygraph evidence "may be admissible" as an "operative fact," *id.*, or if the examination is the basis of a cause of action. In other words, if "it is relevant that a polygraph examination was given, regardless of the result," the exam may be admissible. *United States v. Bowen*, 857 F.2d 1337, 1341 (9th Cir. 1988). That is not the case here: Manley himself chose to sit for a polygraph examination, and convinced his friends and wife to do so, in order to bolster his own claims. The fact that he did so is irrelevant to his claims, and to Defendants' counterclaims. The polygraph evidence should be excluded on this basis alone.

### 2. Manley's Polygraph Evidence Is Unsupported By Expert Opinion And Cannot Satisfy Rule 702.

Polygraph evidence is scientific evidence and therefore can be admitted, if at all, only "as expert testimony" that satisfies Rule 702. *United States v. Ramirez-Robles*, 386 F.3d 1234, 1245 (9th Cir. 2004). A court cannot admit polygraph evidence unless it has determined "the scientific validity of the proffered polygraph evidence under Rule 702." *United States v. Cordoba*, 194 F.3d 1053, 1056–57 (9th Cir. 1999) ("*Cordoba II*").

Manley did not disclose any expert witnesses to explain the examinations or their results. Instead, Manley is now trying to claim that the individuals who administered the polygraph exams are fact witnesses. Joint Pretrial Order at 54–55. But polygraph evidence cannot be admitted unless it meets the requirements of Rule 702 and *Daubert*. *Cordoba II*, 194 F.3d at 1056–57. Manley has no evidence that polygraph exams are reliable because he has no expert testimony on that point.

Manley did not disclose either polygraph examiner as an expert. As fact witnesses, they cannot provide an opinion about the reliability of polygraph examinations. Fact witnesses may testify only as to matters as to which they have personal knowledge, Fed. R. Evid. 602, and may offer opinions only if they are "rationally based on the witness's perception" *and* "not based on scientific technical, or other specialized knowledge within the scope of Rule 702," Fed. R. Evid. 701. Because Manley cannot set forth any evidence demonstrating that the polygraph examinations satisfy Rule 702, the polygraph evidence must be excluded.

### 3. Manley's Polygraph Evidence Should Be Excluded Under Rule 403.

Even if Manley's polygraph evidence were otherwise admissible, it still must be excluded as more prejudicial than probative under Rule 403. Where, as here, "the probative value of [a particular piece of polygraph] evidence is 'substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury,'" such evidence is properly excluded, even where that evidence would otherwise be admissible under the Rule 702 criteria. *Cordoba II*, 194 F.3d at 1062–63 (quoting Fed. R. Evid. 403). The exclusion of this evidence under Rule 403, is "absolute," such that "no other evidentiary rule . . . can operate to make that same evidence admissible." *United States v. Benavidez-Benavidez*, 217 F.3d 720, 725 (9th Cir. 2000).

Manley's polygraph evidence "has grave potential for interfering with the deliberative process," *Cordoba I*, 104 F.3d at 228, because the jury may defer to the polygraph reports when evaluating the credibility of Manley, his wife, and his friends. That is particularly problematic because the polygraph evidence "is cloaked with an illusory indicia of reliability that often proves confusing to the jury." *United States v. Lopez-Estrada*, 891 F.2d 296, 296 (9th Cir. 1989). In fact, there is no guarantee that a given polygraph report is accurate and the risk of exposing the jury to a "flawed" report "greatly outweigh[s its] probative value." *See Cordoba II*, 194 F.3d at 1062–63 (polygraph report found to be defective). As such, they offer a "misleading appearance of accuracy" that is likely to induce overreliance in the jury. *United States v. Falsia*, 724 F.2d 1339, 1342 (9th Cir. 1983).

It is the province of the jury to "determin[e] the weight and credibility of witness testimony," or in other words, to serve as "the lie detector" in a trial. *Scheffer*, 523 U.S. at 313; *see also United States v. Barnard*, 490 F.2d 907, 912 (9th Cir. 1973) ("[T]he jury is the lie detector in the courtroom."). By serving as an ostensible lie detector itself, however, the polygraph can "diminish the jury's role in making credibility determinations." *Scheffer*, 523 U.S. at 313. That is certainly true here, where the polygraph reports assert that there was "no deception indicated" in the answers of any examinee. *See, e.g.*, Ex. 8 (TX074) at 1. That type of analysis does not relate to "matters outside the jurors' knowledge," but merely "suppl[ies] the jury only with another opinion . . . about whether the witness was telling the truth." 523 U.S. at 313. And the answers being assessed for

truthfulness in the polygraphs all relate to Manley's drug consumption, which is a central question that the jury must answer in this lawsuit. *See, e.g.*, Ex. 8 (TX074) at 2. The polygraph evidence therefore poses the "special risk that the jury might give excessive weight to the polygrapher's conclusions" and must be excluded under Rule 403. *Benavidez-Benavidez*, 217 F.3d at 725.

Manley's claims rely, in significant part, on his assertion that he was drugged with ketamine, and that neither he, nor his wife, or his friends, were responsible. Where a case turns on the relative credibility of one party over another, a polygrapher's testimony that one party is being truthful has the potential to be "very prejudicial." *Ramirez-Robles*, 386 F.3d at 1247; *see also Dixon*, 547 F. App'x at 818 (9th Cir. 2013) (same). It would clearly have that prejudicial effect here. The polygraph evidence should therefore also be excluded under Rule 403.

**4. Manley's Polygraph Evidence Is Also Inadmissible Hearsay.**

An "unsworn polygraph [is] a 'statement by somebody who's not on the witness stand,' and inadmissible as hearsay." *In re Cagney*, No. 04-1266, 2010 WL 6452594, at *7 (B.A.P. 9th Cir. Nov. 18, 2010), *aff'd*, 466 F. App'x 674 (9th Cir. 2012) (citation omitted).

Manley's polygraph evidence is unsworn, and concerns facts that will be in dispute at trial. *See, e.g.*, Exs. 4 (TX064), 9 (TX064A). As discussed, the sole plausible purpose of offering polygraph evidence wherein Manley asserts that he did not "add any substance to [his] own drink in Las Vegas" and did not "knowingly consume any illegal substance" on the same trip is for the truth of what is asserted in his statements. Ex. 3 (TX071) at 2. The answers given by his companions asserting that they did not add anything to Manley's drink themselves serve the same purpose. *See, e.g.*, Ex. 4 (TX064) at 2; Ex. 5 (TX065) at 2. The polygraph evidence not only contains these answers, but extensive commentary by the examinees regarding Manley's allegations. *See, e.g.*, Ex. 11 (TX066A) at 2:08:41–20:43. All of this is hearsay, and all of it is inadmissible on that basis as well. Manley, his wife, and his friends can, of course, make whatever statements they like to the jury, but they must be made live, under oath, and subject to cross-examination. The polygraph

evidence must be excluded for this reason, as well.[6]

Manley's polygraph evidence does not fall within the business records exception to hearsay which would require it to be "kept in the regular course of business." *Melendez-Diaz v. Massachusetts*, 557 U.S. 305, 321 (2009). Where a record is created for the purpose of establishing a fact at trial, it is not a business record. *Id.* at 324; *see also Palmer v. Hoffman*, 318 U.S. 109, 114 (1943) (excluding as hearsay an accident report prepared by a railroad company as it was "calculated for use essentially in the court, not in the business"). Like in *Palmer*, Manley asked for polygraph examinations specifically so they could be used at trial. *See* Ex. 2 (Manley Vol. 1 Dep.) at 173:6–25 (admitting he took the polygraph because "I was directed to by my lawyers because the MGM accused my friends and myself of drugging me"). Manley's friends—who agreed to be subject to polygraphs—understood them as serving a similar purpose. *See, e.g.*, Exs. 15 (Snyder Dep.) at 76:5–77:7 (stating that he took the polygraph test because he was asked to do so by Manley's counsel to "assure" he was not involved in spiking Manley's drink), 16 (Herman Dep.) at 53:2–54:18 (stating that he took the polygraph test because Manley's counsel suggested it to "eliminate the people who were with [Manley]" as having not drugged him). The polygraph evidence is not admissible as a business record, and is not subject to any other hearsay exception.

**D. <u>Conclusion</u>**

Defendants request that the Court exclude Manley's Exhibits TX064, TX064A, TX065, TX065A, TX066, TX066A, TX067, TX067A, TX071, TX071A, TX074, and TX074A under Federal Rules of Evidence 702, 403, and 802.

## II. <u>MOTION IN LIMINE NO. 2 TO EXCLUDE EVIDENCE, TESTIMONY, OR ARGUMENT REGARDING MANLEY'S HAIR DRUG TEST, INCLUDING THE</u>

[6] While Manley's failure to designate an expert qualified to testify regarding the polygraph evidence precludes him from relying on the Rule 703 exception to hearsay, *see supra* Section I.C.2, even if he were to rely on an expert, the evidence would not be admissible to "establish the truth of what they assert." *Paddack v. Dave Christensen, Inc.*, 745 F.2d 1254, 1262 (9th Cir. 1984); *United States v. Sims,* 514 F.2d 147, 149–50 (9th Cir. 1975) (holding that hearsay entered through an expert "is to be considered solely as a basis for the expert opinion and not as substantive evidence").

**OPINIONS AND REPORT OF KAILY BISSANI AND DR. MICHEL SUCHER'S RELATED OPINIONS AND TESTIMONY**

**A. Introduction**

Manley seeks to offer into evidence as Exhibit TX062, The Carlson Company Hair Drug Test, dated January 31, 2022. *See* Ex. 17 (TX062 or "Hair Drug Test"). Manley also seeks to introduce a related report from Kaily Bissani ("Bissani"), The Carlson Company's general manager, as TX113, *see* Ex. 18 (TX113 or "Bissani Report"); testimony from Bissani; testimony from Manley's purported expert, Dr. Michel Sucher ("Dr. Sucher") concerning the test's validity and accuracy; and other evidence or testimony concerning the test and its purported results. The Hair Drug Test and all such related evidence and testimony are inadmissible for multiple reasons.

*First*, the Hair Drug Test is inadmissible hearsay, because Manley has no witness he can call to testify as to its reliability. Bissani did not perform the Hair Drug Test, nor did anyone at The Carlson Company—nor would they be qualified to. Dr. Sucher likewise did not perform or observe the testing and has no personal knowledge of the procedures used to generate the purported results. Instead, a separate company, ExperTox Laboratory ("ExperTox"), conducted the testing that purported to detect ketamine in Manley's hair sample. Manley has not disclosed any representative from ExperTox as a witness. Without the testimony of a qualified witness with knowledge of the creation of the Hair Drug Test to lay foundation for its reliability, the Hair Drug Test is inadmissible hearsay.

*Second*, and relatedly, neither Bissani, Dr. Sucher, nor any other witness identified by Manley can authenticate the Hair Drug Test.

*Third*, Manley cannot back-door the Hair Drug Test into evidence through the Bissani Report or testimony. Bissani is not qualified to provide expert testimony about the Hair Drug Test because he lacks specialized knowledge and acts as a mere hearsay conduit. He created his report for the purpose of litigation, and he concedes that its purported descriptions of the testing process rest on mere assumptions, not facts and data. Indeed, Manley agreed during the meet-and-confer process to remove all other expert reports from his exhibit list because they are hearsay. Yet Manley declined to remove the Bissani Report on the theory that Bissani is not an expert witness,

despite the fact that he previously disclosed Bissani as an expert, and has paid Bissani for his report and testimony. Manley's baseless attempt to avoid the standards for expert qualification merely underscore that Bissani cannot be permitted to testify about the Hair Drug Test. Nor may Manley evade the same authentication, hearsay, foundation, and expert-testimony requirements by presenting the purported test results through another witness or exhibit.

*Fourth*, Dr. Sucher cannot offer an admissible expert opinion that the Hair Drug Test or its purported results were valid or accurate. Dr. Sucher did not perform or observe the testing, has never worked directly with ExperTox, and has never investigated the veracity of ExperTox's results. His generalized experience with hair testing and his opinion that liquid chromatography and mass spectrometry are generally reliable do not provide a sufficient factual basis or reliable methodology for validating ExperTox's testing of this particular sample. His test-specific opinion therefore is not based on sufficient facts or data and is not the product of a reliable application of any identified methodology, as Rule 702 requires.

*Fifth*, Manley cannot circumvent exclusion by presenting the Hair Drug Test's purported results through other witnesses or exhibits. Changing the source or form of the evidence does not cure its hearsay, authentication, foundation, and expert-testimony defects.

The Hair Drug Test, Bissani Report, any testimony by Bissani or Dr. Sucher concerning the testing, as well as any other evidence or reference suggesting that the test yielded a positive result for ketamine should be excluded at trial.

## B. Background

The Hair Drug Test is a report containing the results of a Drug-Facilitated Sexual Assault panel performed on Manley's hair sample. Ex. 17 (Hair Drug Test). Manley claims his hair sample was collected for testing on January 3, 2022, nearly one month after his visit to the MGM Grand. *See* Ex. 2 (Manley Vol. 1 Dep.) at 226:16–19, 231:2–4. Bissani claims The Carlson Company received Manley's hair sample on January 5, 2022, and then transferred it to ExperTox on January 7, 2022 for testing. *See* Ex. 18 (Bissani Report) at 1–4. Dr. Sucher's report simply asserts that the Hair Drug Test is "valid and accurate" without explaining the basis for that conclusion. *See* Ex. 19 (Sucher Opening Report) at 8.

Neither Bissani nor Dr. Sucher performed the Hair Drug Test. An individual named Brandon Cox ("Cox"), whom Manley has never disclosed as a witness, was the certifying scientist at ExperTox who performed gas chromatography, liquid chromatography, and mass spectrometry testing on Manley's hair sample. Ex. 17 (Hair Drug Test). The result was reviewed by Dr. Shaiju Vareed and Dr. Ernest Lykissa. *Id.* at 7. The Hair Drug Test results purportedly indicate that ketamine and norketamine (a ketamine metabolite) were detected in Manley's hair sample. *Id.* A disclaimer on the report provides that the "[r]esults are for CLINICAL USE ONLY, NOT FOR FORENSIC PURPOSES." *Id.*

Bissani admitted that he "has never performed this type of test before" and his company "would not be qualified to conduct the type of test" performed on Manley's hair sample. Ex. 20 (Bissani Vol. 2 Dep.) at 57:25–58:5, 77:16–20. All that Bissani contributed to the Hair Drug Test after he received the report from ExperTox was adding a header with The Carlson Company's logo. *Id.* at 63:20–22, 64:8–11.

Two years after the Hair Drug Test, Bissani authored a report about the test results, dated February 6, 2024. The Bissani Report purports to provide "an overview and the general process steps that Cox took to analyze the hair sample for DFSA drugs." Ex. 18 (Bissani Report) at 5. But Bissani concedes that he has no personal knowledge that any of those steps were actually taken by ExperTox. Ex. 20 (Bissani Vol. 2 Dep.) at 61:14–22 (admitting his statement about the hair sample being washed to remove external contaminants was "an assumption" that he did not verify), 74:23–75:7 (admitting he has "no personal knowledge as to how the hair was cut and whether it was actually cut in half-inch increments").

Similarly, Dr. Sucher conceded that he did not perform the Hair Drug Test and that it was not performed at his direction. Ex. 21 (Sucher Dep.) at 79:22–25. Dr. Sucher has never worked directly with ExperTox and does not believe he has ever submitted testing to ExperTox for review or analysis. *Id.* at 36:9–25. He knows nothing about the test's reviewers, Dr. Vareed or Dr. Lykissa, and therefore does not "know their qualifications to do anything." *Id.* at 37:1–12. Dr. Sucher further admitted that he has never conducted any investigation relating to the veracity of ExperTox's test results. *Id.* at 37:21–23. Despite these admitted limitations, Dr. Sucher

affirmatively opined in his report that the Hair Drug Test was "valid and accurate." *See* Ex. 19 (Sucher Opening Report) at 8. He then reaffirmed that opinion at his deposition, testifying that he believed the Hair Drug Test was valid based solely on the "single sheet" of test results and his "very limited knowledge" of The Carlson Company and ExperTox. Ex. 21 (Sucher Dep.) at 80:8–11.

Throughout this litigation, Manley has treated Bissani as an expert witness. Manley identified Bissani as an expert in his expert disclosures and produced Bissani's expert report with those disclosures. Ex. 22 (Manley's Expert Disclosures). Manley later identified the report as the "Expert Report of K. Bissani" on Manley's trial exhibit list. Manley's counsel also paid Bissani $550 per hour for his work on this case. Ex. 20 (Bissani Vol. 2 Dep.) at 23:7–17. Yet, on August 3, 2026, after agreeing that expert reports would be removed from Manley's exhibit list because they are hearsay, Manley's counsel informed Defendants that Manley no longer considered Bissani an expert witness and insisted that his report, unlike Manley's other experts' reports, be admitted at trial. *See* Ex. 23 (Aug. 3, 2026 email from Ms. Jenny Robbins).

## C. <u>Argument</u>

### 1. The Hair Drug Test Is Inadmissible.

#### *(a) The Hair Drug Test Is Hearsay Not Subject to an Exception.*

The Hair Drug Test is classic hearsay: a written, out-of-court statement offered to prove the truth of its contents, namely the purported presence of ketamine in Manley's hair sample. *See* Fed. R. Evid. 801. Courts consistently hold that reports of laboratory test results are hearsay. *See, e.g.*, *Bullcoming v. New Mexico*, 564 U.S. 647 (2011) (treating a laboratory report containing blood alcohol analysis as hearsay); *United States v. Shawda*, No. 2:09–mj–516–GWF, 2010 WL 2680300 (D. Nev. July 1, 2010) (analyzing drug test reports under the hearsay rule).

The Hair Drug Test does not fall within any exceptions to the hearsay rule. To the extent that Manley claims the Hair Drug Test is a business record, the business-records exception does not apply for multiple reasons. As an initial matter, the Hair Drug Test does not qualify because it was produced "for use at trial." *Melendez-Diaz v. Massachusetts*, 557 U.S. 305 (2009). When Manley submitted his hair sample for drug testing on January 3, 2022, he already believed that

litigation was imminent, as evidenced by the legal hold notification he sent to Defendants weeks earlier, on December 13, 2021. *See* Ex. 24 (TX049). The Hair Drug Test was therefore "calculated for use essentially in the court." *Palmer v. Hoffman*, 318 U.S. 109, 114 (1943). "Courts have long held that 'a document prepared for purposes of litigation is not a business record because it is lacking in trustworthiness.'" *Campbell v. Garcia*, No. 3:13–cv–0627–LRH–WGC, 2016 WL 4769728, at *6 (D. Nev. Sept. 13, 2016) (citation omitted) (excluding an investigatory report authored by a non-party to assist in litigation).

Furthermore, Manley has not designated "the custodian or another qualified witness" to lay the necessary foundation for the business-records exception. Fed. R. Evid. 803(6)(D). Courts decline to apply that exception when the sponsoring witness merely received the records and could not "demonstrate any familiarity with the procedures used . . . in making the records." *N.L.R.B. v. First Termite Control Co.*, 646 F.2d 424, 429 (9th Cir. 1981) (excluding a freight bill because the bookkeeper who received it was unfamiliar with the recordkeeping procedures and "had not checked the records for accuracy"); *see also Alexander v. Boeing Co.*, No. C13-1369 RAJ, 2014 WL 3900574, at *5 (W.D. Wash. Aug. 11, 2014) (phone records inadmissible under the business-records exception when the proponent relied on a witness who received the data but offered no evidence establishing the requisite foundational facts concerning the source of the data).

Bissani cannot lay a foundation for the business-records exception because he lacks knowledge of how the Hair Drug Test was created. He acknowledged under oath that "the document is created by ExperTox" and agreed that "the only thing that [he] add[ed] to this document when [he] receive[d] it from the ExperTox is [he] put a header at the top." Ex. 20 (Bissani Vol. 2 Dep.) at 63:20–21, 64:8–11. He also lacks familiarity with the procedures used to collect, prepare, and test Manley's hair sample and did not even check whether ExperTox followed proper procedures. *See id.* at 61:14–22 (conceding that he did not verify whether ExperTox washed the hair sample to remove contaminants), 74:23–75:7 (conceding he had no personal knowledge of the hair-collection procedures). Nor can Bissani explain important aspects of the document itself, including its prominent disclaimer that the Hair Drug Test is "NOT FOR

FORENSIC PURPOSES." *See id.* at 80:21–23 (admitting he did "not know why ExperTox places this disclaimer on the test results").

Dr. Sucher cannot supply the missing foundation either. Dr. Sucher has never worked directly with ExperTox, has never submitted testing to ExperTox for analysis, knows nothing about the ExperTox personnel who reviewed the Hair Drug Test and therefore does not know "their qualifications to do anything," and did not investigate the veracity of ExperTox's test results. *See* Ex. 21 (Sucher Dep.) at 36:9–25, 37:1–23.

Because Bissani lacks knowledge of basic aspects of the testing procedures and the report's preparation, Bissani "cannot be subjected to meaningful cross-examination," leaving the trier of fact with "no rational basis on which to evaluate the accuracy of the record." *First Termite Control Co.*, 646 F.2d at 427. Dr. Sucher cannot fill that foundational gap because he likewise lacks familiarity with ExperTox's testing. The Hair Drug Test must be excluded as hearsay.

*(b) The Hair Drug Test Is Not Properly Authenticated.*

Manley also cannot produce evidence sufficient to authenticate the Hair Drug Test. *See* Fed. R. Evid. 901(a). Because the test result depends on the accuracy of the process or system that produced it, Rule 901(b)(9) applies. Fed. R. Evid. 901(b)(9); *see also id.* advisory committee's note (explaining that the subsection applies to "situations in which the accuracy of a result is dependent upon a process or system which produces it"); 31 Wright & Miller's Federal Practice & Procedure § 7114 (2d ed. 2026) ("Rule 901(b)(9) governs the authentication of data produced by a machine purporting to measure or detect something . . . .").

To authenticate the Hair Drug Test, Manley must produce evidence describing the testing process "and showing that it produces an accurate result." Fed. R. Evid. 901(b)(9). This showing requires evidence that (1) "the type of device in question is accepted as reliable and as suitable for generating the sort of data offered in evidence," (2) "the specific device in question was in good working order at the time it generated the data at issue," and (3) "the individual that operated the device was competent to do so." 31 Wright & Miller's Federal Practice & Procedure § 7114. Consistent with these requirements, the Ninth Circuit requires the proponent to "show that a machine is reliable and correctly calibrated, and that the data put into the machine . . . is accurate."

*United States v. Lizarraga-Tirado*, 789 F.3d 1107, 1110 (9th Cir. 2015). "Failure to establish such a foundation justifies exclusion of the evidence." 31 Wright & Miller's Federal Practice & Procedure § 7114; *see also Lyngaas v. Curaden AG*, No. 17-10910, 2019 WL 6210690, at *11 (E.D. Mich. Nov. 21, 2019) (excluding computer-generated logs under Rule 901(b)(9) because the testifying witness "had no personal knowledge of the process by which the summary report logs were generated or whether the information contained in the logs was accurate").

Bissani cannot authenticate the Hair Drug Test, again for multiple reasons. First, because he did not operate the chromatography and mass-spectrometry instruments, Bissani cannot establish that they were functioning properly and correctly calibrated when the testing occurred. Second, because he did not prepare Manley's hair sample for testing, Bissani lacks personal knowledge that the data entered into those instruments was accurate. Third, Bissani cannot establish that Cox was qualified to operate the instruments because he has no information about Cox's qualifications as a laboratory scientist. *See* Ex. 20 (Bissani Vol. 2 Dep.) at 45:16–21.[7]

Bissani's inability to "testify based on personal knowledge that the [Hair Drug Test] was in fact conducted the way it purports to have been conducted" renders the Hair Drug Test inadmissible. *See Gillette Co. v. Wilkinson Sword, Inc.*, No 89 CIV. 3586 (KMW), 1989 WL 82453, at *2–3 (S.D.N.Y. July 6, 1989) (finding a consumer-use study inadmissible for lack of authentication when the witness "had no personal knowledge" of whether "the data was gathered and reported accurately"). Bissani admitted repeatedly at his deposition that he merely *assumed* ExperTox had taken certain steps but had no actual knowledge of how the test was performed. *See* Ex. 20 (Bissani Vol. 2 Dep.) at 61:14–22 (conceding that his claim that the hair sample was

[7] Separate concerns exist regarding ExperTox's competence. ExperTox's license to conduct drug testing in criminal cases was suspended in 2022 after an investigation found that the lab had submitted inaccurate test results and engaged in misconduct. ExperTox's director, Ernest Lykissa—one of the doctors who reviewed the Hair Drug Test—also violated state regulations by failing to obtain a forensic-analyst license. *See* NBC 5 Dallas-Fort Worth, *Texas Lab's License Suspended After Probe Into Pennsylvania Sex Assault Case* (Aug. 3, 2022), https://www.nbcdfw.com/news/local/texas-news/texas-labs-license-suspended-after-probe-into-pennsylvania-sex-assault-case/3039629/.

washed was "an assumption"), 74:23–75:7 (admitting he had no "personal knowledge as to how the hair was cut and whether it was actually cut in half-inch increments").

Dr. Sucher cannot authenticate the Hair Drug Test either. As discussed, Dr. Sucher did not perform or direct the testing, has never worked directly with ExperTox, does not know the ExperTox reviewers identified on the report or their qualifications, and did not investigate the veracity of ExperTox's test results. *See* Ex. 21 (Sucher Dep.) at 36:9–25, 37:1–23, 79:21–25. Although Dr. Sucher contends that liquid chromatography and mass spectrometry are generally valid testing methodologies, *id.* at 43:7–14, that generalized opinion does not establish that the particular instruments used here were functioning properly and correctly calibrated, that the data entered into those instruments was accurate, or that the personnel were qualified to operate them. Dr. Sucher therefore cannot supply the test-specific foundation required by Rule 901(b)(9).

Manley has identified no other witness capable of supplying the necessary foundation. The Hair Drug Test therefore cannot be authenticated and should be excluded on this basis, too.

**2. The Bissani Report and Testimony About the Hair Drug Test Are Inadmissible.**

Even if the Hair Drug Test were admissible, Bissani is unqualified to opine about it, as Manley implicitly acknowledges by now contending that a witness whom Manley identified and paid as an expert is not an expert at all. First, regardless of how Manley characterizes Bissani, his report is inadmissible hearsay: it is a written, out-of-court statement offered for its truth, with no applicable hearsay exception. Second, Bissani's testimony should be held to the standards of an expert witness. That he cannot meet them does not mean they do not apply. Third, even if the Court were to treat Bissani as a lay witness, he has no personal knowledge of the Hair Drug Test or any other issue in this litigation.

*(a) The Bissani Report Is Hearsay.*

The Bissani Report is hearsay because Manley offers it to prove the truth of its statements concerning the procedures and results of the Hair Drug Test, and no exception applies. *See* Fed. R. Evid. 801, 802. The business-records exception does not apply because, among other things, the Bissani Report was "prepared specifically for use at [plaintiff]'s trial." *Melendez-Diaz*, 557

U.S. at 323. The report also fails Rule 803(6)'s contemporaneity requirement: it is dated February 6, 2024—more than two years after the January 31, 2022 Hair Drug Test—and thus was not created "at or near the time" of the testing. *See* Fed. R. Evid. 803(6)(A); Exs. 18 (Bissani Report), 17 (Hair Drug Test). The report therefore does not qualify as a business record and must be excluded as hearsay.

*(b) Bissani's Expert Opinions Are Inadmissible Under Rule 702.*

Manley's suggestion Bissani is a fact witness rather than an expert is baseless and flatly contradicted by Manley's conduct throughout this litigation. If Manley's position were accepted, it would mean that Manley simply lied when he disclosed Bissani as an expert and produced the Bissani Report as an expert report. *See* Exs. 22 (Manley's Expert Disclosures), 18 (Bissani Report). It would also mean that Manley paid a purported fact witness $550 per hour for his testimony. *See* Ex. 20 (Bissani Vol. 2 Dep.) at 23:7–17. If Manley paid a fact witness for testimony, that would be sanctionable conduct. *Hernandez v. Franco Am. Baking Co.*, No. 3:20-cv-00628-LRH-WGC, 2021 WL 6498256, at *3 (D. Nev. Sep. 3, 2021) ("The court agrees that offering to pay a [fact] witness for his testimony (even if the testimony is true) constitutes bad faith or is tantamount to bad faith and is sanctionable conduct."). Of course, the reality is that Manley designated Bissani as an expert before realizing that he was unqualified. Bissani should be barred from testifying as an expert for exactly that reason.

*First*, Bissani lacks the "scientific, technical, or other specialized knowledge" necessary to help the trier of fact. Fed. R. Evid. 702(a). He did not perform the Hair Drug Test in this case and, by his own admission, "has never performed this type of test before." Ex. 20 (Bissani Vol. 2 Dep.) at 77:16–20. Bissani further acknowledged that his company "would not be qualified to conduct the type of test" performed on Manley's behalf, which is precisely why it engaged ExperTox. *Id.* at 57:25–58:5. The fact that Bissani does not perform this type of testing and instead contracts with another lab underscores his lack of any relevant specialized knowledge. *See Scolaro v. Vons Cos., Inc.*, No. 2:17-cv-01979-JAD-VCF, 2020 WL 8920999, at *1 (D. Nev. Mar. 2, 2020) (finding a licensed nurse practitioner unqualified to opine on the cause of an injury because she did not treat patients with that particular kind of injury and instead referred them to

other practitioners). Although Bissani may hold a master's degree and possess certifications and experience in forensic toxicology generally, those credentials do not establish expertise in the particular testing at issue here. *See In re Canvas Specialty, Inc.*, 261 B.R. 12, 19 (Bankr. C.D. Cal. 2001) ("It is not enough that the proposed expert have expertise in an area of knowledge. The expertise must be relevant to the determination of the facts in issue."). Bissani therefore lacks the requisite expertise to testify about the Hair Drug Test.

*Second*, Bissani's opinions are not "based on sufficient facts or data." Fed. R. Evid. 702(b). An admissible expert opinion "must rely on 'facts or data in the case that the expert has been made aware of or personally observed,' not merely assumptions and speculation." *Stephens v. Union Pac. R.R. Co.*, 935 F.3d 852, 856 (9th Cir. 2019) (quoting Fed. R. Evid. 703). Rule 702(b) therefore requires the district court to determine whether the expert "had sufficient factual grounds on which to draw conclusions." *Elosu v. Middlefork Ranch Inc.*, 26 F.4th 1017, 1025-26 (9th Cir. 2022). Again, Bissani admitted that his descriptions of the testing procedures rest on assumptions rather than personal knowledge or other factual grounds. *See* Ex. 20 (Bissani Vol. 2 Dep.) at 61:14–22, 74:23–75:7. Because he neither performed nor verified the procedures used for the Hair Drug Test, Bissani lacks sufficient facts or data to offer an expert opinion as to its results.

*Third*, beyond offering unverified assumptions, the Bissani Report merely reproduces the Hair Drug Test in its entirety. His parroting of the Hair Drug Test and its conclusions does not constitute reliable expert testimony. The wholesale "acceptance of other's work and incorporating it into a report simply does not meet the reliability component necessary for expert testimony." *Auto Indus. Supplier Emp. Stock Ownership Plan v. Ford Motor Co.*, 435 F. App'x 430, 456 (6th Cir. 2011) (citation omitted) (excluding expert testimony under Rule 702). Likewise, "[a]s courts have repeatedly held, and can be implied from rule 702, an expert cannot merely base his opinions upon the opinions of others without having an independent basis for his opinion." *Wells Fargo Bank N.A. v. LaSalle Bank Nat'l Ass'n*, No. 2:08-CV-1448 JCM (RJJ), 2011 WL 743748, at *3 (D. Nev. Feb. 23, 2011); *see also Cholakyan v. Mercedes-Benz, USA, LLC*, 281 F.R.D. 534, 544 (C.D. Cal. 2012) ("An expert's sole or primary reliance on the opinions of other experts raises serious reliability questions."). Because Bissani relies solely on Cox's work and offers no

independent basis for his opinions as to the procedures and accuracy of the Hair Drug Test, his proposed testimony does not satisfy Rule 702's reliability requirement.

Nor can Manley justify Bissani's reliance on Cox's results under Rule 703. Although Rule 703 permits an expert to base an opinion on inadmissible evidence, such as a hearsay report, if experts in the field would reasonably rely on evidence of that type, an expert "must be more than a conduit or transmitter for testimonial hearsay." *United States v. Shih*, 73 F.4th 1077, 1098 (9th Cir. 2023) (citation modified). The rationale for permitting such reliance is that the expert's "validation, expertly performed and subject to cross-examination, ought to suffice for judicial purposes." Fed. R. Evid. 703 advisory committee's note. That rationale does not apply when the proffered expert merely transmits another person's conclusions and lacks familiarity with the methods underlying the hearsay report, thereby "preclud[ing] any assessment of the validity of the [report] through cross-examination." *TK-7 Corp. v. Est. of Barbouti*, 993 F.2d 722, 732 (10th Cir. 1993). Bissani is no more than a mouthpiece for Cox's findings as reported in the Hair Drug Test. Bissani's assumptions regarding the testing procedures and the accuracy of the results "cannot be considered 'reasonable reliance' for purposes of forming his own opinion" because he "in essence assumed the very matter at issue on which he was called to express his opinion." *Id.*

Bissani therefore fails to satisfy Rule 702, and the Court should preclude him from offering expert testimony concerning the Hair Drug Test.

*(c) Bissani Cannot Testify as a Lay Witness.*

For all of the reasons above, Bissani should be treated as an expert witness and his testimony excluded because he is unqualified to opine on the Hair Drug Test. But even if Bissani was not an expert witness, it does not follow that he could provide lay testimony. Bissani has no personal knowledge of any fact at issue in this case. *See* Fed. R. Evid. 602. Bissani does not have personal knowledge of the procedures involved in the Hair Drug Test and did not draft the Hair Drug Test. *See* Ex. 20 (Bissani Vol. 2 Dep.) at 61:14–22, 74:23–75:7. He therefore has nothing to say, as a lay witness, about the Hair Drug Test and should be barred from testifying about it.

**3. Dr. Sucher's Opinions Regarding the Hair Drug Test Are Inadmissible.**

Dr. Sucher opines that the Hair Drug Test and its purported results are "valid and accurate." Ex. 19 (Sucher Opening Report) at 7–8. That test-specific opinion is inadmissible because Manley cannot establish that it is based on sufficient facts or data or is the product of reliable principles and methods reliably applied to the facts of this case. *See* Fed. R. Evid. 702(b)–(d). Dr. Sucher's general experience with hair testing and his opinion that liquid chromatography and mass spectrometry are generally reliable do not establish the reliability or accuracy of ExperTox's testing of Manley's particular hair sample.

Dr. Sucher performed no test-specific analysis of ExperTox's work. His report identifies no review of the raw analytical data, calibration or quality-control records, or testing procedures; instead, Dr. Sucher merely declares the test "valid and accurate." *See* Ex. 19 (Sucher Opening Report) at 7–8. When asked at his deposition whether he believed the test was valid based only on the "single sheet" of results and despite his "very limited knowledge" of The Carlson Company, ExperTox, and the ExperTox reviewers, Dr. Sucher answered, "I do." Ex. 21 (Sucher Dep.) at 80:1–11.

Manley cannot transform ExperTox's otherwise inadmissible result into reliable expert testimony simply by having Dr. Sucher pronounce it "valid and accurate." Rule 702 requires an independent, reliable analysis—not an expert's uncritical acceptance of another person's work. *See Wells Fargo*, 2011 WL 743748, at *3. Because Dr. Sucher made no effort to evaluate ExperTox's procedures or underlying data and provides no test-specific basis for his conclusion, his opinion amounts to nothing more than an unsupported endorsement of ExperTox's result. The Court should preclude him from opining that the Hair Drug Test or its purported results are valid or accurate.

**4. Manley Cannot Backdoor the Hair Drug Test Into Evidence Through Other Witnesses or Exhibits.**

Manley may not circumvent the exclusion of the Hair Drug Test and the Bissani Report by presenting the purported test results through other witnesses or exhibits. Changing the source or form of the evidence does not cure the evidentiary defects discussed above. A lay witness may not

interpret or vouch for the scientific test results; any such opinion would require qualified expert testimony satisfying Rule 702. Manley himself, for example, may have personal knowledge that a hair sample was collected from him, but he has no personal knowledge of how ExperTox processed or tested that sample. Fed. R. Evid. 602. He therefore should not be permitted to testify that the test detected ketamine, interpret or validate the test results, or repeat what the inadmissible test or report purportedly showed.

References to the purported positive result in other exhibits fare no better. For the reasons explained above, any exhibit that repeats the purported positive result is inadmissible on the same hearsay, authentication, foundation, and expert-testimony grounds. For example, Manley's TX118 is a *Las Vegas Review-Journal* article reporting Manley's assertion that "a hair analysis determined that he had ketamine . . . in his system." *See* Ex. 25 (TX118) at 3. This secondhand account cannot serve as a backdoor for admitting the excluded test result. Even if such evidence could overcome the defects discussed, it should be excluded under Rule 403 because its minimal probative value is substantially outweighed by the danger of unfair prejudice and the risk that the jury will mistake it for reliable scientific evidence. *See* Fed. R. Evid. 403.

### D. <u>Conclusion</u>

For the foregoing reasons, Defendant respectfully requests that this Court exclude the Hair Drug Test (TX062), the Bissani Report (TX113), Bissani's testimony concerning the Hair Drug Test, Dr. Sucher's testimony concerning the Hair Drug Test, as well as any other evidence, testimony, or argument suggesting that the test yielded a positive result for ketamine.

## III. <u>MOTION IN LIMINE NO. 3 TO EXCLUDE IN PART DR. MICHEL SUCHER'S OPINION REGARDING INVOLUNTARY KETAMINE INGESTION</u>

### A. <u>Introduction</u>

Manley seeks to use Dr. Sucher's medical degree to transform Manley's central allegation—that someone secretly put ketamine in his drink—into an expert conclusion. Dr. Sucher intends to tell the jury that Manley was "poisoned" and "drugged," that his drink was "spiked," and that ketamine was otherwise "administered" to him without his knowledge. But those opinions are not the product of any reliable scientific analysis. They rest on Dr. Sucher's

decision to accept Manley's account as true. That is credibility vouching masquerading as expert testimony, and it has no place before a jury.

This motion is narrow. Defendants do not seek to preclude Dr. Sucher from explaining ketamine's effects or opining that Manley's reported symptoms and observed behavior are consistent with ketamine exposure.[8] Defendants dispute those opinions, but the proper place to contest them is at trial through cross-examination and competing expert testimony. Dr. Sucher's opinion that Manley ingested ketamine involuntarily, however, is different. That opinion is not simply a medical conclusion with which Defendants disagree; it is an unsupported factual accusation resting on no reliable expert methodology. Dr. Sucher has identified no symptom, medical principle, or reliable method that enables him to distinguish voluntary from involuntary ketamine ingestion.

Dr. Sucher's opinion that Manley was poisoned should therefore be excluded under Rules 702 and 403. The opinion exceeds Dr. Sucher's expertise, is based on insufficient facts and no reliable methodology, and will not assist the jury. Whatever marginal probative value it may have is substantially outweighed by the danger of unfair prejudice that the jury will mistake Dr. Sucher's accusation for a medical conclusion merely because it is voiced by a physician.

**B. <u>Background</u>**

Dr. Sucher is a physician who is board-certified in addiction medicine and holds several medical-director positions. Ex. 21 (Sucher Dep.) at 26:11–13, 28:6–29:9. Expert-related work accounts for approximately five to ten percent of his professional time. *Id.* at 29:25–30:2. His ketamine-specific experience, however, is limited. Over 20 years, Dr. Sucher has treated only about a half-dozen patients exhibiting signs of active ketamine intoxication. *Id.* at 8:17–9:5. Dr. Sucher has never prescribed ketamine. *Id.* at 10:18–19. And he has published nothing on ketamine and cannot recall any specific presentation or prior expert engagement involving the drug. *Id.* at 97:4–15.

---

[8] Defendants separately move to exclude Dr. Sucher from offering opinions concerning the reliability or results of Manley's hair-drug test, including his opinion that the test's result was "valid and accurate." *See supra* Defendants' Motion in Limine No. 2.

Manley himself first contacted Dr. Sucher around September 2022, described what had happened, and asked whether Dr. Sucher would be interested in serving as an expert witness. Ex. 21 (Sucher Dep.) at 18:9–19:20. They spoke for 15 to 20 minutes. *Id.* at 20:2–4. Dr. Sucher later performed a two-hour substance-use-disorder evaluation of Manley at an office belonging to one of Manley's friends. *Id.* at 22:9–23:3. Dr. Sucher performed no physical examination of Manley. *Id.* at 23:4–7. As part of his evaluation, Dr. Sucher obtained a "thorough history of what happened on December 10th and thereabouts, 2021" from Manley. *Id.* at 23:13–18.

In his opening report, Dr. Sucher opines that Manley was "drugged/poisoned" with ketamine and that his symptoms were "consistent with being poisoned" by ketamine. Ex. 19 (Sucher Opening Report) at 7–8. His rebuttal report goes further, asserting that Manley's first Old Fashioned drink on December 10, 2021 was "spiked" with ketamine. Ex. 26 (Sucher Rebuttal Report) at 7.

Dr. Sucher reaffirmed at his deposition that it is his conclusion that Manley was "poisoned" with ketamine. Ex. 21 (Sucher Dep.) at 12:18–21. He could not identify who allegedly poisoned Manley, explain why anyone would have done so, or determine when or how ketamine entered Manley's drink. *Id.* at 12:22–25, 14:9–23. When asked how his evaluation supported his opinions, Dr. Sucher testified that Manley's "history of the series of events that occurred in Las Vegas on December 10th and December 11th" was "consistent with [Manley's] assertion that he had been poisoned by ketamine." *Id.* at 24:8–12. He further explained that the evaluation provided information bearing on Manley's "credibility." *Id.* at 24:24–25:5. When asked directly whether he was making a credibility determination in rendering his opinions, Dr. Sucher responded: "Well, in the sense that I believe his story and what happened. I believe he is credible." *Id.* at 25:6–10. And, when pressed further, Dr. Sucher explained that assessing Manley's credibility was "part of [his] substance use disorder evaluation." *Id.* at 25:11–14.

### C. <u>Argument</u>

The Court should exclude Dr. Sucher's "poisoning" opinion for at least two reasons. First, the opinion does not satisfy Rule 702. Dr. Sucher lacks expertise to determine whether Manley consumed ketamine involuntarily, offers no specialized knowledge beyond Manley's account, and

used no reliable methodology. Second, Rule 403 independently requires exclusion. The inflammatory terms "poisoned," "drugged," and "spiked" present Manley's disputed accusation of deliberate wrongdoing as a medical conclusion. Given Dr. Sucher's credentials, the jury could mistake his belief in Manley's account for scientific corroboration—a danger of unfair prejudice that substantially outweighs the opinion's marginal probative value.

**1. Dr. Sucher's Poisoning Opinion Does Not Satisfy Rule 702.**

Rule 702 permits Dr. Sucher's "poisoning" opinion only if Manley can establish that the opinion falls within Dr. Sucher's expertise, will help the jury, and rests on sufficient facts and reliable methods properly applied. Fed. R. Evid. 702.

Manley cannot make that showing for at least two reasons: (1) Dr. Sucher's "expertise" concerning ketamine's effects does not extend to determining whether Manley's ingestion was voluntary or involuntary, so his opinion on that issue offers the jury no specialized knowledge; and (2) Dr. Sucher's poisoning opinion lacks a sufficient factual basis and reliable methodology because Dr. Sucher has no medical basis for distinguishing voluntary from involuntary ingestion and instead simply credited Manley's account.

*(a) Dr. Sucher's Poisoning Opinion Will Not Help The Jury Because It Falls Outside His Expertise.*

A witness may be qualified as an expert based on knowledge, skill, experience, training, or education. Fed. R. Evid. 702(a). But those qualifications must match the particular opinion offered. "If an individual is not qualified to render an opinion on a particular question or subject, it follows that his opinion cannot assist the trier of fact with regard to that particular question or subject." *Morin v. United States*, 534 F. Supp. 2d 1179, 1185 (D. Nev. 2005); *see also id.* at 1185–86 (finding that a physician's expertise in diagnosing and treating cancer did not qualify him to opine on the cause of a patient's cancer, which required substantially different expertise).

Dr. Sucher's "poisoning" opinion crosses that line. Dr. Sucher's medical experience may qualify him to explain ketamine's effects and opine on whether Manley's symptoms and behavior were consistent with ketamine exposure. But his "poisoning" opinion goes further: it asserts that Manley did not knowingly consume ketamine and that someone covertly placed it in his first

drink. That conclusion concerns the circumstances of ingestion, not ketamine's physiological effects. Dr. Sucher has no training or experience that enables him to infer from Manley's symptoms whether any ingestion was involuntary. His limited ketamine-specific experience does not fill that gap: he has treated only about a half-dozen patients exhibiting active ketamine intoxication, has never prescribed ketamine, has published nothing on the drug, and could not identify any prior expert engagement specifically involving ketamine. *See* Ex. 21 (Sucher Dep.) at 8:17–9:5, 10:18–19, 97:4–15. His involuntary-ingestion opinion is a factual conclusion based on crediting Manley's account, not a medical inference grounded in his expertise.

Dr. Sucher's "poisoning" opinion will not help the jury. The jury can evaluate Manley's testimony and the surveillance footage for itself. As he conceded in his deposition, Dr. Sucher has no independent knowledge of how ketamine allegedly entered Manley's drink. Ex. 21 (Sucher Dep.) 12:18–25, 14:9–23. His opinion merely reflects his decision to believe Manley's account. But credibility determinations belong to the jury. *See United States v. Barnard*, 490 F.2d 907, 912 (9th Cir. 1973) ("Credibility, however, is for the jury—the jury is the lie detector in the courtroom."). Dr. Sucher's personal endorsement of Manley's version of events supplies no specialized knowledge; it merely tells the jury whom to believe. It therefore fails to satisfy Rule 702(a).

*(b) Dr. Sucher's Poisoning Opinion Lacks Sufficient Facts and a Reliable Methodology.*

Rule 702 permits an expert opinion only if it is based on sufficient facts or data, is the product of reliable principles and methods, and reflects a reliable application of those principles and methods to the facts. Fed. R. Evid. 702(b)–(d). In other words, an expert's conclusion must be connected to the underlying facts by reliable analysis, not the expert's say-so. *See Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997) (recognizing that courts may exclude expert opinions when there is "simply too great an analytical gap between the data and the opinion proffered").

Dr. Sucher's "poisoning" opinion fails to meet this standard because it assumes the very fact it purports to establish through expert testimony. Dr. Sucher testified that Manley's "history of the series of events that occurred in Las Vegas on December 10th and 11th were consistent with

his assertion that he had been poisoned by ketamine." Ex. 21 (Sucher Dep.) at 24:8–12. That reasoning is circular: Manley's account suggests involuntary poisoning only if Manley's account is credited. Dr. Sucher acknowledged as much, explaining that his evaluation supplied information bearing on Manley's "credibility" and that he "believe[d] his story" and found him "credible." *Id.* at 24:20–25:14. Believing Manley is not a reliable methodology for determining whether the alleged exposure was involuntary.

Dr. Sucher has identified no symptom, clinical finding, or pharmacological principle that distinguishes voluntary from involuntary ingestion. Nor has he applied any recognized protocol for determining whether ketamine was covertly administered. Asked when ketamine entered Manley's drink, Dr. Sucher answered "I don't know, but probably in the making of the drink in some way." Ex. 21 (Sucher Dep.) at 14:9–17. And when asked whether Manley could have consumed ketamine voluntarily before arriving at the MGM, Dr. Sucher responded that, "[b]ased on [his] independent evaluation," he did not believe that was "true or possible." *Id.* at 81:13–17. There is no reliable medical analysis behind that conclusion, only his assessment that Manley is credible. *See id.* at 23:8–25:14.

Dr. Sucher's opinion that Manley was involuntarily administered ketamine is not grounded in reliable expert analysis. The Court should exclude the opinion under Rule 702 for this independent reason.

**2. Dr. Sucher's "Poisoning" Opinion Also Fails Rule 403.**

Rule 403 independently requires exclusion of Dr. Sucher's poisoning opinion because its minimal probative value is substantially outweighed by the dangers of unfair prejudice and misleading the jury. *See* Fed. R. Evid. 403.

Expert testimony can be "powerful and quite misleading because of the difficulty in evaluating it." *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 595 (1993) (citation omitted). Courts therefore exercise "more control over experts than over lay witnesses." *Id.* (citation omitted). Applying that principle, the Ninth Circuit has emphasized that testimony delivered under the "mantle" of expertise may carry "special weight with the jury" and may be

excluded under Rule 403 even if it otherwise satisfies Rule 702. *Jinro Am., Inc. v. Secure Invs., Inc.*, 266 F.3d 993, 1005–07 (9th Cir. 2001).

The danger of unfair prejudice here is substantial because Dr. Sucher would present Manley's central allegation—that someone secretly "drugged" Manley—as an expert medical conclusion. The terms "poisoned," "drugged," and "spiked" do more than describe exposure; they imply deliberate wrongdoing by a third party and innocence on the part of Manley. Given Dr. Sucher's medical credentials, a jury could give his "poisoning" opinion undue weight and mistake it for the product of reliable medical analysis. Admitting Dr. Sucher's "poisoning" opinion risks substituting Dr. Sucher's authority for the jury's own evaluation of the evidence.

By contrast, Dr. Sucher's challenged opinion has at most marginal probative value. Dr. Sucher remains free to explain ketamine's effects and opine that Manley's symptoms were consistent with ketamine exposure. His further conclusion that Manley was "poisoned" or "drugged," or that his drink was "spiked," adds no medical insight. It merely places a medical expert's imprimatur on Manley's telling of the disputed events.

Any marginal probative value is therefore substantially outweighed by the danger that the jury will treat Manley's disputed account as a medical fact. The Court should also exclude Dr. Sucher's poisoning opinion under Rule 403.

### D. <u>Conclusion</u>

Dr. Sucher may testify about ketamine's effects and whether Manley's symptoms are consistent with ketamine exposure. But he may not convert Manley's disputed account of involuntary drugging into an expert opinion. Defendants respectfully request that the Court preclude Dr. Sucher from opining at trial that Manley was "poisoned" or "drugged," that his drink was "spiked," that ketamine was "administered" to him without his knowledge, or otherwise that Manley's alleged ketamine ingestion was involuntary.

## IV. <u>MOTION IN LIMINE NO. 4 TO EXCLUDE EVIDENCE, TESTIMONY, OR ARGUMENT OF (1) ALLEGED DRUGGING BY ANYONE OTHER THAN KOCH; (2) KETAMINE INGESTION OTHER THAN THROUGH MANLEY'S</u>

**FIRST DRINK; OR (3) NEGLIGENCE LIABILITY WITHOUT PROOF OF DRUGGING.**

**A. Introduction**

From the outset of this case, Manley has claimed that the first drink he was served on December 10, 2021, was spiked with ketamine, and has repeatedly disclaimed any other theory about how he allegedly became incapacitated on that day. And, from the outset, he argued that the first drink was spiked either by the bartender who prepared it, Jerilyn Koch ("Koch"), or an unidentified third party. This Court subsequently granted Defendants' summary judgment motion on the theory that the first drink was spiked by an unidentified third party. As a result, the only theory remaining is that Koch spiked Manley's first drink with ketamine. Yet Manley has suggested that he intends to argue to the jury that (1) he might have been drugged by someone other than Koch; (2) he might have ingested ketamine through some manner other than his first drink; and (3) even if he cannot prove he was drugged, Defendants were still negligent in addressing the injury he suffered to his hand and in allowing him to continue gambling when he was drunk. None of these theories were properly disclosed in discovery, and should be excluded under Rules 26 and 37 on that basis alone. They all suffer from myriad other legal and evidentiary issues that likewise prevent Manley from presenting them to a jury.

Manley should not be permitted to rewrite his case on the eve of trial. Defendants therefore respectfully request that the Court prohibit Manley from arguing that (1) he was drugged by anyone other than Koch; (2) he ingested ketamine in any way other than through the first drink served to him in the MGM Mansion on December 10, 2021; or (3) that he can prevail on his negligence claim even if he cannot establish that he was drugged.

**B. Argument**

**1. Manley Should Be Precluded From Arguing He Was Drugged By An Unidentified Individual.**

On April 23, 2026, the Court issued an Order granting summary judgment in Defendants' favor as to "Plaintiff's theory that a third-party contaminated Plaintiff's cocktail in support of his negligence claim." Dkt. No. 234 at 3. In doing so, the Court held that:

> Here, the undisputed evidence as seen on the relevant surveillance video ***shows the cocktail in question was prepared by the bartender with the only other person touching the cocktail before Plaintiff was Plaintiff's partner***. Plaintiff offers no evidence to create a genuine factual dispute ***as to how a third party could have or did contaminate his cocktail*** under the circumstances here to rebut Defendants' evidence.

*Id.* (emphasis added) (internal citations omitted).

As such, the Court concluded that Manley's alleged drugging by a third party was not—and could not be—foreseeable under Nevada Revised Statute section 651.015. *Id.*

Manley now suggests that he may raise a new theory at trial: that an unknown employee or agent of Defendants *other than* the bartender at issue drugged his cocktail. Manley should be precluded from doing so.

*First*, the Court's conclusion concerning foreseeability applies with equal force to an argument that an unidentified MGM employee spiked the drink. Although the Court's prior ruling was premised on the foreseeability requirement for torts committed by third parties, *see* Nev. Rev. Stat. § 651.015(2)(a), under Manley's new theory he still must show foreseeability for a tort committed by an employee, *see id.* § 41.745(1)(c). Manley cannot do so because he has not identified any other employee who might have drugged the drink in question.

The Court has already ruled that Manley's first cocktail (1) was prepared by Koch, and (2) was otherwise not touched by anyone but Manley's wife. Dkt. No. 234 at 3. The Court found that Manley had no evidence as to "how a third party could have or did contaminate his cocktail." *Id.*

Just as Manley had no evidence as to how any third party might have spiked his drink, Manley has no evidence that an unknown MGM employee spiked the drink or even had an opportunity to do so. He therefore cannot show that an unknown employee's act was foreseeable. He likewise cannot show, as he must, that the unknown employee's act was (1) not "a truly independent venture of the employee" and (2) "committed in the course of the very task assigned to the employee." Nev. Rev. Stat. § 41.745(1)(a), (b).

*Second*, allowing Manley to present a new theory to the jury, a theory specifically designed to evade this Court's ruling on summary judgment, would be highly prejudicial. From the outset, Manley has insisted that his drink was spiked by the MGM bartender who prepared it, Koch. That

is what he told the Las Vegas Metropolitan Police Department: "[t]he bartender that made my first drink ***is the only person that could have done this***." Ex. 27 (TX084) at 2–3 (emphasis added).

Manley confirmed the same during his deposition:

> Q: Okay. Now, it's your allegation in this case that the first old fashioned you drank was spiked with ketamine; is that correct?
>
> A: Yes.
>
> Q: And only the first drink, the first old fashioned you drank was spiked with ketamine; correct?
>
> A: That's what I'm saying.
>
> Q: Who spiked your drink with ketamine, as you've alleged?
>
> A: I think the person that made the drink.
>
> Q: Your belief is that the bartender that made the first old fashioned is the individual that spiked your drink; correct?
>
> A: I think whoever made the drink.
>
> Q: And that would have been the bartender that made the first drink; correct?
>
> A: If she's the only person that made the drink.
>
> . . .
>
> Q: And how did she spike your drink with ketamine, as you've alleged?
>
> A: With the ingredients.
>
> Q: What specific -- tell me how she spiked your drink, generally speaking?
>
> A: Something in those ingredients was -- either had ketamine in it or it was added in -- in a -- I don't know which ingredient, but there were a lot of steps that went into that that somehow -- I don't believe in magic -- ketamine got into that glass. And she made it.

Ex. 2 (Manley Vol. 1 Dep.) at 94:14–95:7, 95:19–96:4.

Manley wishes to change his story now because he knows that the video of Koch preparing his cocktail does not show any evidence of drugging or unusual behavior. The Las Vegas Metropolitan Police Department told Manley exactly that. But even if Manley could meet the requirements of Nevada Revised Statute section 41.745 (and he cannot), allowing him to present to

the jury a theory he did not plead or raise in discovery would be obviously prejudicial. Manley should be barred from making this new argument to the jury for this reason, as well. *See U.S. Fid. & Guar. Co. v. Lee Invs. LLC*, 641 F.3d 1126, 1137–38 (9th Cir. 2011) (upholding the district court's decision to grant a motion in limine precluding argument of a theory not disclosed during discovery at the time of trial, and noting that the moving party would be unfairly prejudiced by any such argument); *Buckeye Assocs., Ltd. v. Fila Sport, S.p.A.*, 931 F.2d 59 (9th Cir. 1991) (noting that a party's attempt to introduce a new theory at a pretrial conference was, in essence, an improper attempt to amend their complaint); *see also, e.g.*, *Wood v. Santa Barbara Chamber of Com.*, 705 F.2d 1515, 1520 (9th Cir.1983) (refusing to allow plaintiffs to offer new theory more than two years after complaint was filed because of prejudice to defendants), *cert. denied*, 465 U.S. 1081 (1984).

### 2. Manley Should Be Precluded From Arguing Alternative Theories of Ketamine Ingestion.

Manley has litigated this case on the theory that he allegedly ingested ketamine through his first Old Fashioned. That is what he pled, *see* TAC ¶¶ 31–33, 35, that is what he testified to, *supra* p. 30, and that is the opinion of his medical expert, Dr. Sucher: "the first drink Dwight was served was the drink spiked with Ketamine."[9] Ex. 26 (Sucher Rebuttal Report) at 5. In explaining its denial of summary judgment on Manley's negligence claim, the Court cited Manley's testimony "that he thought that the cocktail server spiked his drink, the first drink, the first Old Fashioned beverage." Dkt. No. 221 at 45:5–10. And the Court's written order similarly confirmed that its summary-judgment ruling focused on whether Defendants "tampered with the cocktail in question." Dkt. No. 234 at 2. In short, the first-drink theory was the only exposure theory that survived summary judgment.

Manley now seeks to change course by suggesting that he may have ingested ketamine through some other, unspecified means. That is an impermissible bait and switch. Having

[9] In a separate motion in limine, Defendants seek to exclude Dr. Sucher's opinions that Manley was "poisoned" or "drugged," that his drink was "spiked," or that ketamine was otherwise administered involuntarily. Defendants cite Dr. Sucher's opinion solely to establish Manley's disclosed theory and do not concede the opinion's admissibility.

survived summary judgment on a record tying the alleged exposure to his first Old Fashioned, Manley cannot now pursue a new, open-ended exposure theory revealed only on the eve of trial.

*First*, Rules 26 and 37 bar Manley from relying at trial on an alternative-exposure theory that he failed to disclose during discovery.

*Second*, because Manley's only exposure theory remaining for trial is that one of Defendants' employees put ketamine in his first Old Fashioned, evidence offered by Manley to establish liability through a different exposure mechanism is irrelevant under Rules 401 and 402.

Defendants request that the Court preclude Manley from offering any evidence or argument to establish liability on the theory that his alleged ketamine exposure on December 10, 2021 occurred through any source or mechanism other than his first Old Fashioned.

*(a) Rules 26 and 37 Bar Manley's Alternative-Exposure Theory.*

Rule 26 requires a party to timely supplement or correct a disclosure or discovery response upon learning that it is materially incomplete or incorrect. Fed. R. Civ. P. 26(e)(1)(A). This obligation furthers the "public policy against trial by ambush." *See Shakespear v. Wal-Mart Stores, Inc.*, No. 2:12–cv–01064–MMD–PAL, 2013 WL 6498898, at *4 (D. Nev. Dec. 10, 2013). "If a party fails to provide information . . . the party is not allowed to use that information or witness to supply evidence . . . at a trial, unless the failure was substantially justified or is harmless." Fed. R. Civ. P. 37(c)(1).

Courts routinely grant motions in limine to exclude evidence or argument relating to a new theory that should have been disclosed. *See, e.g.*, *Hous. Auth. of the City of L.A. v. PCC Tech. Indus.*, No. CV 11-1626 FMO (CWx), 2015 WL 13864845, at *3 (C.D. Cal. Mar. 4, 2015) (granting motion in limine to exclude a new expert theory because discovery had closed and curing the resulting prejudice would require reopening discovery); *Amini Innovation Corp. v. Anthony Cal. Inc.*, No. CV 03–8749, 2006 WL 6855371, at *9 (C.D. Cal. Sept. 21, 2006) (granting motion in limine to preclude evidence supporting undisclosed legal theory); *Bilbruck v. Valley Cnty.*, No. CV-21-40-GF-BMM, 2024 WL 3606049, at *9 (D. Mont. July 30, 2024) (granting motion in limine to prohibit the presentation of factual or legal theories not disclosed before the close of discovery, notwithstanding the plaintiff's representation that she did not intend to present

any new theory); *see also Hartzell v. Marana Unified Sch. Dist.*, 130 F.4th 722, 744 (9th Cir. 2025) (subsequent history omitted) ("After having focused on one theory in their complaint and during discovery, plaintiffs cannot turn around and surprise the defendant . . . with a completely different theory." (citation modified)).

Manley never disclosed his new alternative-exposure theory. The TAC does not allege, or fairly encompass, a theory that Manley ingested ketamine through a later drink or another unidentified source. *See* TAC ¶¶ 31–35. Discovery did not expand that theory. When asked whether any subsequent beverage was drugged, Manley stated only that he lacked sufficient information to admit or deny the matter. *See* Ex. 28 (Manley's RFA Responses) at 7. That response did not disclose an alternative theory, identify another possible exposure mechanism, or reveal any supporting facts or evidence. If Manley later obtained information rendering that response materially incomplete or incorrect, Rule 26(e) required timely supplementation. Manley never supplemented his response.

Instead, Manley's affirmative disclosures consistently identified the first Old Fashioned as the alleged source of his ketamine exposure. Manley testified that "only the first drink" was spiked with ketamine and that he lost the capacity to contract or continue gambling from the moment he consumed the first drink. Ex. 2 (Manley Vol. 1 Dep.) at 94:14–21, 107:21–108:1. His retained medical expert advanced the same chronology, opining that "the first drink prepared for Mr. Manley on 12/10/2021 was spiked with Ketamine," that Manley was in a ketamine-induced memory blackout while playing blackjack, and that Manley's lack of recollection after the first drink—including his lack of recollection of increasing his credit limit to $3.5 million—was "fully consistent" with that amnestic episode. *See* Ex. 26 (Sucher Rebuttal Report) at 4–7. Manley later represented in motion practice that Dr. Sucher had "unequivocally confirmed" the timing of the alleged drugging. Dkt. No. 211 at 12 & n.10. These statements confirmed that Manley's theory was that his alleged ketamine exposure occurred through his first drink.

Manley cannot carry his burden to show that his nondisclosure was substantially justified or harmless. Defendants first learned during the pretrial meet-and-confer process that Manley intends to argue exposure through some other means than his first Old Fashioned. An eve-of-trial

announcement is not supplementation "in a timely manner" under Rule 26(e). Defendants structured discovery, examined witnesses, retained experts, reviewed the evidence, and litigated summary judgment based on Manley's disclosed first-drink theory. Curing the prejudice now would require reopening fact and expert discovery and revisiting issues already litigated at summary judgment. Because Manley's nondisclosure was neither substantially justified nor harmless, Rule 37(c)(1) warrants exclusion.

*(b) Rules 401 and 402 Also Bar Manley's Alternative-Exposure Theory.*

Manley's first-drink theory is the only exposure theory remaining for trial. In denying Defendants' summary-judgment motion, the Court expressly relied on Manley's testimony "that he thought that the cocktail server spiked his drink, the first drink, the first Old Fashioned beverage." Dkt. No. 221 at 45:5–10. The Court later confirmed that its ruling had "relied on [Manley's] testimony that he believed the bartender who made the first Old Fashion[ed] cocktail contaminated his drink." Dkt. No. 234 at 2. As a result, it is irrelevant to Manley's remaining affirmative case if he ingested ketamine through some other means and evidence of some alternative theory is irrelevant and inadmissible under Rules 401 and 402.

**3. Manley Should Be Precluded From Arguing Negligence Based Solely On Alcohol Consumption.**

Manley cannot be allowed to argue for liability based on his voluntary consumption of alcoholic beverages separate and apart from the alleged ketamine drugging. *First*, this Court has already correctly held that Manley cannot bring a negligence claim for overservice because such claims must be made to the Nevada Gaming Control Board. *Second*, under long-standing Nevada law, Manley cannot hold Defendants liable for injuries caused by his voluntary alcohol intoxication. If Manley cannot prove he was involuntarily drugged, he has no negligence claim and should not be permitted to argue otherwise to the jury.

*(a) This Court Has Already Held Manley Cannot Bring A Claim For Overservice.*

This Court has already held that Defendants "had no duty to stop serving Manley alcohol." Dkt. No. 28 at 5. Other cases involving similar claims against Defendants have reached the same conclusion: a plaintiff "cannot proceed" on "a negligence suit" that "seeks to recover gaming

losses from his [game] play" by alleging that "MGM overserved him alcohol." *Mehta v. Victoria Partners*, No. 2:21-CV-01493-CDS-VCF, 2023 WL 205758, at *3–4 (D. Nev. Jan. 17, 2023). There is no private right of action for alleged overservice; "authority for enforcement" of an overservice allegation rests "only in the Nevada Gaming Control Board and the Nevada Gaming Commission." Dkt. No. 114 at 4 ("[T]he legislative scheme of Chapter 463 precludes a private cause of action." (quoting *Sports Form, Inc. v. Leroy's Horse & Sports Place*, 823 P.2d 901, 904 (Nev. 1992))). "[O]nly the Nevada Gaming Control Board or the Nevada Gaming Commission may bring [such] enforcement actions." *Sports Form*, 823 P.2d at 903. And plaintiffs asserting negligence claims must pursue administrative remedies before the NGCB if "the essence of [their] claim" falls within its exclusive jurisdiction. *Devon v. Unbelievable, Inc.*, 29 F.3d 631 (9th Cir. 1994); *see also Erickson v. Desert Palace, Inc.*, 942 F.2d 694, 696 (9th Cir. 1991) (affirming dismissal of a fraud claim that "can most accurately be characterized as" a dispute within the NGCB's exclusive jurisdiction); *Friedlander v. Tamarack Junction Race & Sports Book*, 585 P.3d 482, 484–85 (Nev. 2026) (explaining that a plaintiff cannot evade the Nevada Gaming Control Board's exclusive jurisdiction by pleading "a breach of contract claim; instead, the matter must be referred to the Board"). That is the case here. Manley cannot seek to impose liability on Defendants based on a theory that they overserved him alcohol.

*(b) Defendants Cannot Be Liable For Injuries Caused By Manley's Voluntary Alcohol Intoxication.*

This Court allowed Manley's negligence claim to proceed on the theory that he suffered a cut hand and related "severe bruises, nausea, and grogginess" because his first drink of December 10, 2021 was spiked with ketamine. Dkt. No. 28 at 7. If Manley cannot prove his drink was spiked with ketamine, he cannot hold Defendants liable for those alleged injuries because they were the result of his voluntary alcohol intoxication.

As this Court has recognized, "it is well settled in Nevada that commercial liquor vendors, including hotel proprietors, cannot be held liable for damages related to any injuries caused by the intoxicated person, which are sustained by either the intoxicated patron or a third party." *Id.* at 4 (quoting *Rodriguez v. Primadonna* Co.*, LLC*, 216 P.3d 793, 798 (Nev. 2009)); *see also Hallett v.*

*U.S. Dep't of Navy*, 850 F. Supp. 874, 879 (D. Nev. 1994) ("Nevada does not recognize a cause of action arising out of the sale or furnishing of intoxicating beverages."). Among other things, "when a patron sustains injuries due to his intoxication, the proximate cause of those injuries is the consumption of liquor and not the sale." *Rodriguez*, 216 P.3d at 800 & n.3; *see also Hamm v. Carson City Nugget, Inc.*, 450 P.2d 358, 359 (Nev. 1969) ( "[T]he proximate cause of damage" is "the patron's consumption of liquor, and not its sale.")

Manley does not, and cannot, allege that his consumption of alcohol on December 10, 2021 was involuntary. If his first drink was *not* spiked with ketamine, then he cannot hold Defendants liable for injuries he caused himself by voluntarily consuming alcohol. *Rodriguez*, 216 P.3d at 798*; see also Hamm*, 450 P.2d at 359.

**C. <u>Conclusion</u>**

For the reasons set forth above, Defendants respectfully request that the Court preclude Manley from arguing that (1) he was drugged by anyone other than Koch; (2) he ingested ketamine in any way other than through the first drink served to him in the MGM Mansion on December 10, 2021; and (3) that he can prevail on his negligence claim even if he cannot establish that he was drugged.

## V. <u>MOTION IN LIMINE NO. 5 TO EXCLUDE UNDISCLOSED MEDICAL EVIDENCE AND LIMIT EMOTIONAL-DISTRESS DAMAGES AND ARGUMENT</u>

**A. <u>Introduction</u>**

Manley lists Dr. Wiley Johnson ("Dr. Johnson"), the psychologist whom he credits with diagnosing his PTSD, as a potential trial witness. Although Manley disclosed Dr. Johnson as a fact witness under Rule 26(a)(1), he did not provide the expert disclosures required by Rule 26(a)(2) for Dr. Johnson, or any other witness offering opinions concerning Manley's alleged emotional distress. Manley also never produced Dr. Johnson's medical records during discovery, nor disclosed the amount of emotional-distress damages he seeks or a basis for calculating it.

Defendants therefore request that the Court (1) exclude Manley's undisclosed expert medical testimony, including any testimony by Dr. Johnson, and undisclosed records concerning Manley's alleged emotional distress; (2) preclude Manley from seeking future emotional-distress

damages at trial due to his lack of expert testimony; and (3) preclude Manley from suggesting a specific dollar amount of past emotional-distress damages to the jury.

## B. Argument

### 1. The Court Should Exclude Manley's Undisclosed Expert Medical Testimony and Any Records Concerning Emotional Distress.

Rule 26 requires timely disclosure of supporting witnesses and documents, as well as anticipated expert testimony. Fed. R. Civ. P. 26(a), (e). Manley failed to disclose an expert witness or records supporting his alleged emotional distress. The Court should exclude the undisclosed expert opinions and records under Rule 37(c)(1).

#### *(a) Undisclosed Expert Medical Testimony*

Manley's disclosure of Dr. Johnson as a fact witness does not permit him to present Dr. Johnson's expert opinions at trial. During the meet-and-confer process, Manley's counsel stated that Dr. Johnson "was not disclosed as an expert and we do not intend to have him offer expert testimony." *See* Ex. 30 (Nov. 9, 2026 Email from Ms. Jenny Robbins). But the substance of Dr. Johnson's anticipated testimony, not Manley's characterization of the witness, determines whether expert disclosures were required.

Dr. Johnson's likely testimony concerning Manley's alleged emotional distress is plainly expert, not lay, testimony. Manley testified that Dr. Johnson diagnosed him with PTSD related to his December 10, 2021 visit to the MGM Grand. *See* Ex. 2 (Manley Vol. 1 Dep.) at 220:1–7, 263:16–23, 264:5–14. Dr. Johnson's opinions regarding whether Manley has PTSD, the psychological causes of Manley's condition, and its likely duration or prognosis depend on specialized knowledge and therefore amount to expert testimony. *See* Fed. R. Evid. 701(c), 702. Dr. Johnson's opinions do not become lay testimony merely because he formed them during treatment or was disclosed as a fact witness. To present Dr. Johnson's opinions at trial, Manley had to comply with Rule 26(a)(2)'s disclosure obligations.

Manley did not comply with Rule 26(a)(2). The parties' initial expert-disclosure deadline was February 15, 2024. Dkt. No. 62 at 4. Manley first identified Dr. Johnson as a witness in the First Supplement to his Initial Disclosures on March 6, 2024—nearly three weeks after that

deadline—and then only as a fact witness under Rule 26(a)(1). That disclosure supplied neither the subject matter of his anticipated expert testimony nor the summary of the facts and opinions required by Rule 26(a)(2)(C). *See* Ex. 29 (Manley's First Supplement). Thus, Manley's post-deadline identification of Dr. Johnson as a fact witness neither timely designated him as an expert nor supplied the required expert disclosures.

Dr. Johnson's status as a "treating provider" does not excuse Manley's failure to comply with Rule 26(a)(2). Rule 26(a)(2)(A) requires identification of any witness who may offer expert testimony. Although a treating physician is exempt from Rule 26(a)(2)(B)'s full-report requirement to the extent the opinions were formed during treatment, *see Goodman v. Staples the Office Superstore, LLC*, 644 F.3d 817, 826 (9th Cir. 2011), that exemption does not eliminate the disclosure obligation. *See McSwain v. United States*, No. 2:15–cv–01321–GMN–GWF, 2017 WL 1347675, at *2 (D. Nev. Apr. 4, 2017) ("Rule 26(a) provides that witnesses who do not provide a written report (i.e. a non-retained, treating physician) must disclose the 'subject matter' on which the witness is expected to present evidence as well as a 'summary of the facts and opinions' that the witness will testify to." (quoting Fed. R. Civ. P. 26(a)(2)(C)(i)–(ii))). In *McSwain*, the Court found that identifying the subjects of treating physicians' testimony did not satisfy Rule 26(a)(2) because the disclosure nevertheless failed to summarize the experts' opinions and supporting facts. *See id.* The court granted a motion to strike the experts' testimony based on the untimely disclosure. *Id.* Here, Manley timely supplied neither the required subject matter nor the summary, and therefore Dr. Johnson's testimony should be excluded at trial.

Defendants' knowledge of Dr. Johnson's identity and apparent PTSD diagnosis was no substitute for Manley's missing expert disclosures. Manley's account of his treatment did not identify Dr. Johnson as an expert witness, state the opinions Dr. Johnson would offer, or explain their factual bases. Defendants were not required to guess whether Dr. Johnson would testify, anticipate his conclusions, and prepare to rebut opinions Manley never disclosed. Defendants *still* lack a disclosure explaining what Dr. Johnson will say about diagnosis, causation, or prognosis—or why. The Court should not allow Manley to present those opinions for the first time at trial. *See Ollier v. Sweetwater Union High Sch. Dist.*, 768 F.3d 843, 861–63 (9th Cir. 2014) (affirming

exclusion of witnesses whom the defendant had mentioned during depositions but had not timely disclosed).

Manley's failure to provide the required expert disclosures was not substantially justified. During the meet-and-confer process, Defendants specifically identified the missing disclosures and asked whether Manley intended to amend them. Manley's counsel stated that the existing disclosures were adequate because Dr. Johnson would not offer expert testimony. *See* Ex. 30. Testimony concerning Manley's PTSD diagnosis, its causes, and its duration or prognosis necessarily depends on specialized knowledge and is therefore expert testimony. *See* Fed. R. Evid. 701(c), 702. Manley cannot justify withholding the required disclosures by labeling Dr. Johnson a fact witness.

Even accepting Manley's position that Dr. Johnson will testify solely as a fact witness, however, his testimony is still inadmissible. His testimony concerning the December 10, 2021 events is irrelevant because he has no firsthand knowledge of those events. *See* Fed. R. Evid. 402, 602. He may not serve as a conduit for Manley's hearsay. *See* Fed. R. Evid. 802. And any marginal probative value of Dr. Johnson's testimony would also be substantially outweighed by the danger of unfair prejudice and misleading the jury, because permitting Dr. Johnson to repeat Manley's account would improperly cloak that account with the authority of a treating psychologist. *See* Fed. R. Evid. 403. Manley cannot disclaim expert testimony to avoid disclosure while invoking Dr. Johnson's professional credentials to bolster his own account.

Nor were Manley's omissions harmless. Manley knew about Dr. Johnson's treatment and diagnosis during discovery, yet never disclosed the opinions Dr. Johnson will offer or their supporting facts. Moreover, despite Defendants' discovery requests for treatment records and bills, Manley has still never produced records of his visits with Dr. Johnson or bills documenting emotional-distress treatment with any provider. *See infra* Section V.B.1.(b); Ex. 31 (Manley's RFP Responses) at 12. During the meet-and-confer process, Defendants raised Dr. Johnson's missing treatment records and requested that Manley make Dr. Johnson available for a deposition. *See* Ex. 30. Manley produced no records and refused to make Dr. Johnson available. *See id.* Defendants thus lack both the required expert disclosures and the underlying treatment records

that might illuminate Dr. Johnson's opinions and their bases, as well as information defining the scope of any proposed non-expert testimony by Dr. Johnson. These omissions have deprived Defendants of a fair opportunity to test Dr. Johnson's factual and methodological bases, investigate alternative explanations for Manley's claimed symptoms, and develop rebuttal evidence.

Manley should not be permitted to shift the consequences of his failure to comply with Rule 26(a)(2) onto Defendants. The Court should exclude Dr. Johnson's undisclosed expert opinions under Rule 37(c)(1) and, to the extent he is offered as a fact witness, exclude his testimony as irrelevant or, alternatively, because any probative value is substantially outweighed by the danger of unfair prejudice and misleading the jury.

*(b) Undisclosed Medical Records*

To the extent Manley seeks to introduce records or bills concerning emotional-distress treatment, the Court should exclude them. Defendants requested those materials during discovery. *See* Ex. 31 (Manley's RFP Responses) at 12 (Defendants' request for production seeking "all . . . medical records or documents related to any testing, diagnosis, treatment or medication you assert are related to the Incident, including but not limited to . . . medical reports . . . financial records, bills, invoices or writings"). Manley represented that all responsive documents had been produced and that additional responsive documents would be produced, if located. *Id.* at 12–13. Yet he never produced records of his visits with Dr. Johnson or bills documenting any emotional-distress treatment with any provider.

Manley's failure to produce Dr. Johnson's treatment records compounds the prejudice from Manley's missing expert disclosures. Defendants lack both a summary of Dr. Johnson's anticipated opinions and the underlying records that might shed light on those opinions and their factual bases. Without those disclosures or records, Defendants cannot meaningfully assess Dr. Johnson's opinions, determine whether they were formed during treatment, or prepare to address them at trial.

The Court should exclude any undisclosed records or bills concerning Manley's emotional-distress treatment, including Dr. Johnson's treatment records, should Manley attempt to offer them

at trial. *Macias v. Smith's Food & Drug Ctr.*, No. 2:20-cv-01554-JAD-NJK, 2020 WL 7439703, at *5 (D. Nev. Dec. 17, 2020) (excluding untimely disclosed medical records and bills).

**2. The Court Should Preclude Manley from Seeking Future Emotional-Distress Damages.**

Manley should also be precluded from requesting damages for future emotional distress because he has no properly disclosed expert to establish that his claimed psychological injury will continue after trial.

Under Nevada law, expert medical testimony is necessary to support future damages "when an injury or disability is subjective and not demonstrable to others." *Hendrix v. Progressive Direct Ins. Co.*, No. 2-20-cv-01856-RFB-EJY, 2023 WL 2610167, at *2 (D. Nev. Mar. 22, 2023) (quoting *Krause Inc. v. Little*, 34 P.3d 566, 571 (Nev. 2001)); *see Gutierrez v. Sutton Vending Serv., Inc.*, 397 P.2d 3, 4 (Nev. 1964) ("expert testimony that the disability will probably continue is needed before an award for future damage is permissible"). Applying that rule, the Court in *Hendrix* precluded a plaintiff from seeking future medical expenses and pain and suffering because "[t]he record [wa]s devoid of the required expert evidence needed to establish" those damages. 2023 WL 2610167, at *3.

The expert-testimony requirement applies to Manley's claimed future emotional distress from PTSD, or any other condition. Manley's account of past distress and his belief that he has PTSD do not establish the condition's likely course or duration. Whether his alleged PTSD or related symptoms will persist after trial, and whether those future symptoms will be attributable to the incident, are matters of psychological prognosis requiring specialized knowledge. Manley has disclosed no admissible expert opinion establishing that prognosis. Dr. Johnson's fact-witness disclosure does not cure that gap. As explained above, any opinion that Manley's alleged PTSD or related symptoms will persist after trial is expert testimony subject to Rule 26(a)(2), and Manley did not provide the required disclosures. Manley's own testimony may describe symptoms he has experienced, but it cannot supply the missing expert testimony.

The Court should preclude Manley from requesting future emotional-distress damages, including by arguing that Manley's alleged PTSD and related symptoms will persist after trial.

**3. Manley Should Not Be Permitted to Request a Specific Dollar Amount of Past Emotional-Distress Damages.**

Rule 26(a)(1)(A)(iii) requires disclosure of a computation of each category of damages claimed, along with supporting materials. Courts enforce that obligation by precluding counsel from presenting a specific emotional-distress damages demand to a jury that was never disclosed. *See Maharaj v. Cal. Bank & Tr.*, 288 F.R.D. 458, 464 (E.D. Cal. 2013) (granting a motion in limine to preclude a specific emotional-distress damages request when the plaintiff had not disclosed the amount); *First v. Kia of El Cajon*, No. 10–CV–536–DMS (BGS), 2010 WL 3069215, at *2 (S.D. Cal. Aug. 4, 2010) (warning that failure to disclose a calculation of emotional-distress damages may foreclose suggesting a specific emotional-distress amount at trial); *E.E.O.C. v. Gen. Motors Corp.*, No. 3:06–cv–19–WHB–LRA, 2009 WL 910812 (S.D. Miss. Apr. 1, 2009) (precluding the plaintiff from suggesting the amount of damages the jury should award because the plaintiff did not satisfy its Rule 26 obligations).

Manley never identified the amount of past emotional-distress damages he seeks, either in his disclosures or when asked directly at his deposition. Manley's initial disclosures identified that he sought "payment of all of Plaintiff's medical bills and damages incurred or sustained as a result of the incident at issue." Ex. 32 (Manley's Initial Disclosures) at 5. He stated that "the exact amounts . . . w[ould] be supplemented." *Id.* But Manley never supplemented that disclosure with an emotional-distress amount or computation. At his deposition, when asked what amount he sought for emotional distress, Manley answered, "I don't have an amount in mind." Ex. 2 (Manley Vol. 1 Dep.) at 258:14–17. When asked whether he sought more than $1 million in emotional-distress damages, he responded "I've never even thought of that." *Id.* at 258:18–20. He later confirmed again that he had no specific emotional-distress-damages amount in mind. *Id.* at 260:1–4.

Manley had years of discovery to disclose a past emotional-distress damages figure and its basis, but never did so. That nondisclosure is neither substantially justified nor harmless. Allowing Manley to present a specific dollar demand for the first time at trial would deprive Defendants of the opportunity to question him and other witnesses about the amount and

investigate its basis. The Court should preclude Manley from suggesting a specific dollar amount of past emotional-distress damages at trial, while leaving the jury free to determine any award supported by otherwise admissible evidence.

### C. Conclusion

Defendants respectfully request that the Court (1) exclude undisclosed expert medical testimony, including any testimony by Dr. Johnson, and records concerning Manley's alleged emotional distress; (2) preclude Manley from seeking future emotional-distress damages due to his lack of expert testimony; and (3) preclude Manley from suggesting a specific dollar amount of past emotional-distress damages to the jury.

## VI. MOTION IN LIMINE NO. 6 TO EXCLUDE TESTIMONY FROM MANLEY'S SIX UNDISCLOSED FACT WITNESSES

### A. Introduction

Manley's trial witness list includes six individuals whom he did not disclose as fact witnesses during discovery: David Chesnoff, Ashley Eddy, George Olivo, Dennis Rodman, Richard Schonfeld, and James Stern (collectively, the "Undisclosed Witnesses").[10] The Court should exclude their testimony because Manley cannot establish that his failure to disclose them was substantially justified or harmless.

### B. Background

Manley had approximately two years of discovery to identify the Undisclosed Witnesses as potential fact witnesses but never did so. His initial disclosures, served on March 31, 2023, identified 22 witnesses. Ex. 32 (Manley's Initial Disclosures). His first and second supplements to his initial disclosures, served on March 6, 2024 and June 13, 2024, respectively, added two fact

[10] Manley disclosed Bissani as an expert but later asserted he would testify as a fact witness. Because Bissani was deposed, Defendants do not seek to exclude his testimony through this motion. Defendants instead challenge Bissani's qualifications to offer expert testimony and his lack of personal knowledge to offer fact testimony concerning Manley's Hair Drug Test in their separate motion in limine to exclude that test and related testimony. *See supra* Defendants' Motion in Limine No. 2.

witnesses. Ex. 29 (Manley's First Supplement); Ex. 33 (Manley's Second Supplement).[11] None of these disclosures identified the Undisclosed Witnesses, and Manley never further supplemented his witness disclosures. Defendants first learned that Manley intended to call the Undisclosed Witnesses at trial on July 6, 2026, during preparation of the Joint Pretrial Order, and more than a year after discovery had closed on March 14, 2025. *See* Dkt. No. 155.

**C. <u>Argument</u>**

Rule 26 requires parties to timely identify potential witnesses and keep those disclosures current. Rule 26(a)(1)(A)(i) requires a party to identify each individual likely to have discoverable information that the party may use to support its claims or defenses, along with the subjects of that information. Fed. R. Civ. P. 26(a)(1)(A)(i). A party must timely supplement a disclosure that it learns is materially incomplete or incorrect. Fed. R. Civ. P. 26(e)(1)(A).

Rule 37(c)(1) enforces those obligations by prohibiting a party from using an undisclosed witness to supply evidence at trial unless the nondisclosure was substantially justified or harmless. Fed. R. Civ. P. 37(c)(1). The rule is "intended to put teeth into the mandatory . . . disclosure requirements" of Rules 26(a) and (e) and "to encourage parties to try cases on the merits, not by surprise, and not by ambush." *Ollier v. Sweetwater Union High Sch. Dist.*, 768 F.3d 843, 861–62 (9th Cir. 2014) (alteration in original) (citation omitted). That is because "[a]n adverse party should not have to guess which undisclosed witnesses may be called to testify." *Id.* at 863. The party facing exclusion bears the burden of establishing that substantial justification or harmlessness exists. *Yeti by Molly, Ltd. v. Deckers Outdoor Corp.*, 259 F.3d 1101, 1107 (9th Cir. 2001).

Courts assess substantial justification or harmlessness by considering: (1) prejudice or surprise to the opposing party; (2) the ability to cure that prejudice; (3) the likelihood of disrupting trial; and (4) bad faith or willfulness in failing to timely disclose the evidence. *Lanard Toys Ltd. v. Novelty, Inc.*, 375 F. App'x 705, 713 (9th Cir. 2010). Whether to impose a sanction for

---

[11] Manley first identified Dr. Johnson as a fact witness in his First Supplement. Defendants separately move to exclude Dr. Johnson's testimony because Manley failed to timely disclose him as an expert or provide the expert disclosures required by Rule 26(a)(2)(C). *See supra* Defendants' Motion in Limine No. 5.

nondisclosure is an equitable determination committed to the Court's discretion. *Silvagni v. Wal-Mart Stores, Inc.*, 320 F.R.D. 237, 242 (D. Nev. 2017). That discretion is "particularly wide" when excluding witnesses under Rule 37(c)(1). *Yeti by Molly*, 259 F.3d at 1106.

Manley's failure to timely disclose the Undisclosed Witnesses was neither substantially justified nor harmless. *First,* Manley's nondisclosure was not harmless because it deprived Defendants of the opportunity to depose these witnesses during discovery, investigate their anticipated testimony, and otherwise prepare to examine them at trial. Timely disclosure would also have allowed Defendants to pursue follow-up discovery and develop evidence to test or rebut that testimony. Allowing these witnesses to testify now would force Defendants either to proceed without those opportunities or to reopen discovery to obtain them.

*Second*, reopening discovery would impose additional burdens rather than eliminate the prejudice. Discovery was open for approximately two years, and trial is now set for February 9, 2027. Deposing additional witnesses and investigating their testimony would divert resources from trial preparation and require changes to the parties' and the Court's schedules. *See, e.g.*, *Hoffman v. Constr. Protective Servs., Inc.*, 541 F.3d 1175, 1180 (9th Cir. 2008) (finding nondisclosure was not harmless where a late disclosure would likely require a new briefing schedule and potentially reopening discovery), *as amended* (Sept. 16, 2008); *Ollier,* 768 F.3d at 863 (9th Cir. 2014) (affirming exclusion where reopening discovery would burden the opposing party and disrupt the Court's and the parties' schedules).

*Third*, there is no justification for Manley's delay. The Undisclosed Witnesses and their roles were known to Manley during discovery. Chesnoff and Schonfeld represented him, and Eddy previously served as MGM Resorts International's counsel.[12] Rodman is Manley's friend and

[12] Defendants independently oppose Manley's effort to call Eddy as a trial witness. Eddy served as MGM Resorts International's Senior Vice President and Legal Counsel at the time of the alleged December 10, 2021 incident and throughout most of this litigation. Her former employment by MGM Resorts International does not eliminate the prejudice from Manley's nondisclosure. Manley never disclosed that he intended to call her as a fact witness or identified the subjects of her anticipated testimony. Defendants therefore had no notice during discovery that they needed to investigate that testimony or develop other evidence to rebut it.

former client. Olivo administered polygraph examinations to Manley and his friends, with Stern's assistance.[13] These witnesses' identities and potential relevance did not emerge after discovery closed. Yet Manley did not identify them as potential witnesses until July 2026.

**D. Conclusion**

Manley cannot cure his nondisclosure without burdening Defendants with additional discovery during trial preparation. Defendants respectfully request that the Court exclude testimony from the Undisclosed Witnesses under Rule 37(c)(1).

## VII. MOTION IN LIMINE NO. 7 TO EXCLUDE THE FINANCIAL REPORT PRODUCED IN MANLEY'S EIGHTH SUPPLEMENT TO HIS INITIAL DISCLOSURES AS UNTIMELY

Manley has included on his exhibit list four exhibits (TX125, TX126, TX127, and TX128) that should be excluded because they were disclosed more than a year after discovery closed.[14]

Discovery closed in this matter on March 14, 2025. *See* Dkt. No. 155. Nevertheless, on April 14, 2026, Manley purported to serve an Eighth Supplement to his Initial Disclosures. Ex. 34 (Manley's Eighth Supplement). In doing so, Manley produced a 20-page document titled "MGM Resorts International Reports Fourth Quarter and Full Year 2025 Results." *Id.* at 3. The document appears to be a low-quality, scanned report concerning MGM Resorts' quarterly and annual revenues, among other financial metrics. *Id.* The source of the document is unknown and not readily ascertainable from the copy disclosed by Manley. *Id.* Manley marked portions of this document as TX125, TX126, TX127, and TX128.[15]

---

[13] Defendants separately move to exclude these polygraphs examinations. *See supra* Defendants' Motion in Limine No. 1.

[14] Defendants' motion to strike Manley's request for punitive damages remains pending. *See* Dkt. No. 245. Depending on the Court's ruling on that motion, Defendants may supplement this motion regarding the admissibility of evidence of Defendants' financial condition for purposes of punitive damages.

[15] Even if the Court permits the use of the untimely report, Manley should not be permitted to divide that single document into four exhibits and present selected portions in a manner that omits necessary context and/or creates a misleading impression. *See* Fed. R. Evid. 106 ("If a party introduces all or part of a statement, an adverse party may require the introduction, at that time, of any other part—or any other statement—that in fairness ought to be considered at the same time."). Any admission of TX125, TX126, TX127, or TX128 should be subject to Defendants'

Under Federal Rule of Civil Procedure 37(c)(1), a party that fails to provide information as required by Rule 26(a) or (e) may not use that information at trial unless the failure was substantially justified or harmless. Manley's untimely disclosure warrants the document's exclusion at the time of trial. *See, e.g.*, *Hutchinson v. Glob. Experience Specialists Inc.*, No. 2:16-CV-02397-MMD-EJY, 2019 WL 3804234, at *5 (D. Nev. Aug. 13, 2019) (excluding untimely production of documents from being utilized by disclosing party in its case-in-chief).

To the extent Manley argues that this document was unavailable during the discovery period, that does not justify his delay. This is not a case where Manley produced a 2024 version of a document and now seeks to introduce a newer version of the same document. Instead, Manley seeks to introduce an entirely new document, and entirely new issue, into this case long after discovery closed. Disclosure more than a year after the discovery cutoff deprived Defendants of the opportunity during discovery to investigate the document's source, examine its contents, and pursue discovery concerning its proposed use at trial. Manley's disclosure therefore was neither substantially justified nor harmless.

For these reasons, Defendants respectfully request that the Court exclude (1) the untimely "MGM Resorts International Reports Fourth Quarter and Full Year 2025 Results" document, marked as TX125, TX126, TX127, and TX128, because it was disclosed more than a year after the discovery cutoff, and (2) any other financial information concerning Defendants at trial.

## VIII. MOTION IN LIMINE NO. 8 TO LIMIT USE OF EVIDENCE OF MANLEY'S CONDITION AFTER 3:39 P.M. ON DECEMBER 10, 2021 TO HIS NEGLIGENCE CLAIM

### A. Introduction

The jury should decide Manley's contractual capacity based on his condition when he undertook the repayment obligations at issue. Those obligations arose from two marker agreements he had signed by 3:39 p.m. on December 10, 2021. Manley nevertheless intends to present evidence of his condition much later that afternoon, after additional drinking, to suggest

---

right to introduce the portions of the report necessary to place those excerpts in context and correct any misleading impression.

that Manley lacked capacity at the time he signed those agreements. That evidence includes Manley breaking an ashtray at approximately 4:01 p.m., surveillance footage depicting him walking from approximately 5:00 to 5:30 p.m., as well as testimony from Manley, his wife, and his friends describing his later condition. Unrestricted use of that evidence would invite the jury to substitute Manley's subsequent appearance and conduct for an assessment of his capacity when he contracted.

Evidence of Manley's condition after 3:39 p.m. may be relevant to his negligence claim because it could bear on the nature and extent of his alleged physical injuries and whether those injuries were caused by his alleged ingestion of ketamine. But that evidence is not relevant to Manley's other surviving claims or his incapacity defense to MGM Grand's counterclaims. Defendants therefore seek to limit its use. Without a limiting instruction, footage of Manley breaking an ashtray and later having difficulty walking, accompanied by testimony describing his later appearance and condition, threatens to overshadow the evidence of his condition at the times he signed the first and second marker agreements. The jury may collapse distinct events into a single, unwarranted impression that Manley lacked contractual capacity throughout the afternoon. His continued drinking after signing those agreements makes that inference particularly misleading: it invites the jury to attribute his later condition to the earlier transactions without accounting for his intervening alcohol consumption or assessing his capacity when he signed each agreement.

Defendants accordingly request a limiting instruction under Rule 105 confining the jury's consideration of evidence of Manley's condition after 3:39 p.m. on December 10, 2021 to his negligence claim. Rules 401 and 402 warrant that restriction because his later condition is irrelevant to his other surviving claims and his incapacity defense to MGM Grand's counterclaims, which concern his capacity when he undertook the repayment obligations at issue. Even if that evidence has some marginal relevance to those issues, Rule 403 warrants the same restriction because its limited probative value is substantially outweighed by the dangers of unfair prejudice, confusing the issues, and misleading the jury.

**B. Argument**

"A motion in limine is a procedural mechanism to limit testimony or evidence in a particular area in advance of trial." *Composite Res. Inc. v. Recon Med. LLC*, No. 2:17-cv-01755-MMD-VCF, 2021 WL 5501104 (D. Nev. Nov. 22, 2021). A limiting instruction may address issues raised through a motion in limine. *United States v. Castro*, 626 F. Supp. 3d 1186, 1192 (D. Nev. 2022). When evidence is admissible for one purpose but not another, Rule 105 requires the Court, upon timely request, to restrict the evidence to its proper scope and instruct the jury accordingly. Fed. R. Evid. 105.

A limiting instruction is warranted here for two reasons: (1) Manley's later condition is irrelevant to his contractual capacity when he undertook the repayment obligations at issue; and (2) even if marginally relevant, the evidence's limited probative value is substantially outweighed by the dangers of unfair prejudice, confusing the issues, and misleading the jury.

**1. Evidence of Manley's Later Condition Is Irrelevant to His Contractual Capacity When He Undertook the Obligations to Repay the $3 Million.**

Evidence is relevant only if it tends to make a fact of consequence more or less probable. Fed. R. Evid. 401. Irrelevant evidence is inadmissible. Fed. R. Evid. 402.

Manley's contractual capacity must be assessed when he undertook the obligations he now seeks to avoid. Under Nevada law, intoxication may render a party's contractual duties voidable upon "convincing proof of claims that due to intoxication *at the time* of making a contract, the party was bereft of mental faculties." *LaBarbera v. Wynn Las Vegas, LLC*, 422 P.3d 138, 141 (Nev. 2018) (emphasis added) (quoting 17B C.J.S. Contracts § 988 (2018)). The inquiry therefore concerns his capacity when the relevant contracts were formed.

Manley undertook the repayment obligations at issue no later than approximately 3:39 p.m. on December 10. He signed two marker agreements under which Defendants advanced him $3 million to gamble. By approximately 1:49 p.m., he had signed the first agreement for a $2 million advance. Exs. 35 (TX033), 36 (TX059) at 2. At approximately 3:39 p.m., he signed the second agreement, increasing the amount he could borrow to $3 million. Exs. 37 (TX034), 38 (TX030O (Camera 2870)) at 15:39. Those agreements established the terms governing the advances and

Manley's repayment obligations, including his obligation to execute corresponding credit instruments for the amounts advanced. *See* Exs. 35 (TX033), 37 (TX034) ("Before drawing on my permanent or temporary credit limit, if granted, I agree to sign credit instruments (i.e. markers or counterchecks) in the amount of the draw."). The two agreements expressly contemplated that Defendants might provide gaming chips before Manley signed a corresponding instrument: in that circumstance, Manley agreed that he would promptly execute an instrument in the amount provided. *See id.* ("If I received funds (i.e. cash, chips, tokens, etc.) before I execute a credit agreement, I promptly will sign a credit instrument in the amount of the funds provided.").

Manley's later execution of credit instruments fulfilled those existing contractual obligations; it did not postpone the relevant contracting time. He signed a $2 million instrument at approximately 3:22 p.m., after losing the first $2 million advanced by Defendants, and a $1 million instrument at approximately 4:25 p.m., after losing an additional $1 million. *See* Ex. 39 (TX069); Ex. 38 (TX030O (Camera 2870)) at 15:22; Ex. 38 (TX030C (Camera 2803)) at 16:25. His obligations to repay the advances made pursuant to the marker agreements arose from the marker agreements themselves, not his later execution of the instruments.[16] *See Desert Palace, Inc. v. Michael*, No. 2:16-cv-00462-JAD-GWF, 2017 WL 2695296, at *6–7 (D. Nev. June 22, 2017) (enforcing a patron's earlier marker agreement requiring execution of subsequent credit instruments and rejecting the argument that it was merely an "agreement to agree"). Because Manley seeks to avoid his repayment promises based on alleged incapacity, his capacity must be assessed when he made those promises. The latest relevant contracting time was therefore approximately 3:39 p.m., when he signed the second marker agreement.

---

[16] Even if the Court treats execution of the credit instruments as the relevant contracting events, Manley signed the first at 3:22 p.m. and the second at 4:25 p.m. At a minimum, the Court should therefore apply Defendants' requested limitation to evidence of Manley's condition after 4:25 p.m., including the footage and testimony describing his appearance and conduct before he returned to his room at approximately 5:30 p.m. That later condition is irrelevant to his capacity when he signed the instruments or, at most, has marginal probative value substantially outweighed by the dangers of unfair prejudice and misleading the jury.

Manley's nominal challenge to a third marker agreement does not extend that inquiry. That agreement, signed at approximately 4:36 p.m., increased the amount he could borrow by another $500,000. *See* Exs. 40 (TX035), 38 (TX030C (Camera 2803)) at 16:36. But Manley testified that his December 10 losses totaled $3 million and that $500,000 in advances remained available when he finished playing that day. *See* Ex. 2 (Manley Vol. 1 Dep.) at 115:23–116:18, 117:1–6. MGM Grand seeks no repayment attributable to that third agreement, and Manley identifies no loss arising from that agreement that invalidating it would remedy. His request to invalidate that third marker agreement therefore presents no live controversy: there is no corresponding repayment obligation being enforced or loss to recover.[17]

Manley's remaining non-negligence claims and incapacity defense concern the validity or enforcement of the obligations he undertook in the first two marker agreements.[18] His declaratory-relief claim alleges that he "was unable to understand in a reasonable manner the nature and consequence of his actions and the transactions." TAC ¶ 73(c).[19] His unjust-enrichment claim challenges Defendants' collection of the $2 million advanced under the first agreement through presentation of the corresponding credit instrument to his bank. *Id.* ¶ 96. His contractual implied-covenant claim alleges that Defendants took advantage of his gaming history

[17] Even if the Court considers the third agreement, Manley signed it at approximately 4:36 p.m., before the footage and testimony concerning his condition around 5:00 to 5:30 p.m. Using those subsequent observations to assess his earlier capacity presents the same danger of projecting his later condition backward, compounded by the risk that the jury will use that later evidence to invalidate the first two marker agreements underlying the disputed $3 million.

[18] Manley's surviving negligence claim seeks damages for alleged physical injuries resulting from the alleged drugging and Defendants' response. *See* TAC ¶ 77; Dkt. No. 28 at 7 (permitting the claim to proceed in part because Manley "alleges specific personal injuries—a cut hand, severe bruises, nausea, and grogginess—that resulted from Defendants' 'fail[ure] to properly respond to him cutting his hand and bleeding on a blackjack table' during his ketamine-induced blackout" (alteration in original)).

[19] Manley seeks a declaration that, among other things, the second and third marker agreements and both credit instruments are invalid based on alleged incapacity and that he owes no remaining balance. *See* TAC ¶¶ 41, 43, 46, 73(e)–(f). As explained above, his challenge to the third agreement identifies no repayment obligation being enforced or corresponding loss that invalidating it would remedy.

by having him "enter into written agreements" inconsistent with their purpose and his justified expectations. *Id.* ¶¶ 101–103. And his incapacity defense challenges his ability to undertake the repayment obligations in the first and second marker agreements that MGM Grand seeks to enforce.

Generalized evidence of Manley's condition after 3:39 p.m. does not establish that he lacked capacity when he signed those agreements or that Defendants denied him a justified contractual benefit by depositing the $2 million credit instrument. Rules 401 and 402 therefore support limiting his use of that evidence to his negligence claim.

**2. Even If Marginally Relevant, the Evidence's Probative Value Is Substantially Outweighed by the Dangers of Unfair Prejudice, Confusing the Issues, and Misleading the Jury.**

Rule 403 permits exclusion of relevant evidence when its probative value is substantially outweighed by dangers including unfair prejudice, confusing the issues, and misleading the jury. Fed. R. Evid. 403. Even if evidence of Manley's later condition has some marginal relevance to his earlier contractual capacity, unrestricted use presents precisely those dangers.

The challenged evidence includes depictions and accounts of Manley's condition after he signed the first two marker agreements. At approximately 4:01 p.m., Manley broke an ashtray and cut his hand. *See* Ex. 38 (TX030O (Camera 2870)) at 16:01. Later surveillance footage depicts Manley's departure from the gaming area and difficulty walking back to his room, which he reached by approximately 5:30 p.m. *See, e.g.*, Ex. 38 (TX030P (Camera 2982)); Ex. 38 (TX030V (Camera 4037, Camera 4087)). Manley also intends to present testimony from himself, his wife, and his friends describing his condition and appearance throughout the late afternoon and early evening. *See, e.g.*, Ex. 2 (Manley Vol. 1 Dep.) at 124:3–6, 170:9–20; Ex. 41 (Nasongkhla-Manley Dep.) at 70:7–71:3, 71:10–25, 72:8–23; Ex. 15 (Snyder Dep.) at 55:11–56:7, 58:15–59:5.

Without a limiting instruction, that evidence threatens to overshadow the evidence of Manley's capacity when he contracted. The jury may collapse distinct events into a single, unwarranted impression that he lacked contractual capacity throughout the afternoon, projecting his later appearance and conduct backward onto the first and second marker agreements. His continued alcohol consumption compounds that risk. Manley alleges that his first Old Fashioned,

served at approximately 1:54 p.m., contained ketamine, but he ordered five more Old Fashioneds over the course of the afternoon and continued drinking, including after signing the second marker agreement at approximately 3:39 p.m. *See* TAC ¶¶ 31–35; Ex. 38 (TX030H (Camera 2851)) at 13:54, 14:21, 15:07, 15:31; Ex. 38 (TX030D (Camera 2804)) at 15:58, 16:56. Defendants' position is that alcohol consumption explains Manley's later appearance and conduct. Unrestricted use of the evidence of Manley's post-3:39 p.m. condition risks leading the jury to mistake the effects of his continued drinking for proof that he lacked capacity when he contracted hours earlier. Any limited probative value of the later observations is substantially outweighed by the danger that the jury will substitute them for an assessment of his capacity when he signed the agreements.

A limiting instruction addresses that danger while permitting Manley to present evidence that is arguably relevant to his negligence theory. The Court should give the instruction when post-3:39 p.m. condition evidence is first introduced, repeat it in the final charge, and direct counsel to confine examination and argument concerning that evidence to the negligence claim.

### C. <u>Conclusion</u>

Defendants respectfully request that the Court give the following limiting instruction under Rule 105 when evidence of Manley's condition after 3:39 p.m. is first introduced and again in the final charge:

> Evidence of Mr. Manley's condition after 3:39 p.m. on December 10, 2021, is admitted only for your consideration of his negligence claim. You may consider that evidence in determining the nature and extent of his alleged physical injuries, whether those injuries were caused by the alleged ketamine ingestion, and Defendants' response. You must not consider that evidence in deciding Mr. Manley's other claims or his incapacity defense to MGM Grand Hotel, LLC's counterclaims, including when deciding whether Mr. Manley had capacity when he signed the first and second marker agreements.

Defendants further request that the Court direct counsel to confine examination and argument concerning that evidence to the negligence claim. The restriction should apply equally to any surveillance-footage evidence; testimony from Manley, his wife, or his friends; and any other descriptions or depictions of his condition after 3:39 p.m. It should not limit evidence or

argument concerning Manley's subsequent conduct bearing on disaffirmance or ratification of the relevant agreements.

## IX. MOTION IN LIMINE NO. 9 TO PRECLUDE MANLEY'S NEGLIGENCE THEORY BASED ON DEFENDANTS' EXTENSION OF GAMING CREDIT

### A. Introduction

Manley should be precluded from arguing that Defendants were negligent in allowing him to gamble, and lose, too much money. In his Third Amended Complaint, Manley pled multiple theories of negligence, including that Defendants were negligent in "extending credit and significantly increasing his credit limit." TAC ¶ 77. But that "credit" theory is barred by Nevada's economic-loss rule and cannot be presented to the jury.

### B. Background

Manley's "credit" theory does not concern a traditional credit arrangement in which, for example, a credit card company permits a user to make purchases on credit for a period of time and then repay the costs of the purchases. Casino "credit" is different: a casino allows patrons to acquire chips with which to gamble without having to bring large amounts of cash to the casino floor, but the patron is expected to pay for those chips at the end of his or her session. The casino guards against the patron *not* paying his or her debts by requiring the patron to sign a "credit" or "marker" agreement establishing the patron's obligations, including the obligation to execute corresponding credit instruments or "markers." *See Desert Palace, Inc. v. Michael*, No. 2:16-cv-00462-JAD-GWF, 2017 WL 2695296, at *1 (D. Nev. June 22, 2017). Specifically, the player "exchanges [a] marker for gaming tokens or 'chips,' which may be exchanged for currency with the casino cashier." *Nguyen v. State*, 14 P.3d 515, 516 (Nev. 2000). The marker, in turn, is effectively a personal check: "an instrument, usually dated, bearing the following information: the name of the player; the name, location, and account number of the player's bank; and the instruction 'Pay to the Order of' the casino for a specific value in United States dollars." *Id.* "When a patron has concluded play, he either pays the full amount of the marker he has obtained or leaves the casino with the marker outstanding. If the marker remains outstanding, casino personnel attempt to notify the patron and, after a specified period of time, submit the marker to

the patron's bank for collection." *Id.* When Manley claims Defendants improperly "extend[ed] credit," he is really asserting that Defendants improperly allowed him to continue purchasing chips with his own money. Defendants have no duty, of course, to control Manley's purchases, whether of casino chips or anything else. But even if Manley could identify such a duty in the law, his theory would be barred by the economic-loss rule, as explained below.

**C. <u>Argument</u>**

As this Court has previously explained, Nevada's economic-loss rule bars "unintentional tort claims when a plaintiff seeks 'purely economic losses.'" Dkt. No. 28 at 7 (citation omitted). That means that "a plaintiff may not recover economic loss under" a negligence theory. *Cent. Bit Supply, Inc. v. Waldrop Drilling & Pump, Inc.*, 717 P.2d 35, 36 (Nev. 1986); *see also Loc. Joint Exec. Bd. of Las Vegas, Culinary Workers Union, Loc. No. 226 v. Stern*, 651 P.2d 637, 638 (Nev. 1982) (similar). This Court held that Manley's negligence claim survived Defendants' motion to dismiss because he had alleged an entirely separate theory of negligence—that Defendants failed "to properly respond to him cutting his hand and bleeding on a blackjack table"—and separate harm arising from that alleged wrongdoing—that he had suffered "a cut hand, severe bruises, nausea, and grogginess." Dkt. No. 28 at 7.

The Court's ruling on Manley's injury-based negligence theory does not mean that Manley may argue to the jury that Defendants were negligent in improperly extending him credit. This Court has already held, correctly, that "gambling losses" are "economic losses" that Manley "could have recovered under contract law." *Id.* He therefore cannot proceed on a negligence theory for which the only alleged injury is the money he lost gambling. But that is the only injury he can tie to the alleged negligence in "extending credit and significantly increasing his credit limit." TAC ¶ 77. Manley has not pled, and cannot plausibly argue, that his gambling losses led to "a cut hand, severe bruises, nausea, and grogginess" that this Court found were non-economic harms cognizable in a negligence action. Dkt. No. 28 at 7. In short, Manley cannot use his claim that Defendants were negligent in failing "to properly respond to him cutting his hand and bleeding on a blackjack table" to smuggle in a claim that Defendants were negligent in "extending

credit and significantly increasing his credit limit." TAC ¶ 77. The latter is flatly barred by the economic loss rule, and cannot be presented to the jury.

## X. MOTION IN LIMINE NO. 10 TO EXCLUDE EVIDENCE, TESTIMONY, AND ARGUMENT REGARDING DEFENDANTS' POLICIES AND INVESTIGATION

### A. Introduction

Manley intends to introduce as evidence (1) internal MGM policies; (2) a third-party document concerning alcohol service; and (3) evidence criticizing Defendants' subsequent investigation of Manley's allegation that he was drugged, including an incomplete and inaccurate internal surveillance timeline. *See* Ex. 42 (TX138). Neither the policies nor the adequacy of Defendants' investigation is relevant to Manley's remaining claims for declaratory relief, negligence, unjust enrichment, and breach of the implied covenant of good faith and fair dealing. The timeline also risks confusing and misleading the jury through inaccurate timestamps and an incomplete account of the underlying footage. Defendants therefore seek to exclude this evidence and related testimony and argument.

### B. Argument

#### 1. The Policies Are Not Relevant To Manley's Negligence Claim.

Manley seeks to introduce two types of policies:

1. Defendants' policies relating to so-called "TTOs," which are temporary increases in patrons' credit limits, *see* Exs. 43 (TX012), 44 (TX013), 45 (TX100) ("TTO Policies"); and
2. Policies relating to alcohol service, including Defendants' policies, *see* Exs. 46 (TX011), 47 (TX130), and a third-party document, *see* Ex. 48 (TX145) (collectively, "Alcohol Policies," and together with the TTO Policies, "Policies").

Neither is relevant to Manley's negligence claim. In a negligence action, the defendant's conduct is judged against "an objective standard of care," not the defendant's own personal, "subjective" judgments about prudent behavior. *Parodi v. Washoe Med. Ctr., Inc.*, 892 P.2d 588, 591 (Nev. 1995). Courts in this District have therefore recognized that internal policies are irrelevant and inadmissible in negligence actions. "[W]hether Defendant adhered to its own

policies . . . is simply not relevant to whether it was negligent." *McConnell v. Wal-Mart Stores, Inc.*, 995 F. Supp. 2d 1164, 1169 (D. Nev. 2014) (granting a motion to exclude such evidence). "Adherence to insufficient policies will not exculpate a negligent defendant any more than nonadherence to sufficient policies will inculpate him." *Id.* And "[w]hether a defendant's actions in a particular instance are negligent does not at all depend upon his habits or personal guidelines for his own behavior." *Id.* Applying this principle, another court in this District held that "whether an employee followed his employer's policies leading up to or following an accident is irrelevant to a negligence claim." *Lologo v. Wal-Mart Stores, Inc.*, No. 2:13-CV-1493-GMN-PAL, 2016 WL 4084035, at *3, *7 (D. Nev. July 29, 2016) (granting a motion for "exclusion of evidence regarding [a defendant]'s policies and whether Defendants adhered to them").

This Court should do the same and exclude Defendants' Policies. The standard of care is determined by law, not Defendants' handbooks. Defendants' policies therefore have no tendency to increase or decrease the likelihood of a jury's breach determination and should be excluded under Rules 401 and 402 alone. The TTO Policies and the Alcohol Policies should be excluded for additional reasons, discussed below.

*(a) The TTO Policies Should Be Excluded For Additional Reasons.*

(i) <u>The TTO Policies Are Not Relevant To Manley's Negligence Claim.</u>

The TTO Policies would, at most, be relevant to a claim that Defendants negligently extended Manley too much credit. But Nevada's economic-loss rule squarely forecloses that negligence theory, as Defendants explain in Motion in Limine No. 9, *supra*. *See also* Dkt. No. 28 at 7 (holding economic-loss rule bars recovery of Manley's "gambling losses" in negligence). The TTO Policies are not even arguably relevant to Manley's cut hand, or the alleged "severe bruises, nausea, and grogginess" that he attributes to that injury. Dkt. No. 28 at 7.

(ii) <u>Any Probative Value Is Outweighed By The Obvious Prejudice.</u>

"Where the evidence is of very slight (if any) probative value," it is inadmissible under Rule 403, "if there's even a modest likelihood of unfair prejudice or a small risk of misleading the jury." *United States v. Hitt*, 981 F.2d 422, 424 (9th Cir. 1992). Courts routinely exclude policies

like these precisely because they have "little or no bearing on whether the [defendant] breached his duty of care," but "cause[] confusion" about what that duty entails. *See, e.g.*, *Thompson v. City of Chicago*, 472 F.3d 444, 456–57 (7th Cir. 2006) (affirming exclusion under Rule 403 while "assum[ing], without deciding, that the [internal policies] were relevant to the" plaintiff's claim).

Admitting Defendants' TTO Policies would create a serious risk of unfair prejudice because it could cause the jury to confuse the actual standard for breach of duty with Defendants' internal policies. The Court should exclude the TTO Policies on this basis as well.

*(b) The Alcohol Policies Should Be Excluded For Additional Reasons.*

Like the TTO Policies, the Alcohol Policies should be excluded for two additional reasons: any negligence theory based on overservice is foreclosed and the prejudice caused by admitting the policies would outweigh any slim probative value.

(i) <u>As This Court Has Already Found, Any Theory Of Over-Service Is Foreclosed.</u>

This Court has already held that Defendants "had no duty to stop serving Manley alcohol." Dkt. No. 28 at 5. Other cases involving similar claims against Defendants have reached the same conclusion: a plaintiff "cannot proceed" on "a negligence suit" that "seeks to recover gaming losses from his [game] play" by alleging that "MGM overserved him alcohol." *Mehta v. Victoria Partners*, No. 2:21-CV-01493-CDS-VCF, 2023 WL 205758, at *3–4 (D. Nev. Jan. 17, 2023). Because Manley cannot bring a negligence claim premised on overservice, Defendants' policies relating to alcohol service and overservice are irrelevant.

To be sure, this Court has not dismissed Manley's negligence claim insofar as it is premised on the general duty of care that Defendants owed him as "an invited guest and patron" or "an entrant" who cut his hand while playing blackjack. Dkt. No. 28 at 5. But the policies at issue here do not speak to those theories; instead they relate to how staff should treat patrons who are "visibly intoxicated," *see* Ex. 46 (TX011), or otherwise behaving erratically on account of their substance use, *see* Exs. 47 (TX130), 48 (TX145). And a negligence theory premised on Defendants' failure "to stop serving Manley alcohol once he had become visibly 'erratic'" is

precisely the one this Court previously rejected. Dkt. No. 28 at 5. Because Manley cannot seek to impose liability on Defendants for overservice of alcohol, the alcohol policies are not relevant.

(ii) The Alcohol Policies should be excluded under Rule 403.

As is true for the TTO Policies, admitting the Alcohol Policies would unfairly prejudice Defendants. The policies have "the capacity . . . to lure the factfinder into" judging MGM "on a ground different from proof specific to the" actual legal standard of care. *Old Chief v. United States*, 519 U.S. 172, 180 (1997).

**2. The Policies Are Not Relevant To Any Other Claim.**

Manley has three remaining claims, beyond negligence: declaratory relief; unjust enrichment; and breach of the implied covenant of good faith and fair dealing. The Policies are even more obviously irrelevant to those claims, which turn on factual questions about the night of the incident and days thereafter; in particular, whether (1) Manley was legally incapacitated such that he was unable to enter into a contract; (2) Defendants knew he was so incapacitated; (3) Manley failed to timely disclaim his contracts; and (4) Manley ratified the contracts by making partial payment of them.

The declaratory-relief claim turns on whether "Plaintiff was unable to understand in a reasonable manner the nature and consequence of his actions and the transactions," TAC ¶ 73(c). The unjust enrichment claim similarly hinges on whether Defendants "deposited Plaintiff's credit instruments despite being on express notice of Plaintiff's erratic behavior and incapacity." *Id.* ¶ 96. And Manley's good faith and fair dealing theory also turns on whether MGM "took advantage of Plaintiff's long history of gaming play at MGM properties," *id.* ¶ 101, by "permitting him to participate in gaming activity [while] engaging in erratic behavior indicating diminished capacity," *id.* ¶ 108. These are questions of fact that the Policies do not help answer. The Policies are therefore properly excluded under Rules 401 and 402.

**3. Evidence About the Adequacy of Defendants' Investigation Is Irrelevant, and the Surveillance Timeline Presents Additional Grounds for Exclusion.**

Manley also seeks to criticize Defendants' investigation of his assertion that he was drugged. As part of that effort, he has designated an internal surveillance timeline, *see* Ex. 42

(TX138), as a proposed trial exhibit and stated during the parties' meet-and-confer discussions that he intends to use it to show that Defendants' investigation was inadequate. Neither that collateral criticism nor the inaccurate timeline should be presented to the jury.

*(a) The adequacy of Defendants' investigation does not bear on Manley's surviving claims.*

Defendants' investigation is not relevant to any of Manley's claims. What Defendants did in the days and weeks *after* Manley allegedly consumed ketamine, *after* he lost millions gambling, and *after* he cut his hand says nothing at all about Manley's claims that Defendants did not properly address his hand injury, or that he was too incapacitated to enter into an agreement with Defendants. Indeed, all of Manley's claims turn on his, or Defendants', acts and state of mind on December 10 only.[20] Defendants' investigation thereafter is not relevant to any of those claims, and therefore should be excluded.

*(b) The internal surveillance timeline lacks an established foundation and risks misleading the jury.*

Beyond its irrelevance if offered to challenge the adequacy of MGM's investigation, the surveillance timeline should be excluded because it lacks an established foundation and risks misleading the jury. TX138 purports to summarize events captured by surveillance cameras on December 10, 2021, but provides an incomplete and inaccurate account of the underlying footage. The Court should therefore exclude the timeline for two additional reasons.

*First*, Manley cannot lay foundation for the timeline. Neither Vanessa Reboton nor Justin Manacher, Defendants' employees, had seen the timeline before her or his respective depositions. *See* Ex. 49 (Reboton Dep.) at 116:22–23; Ex. 50 (Manacher Dep.) at 79:17–20. Neither can establish from personal knowledge who prepared it or how its timestamps were derived. If Manley offers the timeline to suggest that Defendants failed to take his allegations seriously, he must also establish when it was prepared and how its errors bear on Defendants' response. Otherwise, the jury would be left to speculate about what those errors mean.

[20] Disaffirmance and ratification may require consideration of subsequent events, but those issues concern Manley's conduct and communications, not Defendants' investigation.

*Second*, the timeline's limited value as a summary is substantially outweighed by the risk that jurors will rely on incorrect timestamps or mistake its selective descriptions for an accurate, complete account of the surveillance footage. *See* Fed. R. Evid. 403. Admitting it alongside the videos would require the parties to spend trial time needlessly identifying and explaining its errors, when those errors offer no probative value in this case. The timeline should be excluded under Rule 403 because it risks confusing and misleading the jury.

**C. <u>Conclusion</u>**

Defendants respectfully request that the Court exclude the TTO Policies and Alcohol Policies identified above and preclude testimony and argument about them. Defendants further request that the Court exclude evidence, testimony, and argument about the adequacy of their post-incident investigation, including the internal surveillance timeline designated as TX138.

## XI. <u>MOTION IN LIMINE NO. 11 TO EXCLUDE EVIDENCE, TESTIMONY, OR ARGUMENT REGARDING ALLEGATIONS OF OTHER DRUGGING INCIDENTS AT MGM-AFFILIATED PROPERTIES</u>

**A. <u>Introduction</u>**

Manley seeks to put before the jury a collection of unverified allegations that other patrons were drugged at MGM-affiliated properties. The proposed evidence includes tips gathered after Manley offered a reward ("Tips") that purport to describe three unrelated drugging incidents; MGM reports documenting ten other patrons' allegations ("Incident Reports"); and deposition testimony from two patrons concerning one of those ten allegations ("Deposition Testimony," and collectively, "Past Alleged Incidents"). None of the alleged incidents involved the employee implicated by Manley or the MGM Mansion; only one even occurred at the MGM Grand. The only similarity between those allegations and this case is the general—and unsubstantiated—accusation that a patron was drugged. That is not enough to make them admissible. Manley cannot turn a trial about one drink prepared by one bartender into a referendum on every unverified drugging accusation he can associate with an MGM Resorts property.

*First*, any marginal probative value of the Past Alleged Incidents is substantially outweighed by the dangers of unfair prejudice, confusing the issues, undue delay, and wasting time. Manley would use these unrelated allegations to unfairly suggest that, because other patrons

accused employees at MGM-affiliated properties of drugging them, an MGM employee must have drugged him, too. Admitting the evidence would require Defendants to rebut numerous collateral allegations involving different properties, employees, circumstances, and alleged substances. The resulting series of mini-trials would consume substantial time while distracting the jury from the evidence concerning Manley's allegations.

*Second*, the Past Alleged Incidents are impermissible propensity evidence. Manley seeks to use unrelated accusations of misconduct at MGM Resorts-affiliated properties to suggest that one of Defendants' employees acted in conformity with an alleged practice of drugging patrons in this case. Rule 404 prohibits that inference.

*Third*, the Tips and Incident Reports are inadmissible hearsay. The Tips are out-of-court statements gathered by Manley for this litigation and offered to prove that the alleged druggings occurred. The Incident Reports likewise contain MGM Resorts personnel's accounts of patrons' accusations and therefore present hearsay within hearsay.

**B. <u>Background</u>**

Manley claims his first Old Fashioned at the MGM Grand on December 10, 2021, which bartender Koch prepared, was spiked with ketamine. In October 2023, nearly two years after the alleged incident, Manley solicited tips about his alleged drugging through a website offering a $500,000 reward. He retained Hal de Becker at De Becker Investigations, Inc. to receive any emails or telephone calls. de Becker received five emails through a reward website, but did not interview the senders, investigate their assertions, or provide the Tips to law enforcement. Ex. 51 (de Becker Dep.) at 36:1–38:23. When asked whether he thought the tips were credible, de Becker stated: "Credible as it relates to Mr. Manley's incident? I don't believe either one has anything to do with it." *Id.* at 37: 3–5.

Three of the Tips allege past incidents:

- **Incident #1 (Johnny Push, October 15, 2023).** Push claimed that a bartender named "Chris" drugged him on an unspecified June 10 while he was playing video poker at a sportsbook bar in Mandalay Bay. Push reported collapsing shortly after receiving a drink, having difficulty speaking, and later being unable to recall how he returned to his room. Ex. 52 (TX107).

REDACTED

- **Incident #2 (R. Limon, October 15, 2023).** Limon claimed that two individuals recognized from a reality-television program handed Limon a drugged drink at the Cosmopolitan in or around 2018. Among other things, Limon further alleged that, after leaving a job at Wynn and selling a Las Vegas home before moving to the Midwest, Limon believed unidentified actors at Wynn had interfered with the sale. Limon further relayed stories allegedly told to Limon's hairdresser that "cat tranquilizers" were used in drinks. *Id.* at 3–4.

- **Incident #3 (anonymous, October 16, 2023).** An anonymous sender from the email address "unknownmaster6612@proton.me" claiming to be a former hotel employee at an unspecified hotel asserted, without specifics, that unnamed hotel staff had drugged patrons "a few times" years earlier so the unnamed hotel could recover its losses. *Id.* at 4–5.

MGM also produced Incident Reports documenting allegations of drink-drugging at various MGM properties between 2016 and 2021:

- [redacted] Ex. 53 (TX010) at 1–3.
- [redacted] *Id.* at 5–8.
- [redacted] *Id.* at 9–12.
- [redacted] *Id.* at 13–18.
- [redacted] *Id.* at 19–25.
- [redacted] *Id.* at 26–34.
- [redacted] *Id.* at 35–38.
- [redacted] *Id.* at 39–48.
- [redacted]

REDACTED

[redacted] *Id.* at 49–59.

- [redacted] *Id.* at 60–66

[redacted] and [redacted] were each deposed regarding Incident #12, and Manley intends to play excerpts from those two depositions at trial. *See* Joint Pretrial Order at 28. In those excerpts, [redacted] and [redacted]. *See* Ex. 54 (designations and counter designations from [redacted] deposition); Ex. 55 (same as to the [redacted] deposition). Manley also intends to introduce additional MGM records regarding Incident #12. Exs. 56 (TX018), 57 (TX019), 58 (TX020).

**C. <u>Argument</u>**

The Court should exclude all evidence and argument concerning the Past Alleged Incidents for three reasons. *First*, the Past Alleged Incidents bear little resemblance to the events alleged here, and their minimal probative value is substantially outweighed by the dangers of unfair prejudice, confusing the issues, undue delay, and wasting time. *Second*, Manley seeks to invite the propensity inference that, because other patrons previously accused employees at MGM properties of drugging them, an employee must have drugged him as well. *Third*, the Tips and Incident Reports are hearsay without an exception.

**1. The Past Alleged Incidents Should Be Excluded Under Rule 403.**

Rule 403 permits the Court to exclude evidence when its probative value is substantially outweighed by the dangers of unfair prejudice, confusing the issues, misleading the jury, undue delay, or wasting time. Fed. R. Evid. 403. "Unfair prejudice is 'the possibility that the evidence will excite the jury to make a decision on the basis of a factor unrelated to the issues properly before it.'" *Heyne v. Caruso*, 69 F.3d 1475, 1481 (9th Cir. 1995) (citation omitted).

The Past Alleged Incidents present those dangers. *First*, the incidents bear little resemblance to Manley's allegations, yet would invite the jury to decide this case based on unrelated and unsubstantiated accusations against MGM. *Second*, admitting the evidence would require collateral mini-trials into each alleged incident, consuming substantial time and distracting

REDACTED

the jury from the facts properly at issue. Those risks substantially outweigh the evidence's minimum probative value.

*(a) The Past Alleged Incidents would create substantial unfair prejudice.*

Courts exclude evidence of unrelated incidents when factual differences leave the evidence with little probative value and create a substantial risk that the jury will treat the other allegations as evidence of propensity. *See, e.g.*, *Copart, Inc. v. Sparta Consulting, Inc.*, No. 2:14–CV–00046–KJM–CKD, 2018 WL 1871414, at *7–8 (E.D. Cal. Apr. 19, 2018) (excluding third-party disputes that would raise unrelated issues and risk being treated as propensity evidence); *Edmonds v. City of Los Angeles*, No. 2:21-cv-03149-FWS-ADS, 2023 WL 8119197, at *2 (C.D. Cal. Oct. 6, 2023) (granting motion in limine to exclude evidence of unrelated incidents because it "runs a substantial risk of unduly prejudicing the jury"); *see also Alexander v. Wal-Mart Stores, Inc.*, No. 2:11–CV–752 JCM (PAL), 2013 WL 427132, at *5 (D. Nev. Feb. 1, 2013) (excluding evidence of unrelated incidents because they were irrelevant).

The Past Alleged Incidents have no meaningful connection to Manley's claim. None involved Koch, the bartender who prepared Manley's Old Fashioned. None identified ketamine as the alleged substance. [redacted] The remaining allegations involve different properties, employees, settings, circumstances, and theories. Many did not involve gambling. In short, no common actor, method, substance, or other factual link connects these Past Alleged Incidents to Manley's claim that Koch put ketamine in his first Old Fashioned. The Past Alleged Incidents therefore have, at most, minimal probative value.

The reward-generated Tips are entirely attenuated. de Becker did not interview the senders or investigate their claims. *See* Ex. 51 (de Becker Dep.) at 37:10–38:4. Incident #1 concerns a different bartender at Mandalay Bay. *See* Ex. 52 (TX107) at 2. Incident #2 attributes an alleged drugging to individuals recognized from a reality-television program, accuses unidentified Wynn personnel of interfering with a home sale, and repeats a hairdresser's secondhand claim about "cat

tranquilizers." *Id.* at 3–4. Incident #3 is anonymous and identifies no property, employee, or alleged victim. *Id.* at 5. None provides any factual link to Koch or Manley's Old Fashioned. de Becker himself agreed, recognizing none "ha[ve] anything to do with" Manley's case. *See* Ex. 51 (de Becker Dep.) at 37: 3–5.

The Incident Reports fare no better. *See* Exs. 53 (TX010), 56 (TX018), 57 (TX019), 58 (TX020). The Incident Reports reflect a routine administrative function of casino security: receiving, documenting, and addressing patron complaints. MGM's decision to document an accusation does not mean that the accusation was substantiated. Indeed, several reports identify no suspected employee, while others describe circumstances suggesting alternative explanations. As to Incident #12, [redacted] and [redacted] Their later deposition testimony departs from their contemporaneous responses and adds detail about an allegation that nevertheless involves different patrons, a different bartender, and a different location.

The obvious danger is that the jury will treat the volume of accusations as corroboration, even though each remains unproven and is wholly disconnected from Manley's claim. Permitting Manley to parade thirteen inflammatory accusations before the jury would invite a verdict based on generalized suspicion of Defendants rather than evidence concerning Koch and Manley's drink.

*(b) The Past Alleged Incidents would require numerous mini-trials, confuse the issues, and waste the jury's time.*

Courts also exclude evidence of unrelated incidents when addressing them at trial would spawn collateral mini-trials, confuse the issues, and waste time. *See, e.g.*, *Grouse River Outfitters Ltd. v. Oracle Corp.*, No. 16-cv-02954-LB, 2019 WL 8918902, at *4 (N.D. Cal. June 21, 2019) ("[E]vidence of other lawsuits . . . is likely to confuse issues, mislead the jury, cause undue delay, and waste time because 'the evidence will spawn collateral mini-trials to disprove or rebut' the allegations made in those lawsuits." (citation omitted)); *Edmonds*, 2023 WL 8119197, at *2 (excluding evidence of unrelated incidents to avoid "a 'mini-trial' over irrelevant issues").

That would happen here. Manley proposes to present thirteen distinct allegations involving different patrons, properties, employees, dates, beverages, symptoms, and surrounding

circumstances. Fairly addressing the allegations would require Defendants to present rebuttal evidence and argument about matters such as each accuser's alcohol consumption, the handling of the drinks, contemporaneous witness accounts, surveillance footage, and alternative explanations for the reported symptoms.[21] The result would be a patchwork of collateral mini-trials centered on events with little bearing on Manley's claim, confusing the issues and wasting the jury's time.

The Court should exclude the Past Alleged Incidents because the resulting undue delay and waste of time would substantially outweigh their minimal probative value.

**2. The Past Alleged Incidents Are Inadmissible Propensity Evidence.**

Rule 404 prohibits evidence of a person's character or other acts when offered to prove that the person acted in conformity with that character on a particular occasion Fed. R. Evid. 404(a)(1), (b)(1). Other-act evidence may be admitted for a non-propensity purpose, such as proving motive, intent, plan, or knowledge. Fed. R. Evid. 404(b)(2). But the proponent must show, among other things, that the evidence tends to prove a material point and is "sufficient to support a finding that [the] defendant committed the other act." *United States v. Cherer*, 513 F.3d 1150, 1157 (9th Cir. 2008) (citation omitted). Courts exclude evidence of prior incidents under Rule 404 when those incidents have no material connection to the disputed issues and would invite a propensity inference. *See, e.g.*, *Copart, Inc.*, 2018 WL 1871414, at *7–8 (excluding unrelated third-party disputes because they risked being used as propensity evidence).

Manley seeks to use the Past Alleged Incidents for the propensity inference Rule 404 prohibits. By presenting accusations that other patrons were drugged at MGM-affiliated properties, Manley invites the jury to conclude that MGM or its employees have a propensity to drug patrons. The Tips in Incident #2 and Incident #3 make that explicit, asserting that patrons "will be roofied," that "they use cat tranquilizers in the drinks," and that drugging "is done by someone from the hotel staff." Ex. 52 (TX107) at 3–5. The Incident Reports and Deposition

---

[21] Some allegations, however, are so sparsely documented that such scrutiny may not be possible. That does not lessen the Rule 403 problem; it compounds it. The jury would hear a serious and inflammatory accusation without the information needed to evaluate its reliability, leaving Defendants to choose between allowing the accusation to go unanswered or spending trial time attempting to rebut a claim whose basic facts are unknown. That is unduly prejudicial.

Testimony advance the same propensity inference through repetition: because other patrons accused casino employees of drugging them, the jury should believe that Koch drugged Manley.

Nor do the Past Alleged Incidents serve a permissible purpose under Rule 404(b)(2). They prove no material issue concerning Manley's alleged drugging, including knowledge, motive, intent, plan, identity, or absence of mistake. Even if MGM's pre-incident knowledge were material, the Tips postdate the incident and were never received by MGM, while the Incident Reports show only that MGM received unsubstantiated complaints. None of those alleged incidents involved Koch, only one concerned the MGM Grand, and all arose under circumstances substantially different from those alleged here.

The Past Alleged Incidents serve only to portray MGM and its employees as the type of actors who drug casino patrons and to suggest that they acted in conformity with that supposed character here. Rule 404 prohibits that inference, and the Court should exclude the evidence.

**3. The Tips and Incident Reports Contain Inadmissible Hearsay.**

The Tips are straightforward hearsay. Fed. R. Evid. 801(c), 802. They are out-of-court written statements that Manley offers to prove the described druggings occurred or that casino employees engage in such conduct. *See* Ex. 52 (TX107) at 2–5. No exception applies. Incident #2 adds another hearsay layer because the sender repeats what a hairdresser allegedly heard from unidentified bartenders. *Id.* at 3–4. The Tips should be excluded under Rule 802.

The Incident Reports contain hearsay within hearsay and are likewise offered to prove that the alleged incidents occurred. *See* Exs. 53 (TX010), 56 (TX018), 57 (TX019), 58 (TX020). When a record contains another declarant's out-of-court statement, each layer must independently qualify as nonhearsay or satisfy a hearsay exception. Fed. R. Evid. 805; *see Pope v. Las Vegas Metro. Police Dep't*, No. 2:12–cv–01867–LDG (PAL), 2014 WL 1092263, at *6 (D. Nev. Mar. 18, 2014) (reasoning that hearsay statements do not qualify for an exception "merely because they are recorded in an 803(6) document").

The first layer of inadmissible hearsay is the reports created by MGM personnel. They are not opposing-party admissions that the alleged druggings occurred. MGM personnel merely documented accusations made by others; MGM did not adopt those accusations. The business-

records exception likewise does not make the reports admissible. That exception does not apply if "the source of information . . . indicate a lack of trustworthiness." Fed. R. Evid. 803(6)(E). The MGM personnel who prepared the reports generally lacked firsthand knowledge of the alleged druggings and instead recorded unverified third-party accounts. At most, the reports reliably establish that MGM received and recorded complaints—a fact irrelevant to whether Ms. Koch drugged Manley. The reports lack the trustworthiness necessary to establish that the complaints are true.

The second hearsay layer consists of the Incident Reports' quotations or summaries of statements by patrons and other third parties claiming that druggings occurred. Those out-of-court statements are offered for their truth and therefore are a separate layer of hearsay. They are not opposing-party statements because the declarants were not MGM employees, and they do not qualify as business records. Recording the statements in an MGM document does not make them admissible. *See Pope*, 2014 WL 1092263, at *6.

**D. <u>Conclusion</u>**

Defendants respectfully request that the Court exclude Manley's Exhibits TX010, TX018, TX019, TX020, and TX107 and preclude Manley from offering any other testimony, evidence, or argument regarding the Past Alleged Incidents.

## XII. <u>MOTION IN LIMINE NO. 12 TO EXCLUDE APPEALS TO JURORS' PERSONAL SAFETY AND OTHER "GOLDEN RULE" ARGUMENTS</u>

Defendants anticipate that Manley will ask jurors to consider whether they, their families, or others in the community could suffer similar harm to that alleged by Manley against Defendants. The Court should preclude any argument that invites jurors to decide this case based on fear for their own safety or a desire to protect others, rather than the evidence and the Court's instructions.

"Golden Rule" arguments ask jurors to place themselves in the plaintiff's position when determining damages. Such arguments have been "universally condemned" because they encourage jurors "to depart from neutrality and to decide the case on the basis of personal interest

and bias rather than on the evidence.'" *Forrestal v. Magendantz*, 848 F.2d 303, 309 (1st Cir. 1988) (citation omitted).

Manley need not expressly ask jurors to put themselves in Manley's shoes to violate the rule. Courts have condemned "send a message" arguments that ask jurors to decide a case on grounds other than the evidence. *See, e.g.*, *Grosjean v. Imperial Palace, Inc.*, 212 P.3d 1068, 1081–82 (Nev. 2009) (explaining that counsel improperly asks jurors to abandon their role by urging them to "send a message" rather than evaluate the evidence.); *Caudle v. District of Columbia*, 707 F.3d 354, 361 (D.C. Cir. 2013) (holding that a "send a message" argument was improper because it diverted jurors from deciding the case on the facts and the law). An appeal to the "conscience of the community" is likewise improper when it seeks an emotional verdict rather than a decision on the evidence. *See, e.g.*, *Westbrook v. Gen. Tire & Rubber Co*., 754 F2d 1233, 1238 (5th Cir. 1985) (condemning appeals intended to evoke community loyalty, duty, or expectation); *Arnold v. E. Air Lines, Inc.*, 681 F.2d 186, 199 (4th Cir.1982) (finding Golden Rule and sympathy appeals improper because they were irrelevant to the issues).

The jury must decide this case under the Court's instructions and on the evidence, not on appeals to fear for the safety of jurors or others. Evidence offered support such an emotional appeal is irrelevant and inadmissible under Rules 401 and 402, and even if it were relevant, its limited probative value is substantially outweighed by its unfair prejudice to Defendants under Rule 403. *See* Fed. R. Evid. 401, 402, 403. The Court should preclude Manley from:

1. Inviting jurors to place themselves or someone they know in the position of any party;
2. Asking jurors to "send a message" through their verdict;
3. Asking jurors to find Defendants liable based on an appeal to the "conscience of the community" or community loyalty, duty, or expectation;
4. Asking jurors to find Defendants liable to prevent similar incidents from happening in the future; and
5. Asking jurors to find Defendants liable as a punishment.

Defendants offered to agree to these same restrictions on a reciprocal basis in order to avoid bringing this motion. Manley refused, citing his pursuit of punitive damages,[22] but provided no further explanation and proposed no alternative language. *See* Ex. 30 (Nov. 9, 2026 Email from Ms. Jenny Robbins). But the potential availability of punitive *damages* does not warrant appeals to punishment or community protection as a basis for finding Defendants *liable*. Whether Defendants are liable must be determined under the applicable legal standards, regardless of whether punitive damages may ultimately be available.

These arguments would risk confusing the applicable legal standard and unfairly prejudicing Defendants. Defendants respectfully request that the Court preclude Manley from making the arguments identified above or offering evidence solely to support them.

DATED this 10th day of November, 2026.

SEMENZA RICKARD LAW

*/s/ Lawrence J. Semenza, III, Esq.*
Lawrence J. Semenza, III, Esq. (Bar No. 7174)
Katie L. Cannata, Esq. (Bar No. 14848)
10161 Park Run Drive, Suite 150
Las Vegas, Nevada 89145
-
MUNGER, TOLLES, & OLSON LLP
Bethany W. Kristovich, Esq. (*pro hac vice)*
John Schwab, Esq. (*pro hac vice)*
Graham J. Wyatt, Esq. (*pro hac vice*)
350 South Grand Avenue, Fiftieth Floor
Los Angeles, California 90071-3426

*Attorneys for Defendant MGM Resorts International & Defendant/Counterclaimant MGM Grand Hotel, LLC*

[22] Defendants' motion to strike Manley's request for punitive damages remains pending. *See* Dkt. No. 245.

## CERTIFICATE OF SERVICE

I am employed by the law firm of Semenza Rickard Law in Clark County, Nevada. I am over the age of 18 and not a party to this action. The business address is 10161 Park Run Drive, Suite 150, Las Vegas, Nevada 89145.

I hereby certify that on the 10th day of November 2026, I served the document(s), described as:

**DEFENDANTS' CONSOLIDATED MOTIONS IN LIMINE NOS. 1–12**

☒ by placing the ☐ original ☒ a true copy thereof enclosed/attached and delivered:

☒ a. via **ECF System** *(You must attach the "Notice of Electronic Filing", or list all persons and addresses and attach additional paper if necessary)*

**PRHLAW LLC**
Charles H. McCrea, charles@prhlawllc.com, tlc@hmlawlv.com
Paul R. Hejmanowski, paul@prhlawllc.com, tc@hmlawlv.com
-
**MADEL PA**
Christopher W. Madel, Esq. (*pro hac vice*), cmadel@madellaw.com
Jennifer M. Robbins, Esq. (*pro hac vice*), jmrobbins@madellaw.com, 6815994420@filings.docketbird.com, madelpafile@madellaw.com
*Attorneys for Plaintiff*

☐ b. **BY U.S. MAIL.** I deposited such envelope in the mail at Las Vegas, Nevada. The envelope(s) were mailed with postage thereon fully prepaid. I am readily familiar with Semenza Rickard Law's practice of collection and processing correspondence for mailing. Under that practice, documents are deposited with the U.S. Postal Service on the same day which is stated in the proof of service, with postage fully prepaid at Las Vegas, Nevada in the ordinary course of business. I am aware that on motion of party served, service is presumed invalid if the postal cancellation date or postage meter date is more than one day after the date stated in this proof of service.

☐ c. **BY PERSONAL SERVICE.**

☐ d. **BY DIRECT EMAIL**

☐ e. **BY FACSIMILE TRANSMISSION.**

I declare under penalty of perjury that the foregoing is true and correct.

*/s/ Olivia A. Kelly*
An Employee of Semenza Rickard Law